# EXHIBIT A

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | |
|---|---|
| SHAWN L. THOMAS AND CHARLES GEOFFREY WOODS on behalf of themselves and all others similarly situated, | |
| PLAINTIFFS, | Case No. _____ |
| v. | **CLASS ACTION COMPLAINT** |
| KENVUE, INC., MCNEIL CONSUMER HEALTHCARE, PROCTOR & GAMBLE CO., BAYER CORPORATION, and BAYER HEALTHCARE LLC | **JURY TRIAL DEMANDED** |
| DEFENDANTS. | |

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................... 1

PARTIES ................................................................................................................... 2

    A.    Plaintiffs ...................................................................................... 2

    B.    Defendants .................................................................................. 3

JURISDICTION AND VENUE .............................................................................. 4

FACTUAL ALLEGATIONS ................................................................................... 5

    A.    The Substantial Market for Decongestion Products and Pivot to PE ................. 5

    B.    Defendants Have Long Known that Their PE Products Are Ineffective ............ 6

    C.    Defendants Fraudulently Marketed Their PE Products as Effective in Treating Congestion ............................................................. 9

TOLLING OF THE STATUTE OF LIMITATIONS .......................................... 12

    A.    Discovery Rule Tolling ............................................................ 12

    B.    Fraudulent Concealment Tolling ............................................ 13

CLASS ACTION ALLEGATIONS ...................................................................... 13

CAUSES OF ACTION .......................................................................................... 16

PRAYER FOR RELIEF ........................................................................................ 27

JURY DEMAND .................................................................................................... 27

Plaintiffs Shawn L. Thomas and Charles Geoffrey Woods ("Plaintiffs"), by and through their undersigned counsel, bring this action individually and on behalf of all others similarly situated, who paid for nasal decongestant drugs containing phenylephrine ("PE") that were fraudulently marketed as effective for treating nasal congestion by Defendants Kenvue, Inc. ("Kenvue"), McNeil Consumer Healthcare ("McNeil"), The Procter & Gamble Company ("P&G"), Bayer Corporation and Bayer Healthcare LLC (together with Bayer Corporation "Bayer" and collectively, with the other defendants, the "Defendants").

## INTRODUCTION

1.      For over a decade, Defendants knowingly sold products containing a drug, PE, that is ineffective at treating congestion to unsuspecting American consumers who thought they were purchasing decongestant products. Defendants—who were aware of clinical trials which revealed the ineffectiveness of PE in treating congestion—have known that PE is entirely ineffective at treating nasal congestion via oral administration for years. Nonetheless, Defendants continued to fraudulently market their products as effective for treating congestion. As a result, consumers have overpaid for products manufactured and sold by Defendants, which were fraudulently marketed as effective decongestants.

2.      Medications that are widely popular household staples for treating colds and the flu are implicated in this action, including, without limitation: Sudafed PE (Kenvue), Benadryl Allergy Plus Congestion (Kenvue), Tylenol Cold + Flu products (Kenvue), Benylin Cold & Flu (Kenvue), Codral Cold & Flu (Kenvue), Children's Benadryl Allergy Plus Congestion (Kenvue), DayQuil and NyQuil products (P&G), DayQuil and NyQuil VapoCool (P&G), Sinex Severe (P&G), Vicks Children's Multi-Symptom Cold Relief From Cough, Sore Throat & Fever Medicine (P&G), and Alka-Seltzer Plus (Bayer) (collectively, the "PE Products").

3.      Defendants manufacture, design, test, promote, advertise, market, distribute, and sell the PE Products for the supposed treatment of congestion, and, for years, Defendants have sold these PE Products to thousands of Americans who purchased these products with the understanding that they will relieve their nasal congestion. Yet, in truth, as Defendants have long been aware, the PE Products do not relieve nasal congestion, and thus Defendants have made billions of dollars on the fraudulent sale of products that are "no better than a dummy pill" in treating congestion.[1]

4.      Had Plaintiffs and members of the Classes known, as Defendants did, that the PE Products were ineffective at treating nasal congestion they would not have purchased, or would have paid substantially less for the PE Products.

5.      Accordingly, Plaintiffs, on behalf of themselves and members of the Classes, seek to hold Defendants liable for their fraudulent conduct and breaches of warranties and demand judgment against Defendants.

**PARTIES**

**A.      Plaintiffs**

6.      Plaintiff Shawn L. Thomas is a citizen and resident of Brooklyn, New York. During the class period, Plaintiff Thomas paid money for Defendants' PE Products to treat congestion. Specifically, Plaintiff Thomas purchased several of Defendant P&G's PE Products (specifically, DayQuil and NyQuil Cold & Flu), several of Defendants Kenvue and McNeil's PE Products (specifically, Children's Benadryl Allergy Plus Congestion, Benadryl Allergy Plus Congestion and Benylin Cold & Flu), and several of Defendant Bayer's PE Products (specifically, Alka-Seltzer Plus).

---

[1] Matthew Perrone, *Popular nasal decongestant doesn't actually relieve congestion, FDA experts say*, L.A. Times (Sept. 12, 2023, 2:40 pm), https://www.latimes.com/science/story/2023-09-12/nasal-decongestant-doesnt-relieve-congestion-fda-experts-say.

Had Plaintiff Thomas known that the PE Products were ineffective at treating congestion at the time of purchase, he would not have paid for Defendants' PE Products or would have paid less.

7.      Plaintiff Charles Geoffrey Woods is a citizen and resident of West Deptford, New Jersey. During the class period, Plaintiff Woods paid money for Defendants' PE Products to treat congestion. Specifically, Plaintiff Woods purchased several of Defendant P&G's PE Products (specifically, DayQuil and NyQuil Cold & Flu).  Had Plaintiff Woods known that the PE Products were ineffective at treating congestion at the time of purchase, he would not have paid for Defendants' PE Products or would have paid less.

**B.      Defendants**

8.      Defendant Kenvue Inc. is an American consumer health company, and formerly the consumer healthcare division of Johnson & Johnson ("J&J"), with its headquarters located in Skillman, New Jersey. On information and belief, all assets and liabilities associated with the PE Products that had been manufactured, marketed, and/or sold by Johnson & Johnson were transferred to Defendant Kenvue. These PE Products, include but are not limited to, Benadryl Allergy Plus Congestion, Benylin Cold & Flu, Children's Benadryl Allergy Plus Congestion, Codral Cold & Flu, Sudafed PE, and Tylenol Cold + Flu products.

9.      Defendant McNeil Consumer Healthcare is a Pennsylvania corporation with its headquarters located in the Fort Washington, Pennsylvania. Defendant McNeil is wholly owned by Defendant Kenvue. Defendant McNeil is engaged in the business of manufacturing, marketing, testing, promoting, selling, and/or distributing the PE Products owned by Defendant Kenvue.

10.     Defendant The Procter & Gamble Company is an Ohio corporation with its headquarters located in Cincinnati, Ohio. At all times relevant to this complaint, Defendant P&G was engaged in the business of manufacturing, marketing, testing, promoting, selling, and/or distributing certain of the PE Products, including but not limited to, DayQuil and NyQuil products, DayQuil and

NyQuil VapoCool, Sinex Severe, and Vicks Children's Multi-Symptom Cold Relief From Cough, Sore Throat & Fever Medicine.

11.     Defendant Bayer Corporation, is an Indiana corporation with a principal place of business in Whippany, New Jersey. At all times relevant to this complaint, Defendant Bayer Corporation was engaged in the business of manufacturing, marketing, testing, promoting, selling, and/or distributing certain of the PE Products, including but not limited to, Alka-Seltzer Plus.

12.     Defendant Bayer Healthcare LLC is a Delaware limited liability corporation with its headquarters in Whippany, New Jersey. At all times relevant to this complaint, Bayer Healthcare LLC was engaged in the business of manufacturing, marketing, testing, promoting, selling, and/or distributing certain of the PE Products, including but not limited to, Alka-Seltzer Plus.

## JURISDICTION AND VENUE

13.     This Court has original jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d), because (a) at least one member of the proposed class is a citizen of a state different from that of each Defendant, (b) the amount in controversy exceeds $5,000,000, exclusive of interest and costs, (c) the proposed class consists of more than 100 class members, and (d) none of the exceptions under the subsection apply to this action.

14.     Each Defendant is subject to the personal jurisdiction of this Court because the Defendants conduct business within this state, maintain and carry out continuous and systematic contacts within this state and this judicial District, regularly transacts business within this state and this judicial District, and regularly avails themselves of the benefits of their presence in this state and this judicial District. Additionally, Defendants Kenvue and Bayer have a principal place of business in this District.

15.     Venue is proper in this District because the claims alleged in this action accrued in this District and each Defendant regularly transacts its affairs in this District. Additionally, Defendants Kenvue and Bayer have a principal place of business in this District.

**FACTUAL ALLEGATIONS**

A.     **The Substantial Market for Decongestion Products and Pivot to PE**

16.     The market for oral decongestants is an incredibly lucrative $2.2 billion market. Historically, manufacturers of oral decongestants used pseudoephedrine as the drug in products marketed to relieve nasal congestion. However, pseudoephedrine can be illegally used to process methamphetamine. Due to this illicit use of pseudoephedrine, in 2006, a federal law required drugs containing pseudoephedrine to be moved behind pharmacy counters. These products containing pseudoephedrine are usually in locked containers behind the pharmacy counter, consumers are limited in the amount that they can purchase, and purchasers are often required to provide personal identification and other information to track the amount of the substance being purchased. Moreover, while products containing pseudoephedrine can still be purchased from pharmacist, it has become "increasingly difficult to obtain them from grocery, discount, and convenience stores."[2]

17.     Accordingly, as a natural consequence of this change in how decongestants containing pseudoephedrine may be sold, it became harder for consumers to purchase these products and Defendants therefore sold fewer of these nasal decongestant products. Indeed, today products containing pseudoephedrine "account for about one-fifth of the $2.2 billion market for oral decongestants."[3]

---

[2] Leslie Hendeles, PharmD and Randy C. Hatton, PharmD, *Oral phenylephrine: An ineffective replacement for pseudoephedrine?*, J. of Allergy & Clinical Immunology (May 1, 2006), https://www.jacionline.org/article/S0091-6749(06)00633-6/fulltext#bib5.
[3] Matthew Perrone, *supra* note 1.

5

18.     Upon information and belief, in order to continue selling large quantities of nasal decongestant products after products containing pseudoephedrine were moved behind pharmacy counters, Defendants began manufacturing and selling the PE Products which use PE instead of pseudoephedrine as the alleged decongestant drug in the products despite knowing that PE is not an effective nasal decongestant.

19.     Sales of products containing PE have come to dominate the decongestant product market accounting for nearly $1.8 billion in sales last year alone.[4]

**B.     Defendants Have Long Known that Their PE Products Are Ineffective**

20.     Defendants have known for years that orally administered PE is ineffective for treating congestion.

21.     Indeed, in 2006, at the same time that Defendants were shifting towards sales of the PE Products, scientist were reporting that "[PE]…is unlikely to provide relief of nasal congestion."[5] This was further confirmed by industry studies.

22.     For instance, prior to December 2007, Schering-Plough Corporation and Schering-Plough/Merck Pharmaceuticals (SPM), conducted two randomized placebo-controlled studies "to examine the effects of [PE] on the symptoms of allergic rhinitis – especially the congestion component."[6] One of these studies showed that PE "was not significantly different from placebo in the primary endpoint, decreasing nasal congestion scores" while the other demonstrated that "[t]here were no significant differences between PE and placebo."[7]

---

[4] Christina Jewett and Roni Caryn Rabin, *A Decongestant in Cold Medicines Doesn't Work at All, an F.D.A. Panel Says*, N.Y. Times (Sept. 12, 2023), https://www.nytimes.com/2023/09/12/health/cold-medicine-decongestant-fda.html.

[5] Leslie Hendeles, PharmD and Randy C. Hatton, PharmD, *supra* note 2.

[6] https://wayback.archive-it.org/7993/20170405052523/https://www.fda.gov/ohrms/dockets/ac/07/briefing/2007-4335b1-02-Schering-Plough-Merck.pdf

[7] *The Effects of Phenylephrine on the Symptoms of Allergic Rhinitis* at 2, (Nov. 20, 2007),

23.     Then, between March and June of 2011, Merck funded a clinical study titled: "A Randomized, Dose-ranging, Placebo-controlled Trial to Evaluate the Effects of Phenylephrine HCl Immediate Release Tablets on Nasal Congestion in Subjects With Seasonal Allergic Rhinitis" (the "First 2011 Study").[8] Importantly, Defendant P&G purchased Merck's consumer health division in 2018.[9]

24.     Upon information and belief, Defendant Bayer was the Sponsor of the First 2011 Study. As the Sponsor of the study, Bayer initiated the study and had authority and control over the study.[10]

25.     The First 2011 Study was "of high quality . . . and accurately portrays the treatment effect of orally administered . . .  PE."[11] The results of this high-quality study were clear: "[n]one of the active treatment groups had a statistically significant change from baseline in reflective nasal congestion scores compared to placebo."[12] In other words, the First 2011 Study "showed no statistically meaningful difference between the [group taking a product with PE] and placebo treatment groups."[13]

26.     Tellingly, the First 2011 Study was cited in a later publication which asserts that the 2011 Study results show that "[n]one of the PE . . .  treatment groups had a statistically significant

---

https://wayback.archive-it.org/7993/20170405052523/https://www.fda.gov/ohrms/dockets/ac/07/briefing/2007-4335b1-02-Schering-Plough-Merck.pdf.

[8] *Effects of Phenylephrine on Nasal Congestion in Participants With Seasonal Allergic Rhinitis*, Bayer (Mar. 11, 2015), https://clinicaltrials.gov/study/NCT01330017.

[9] Press Release, *P&G Acquires the Consumer Health Business of Merck KGaA, Darmstadt, Germany*, (Apr. 19, 2018), https://www.sec.gov/Archives/edgar/data/80424/000080424180000029/merckpressrelease.htm.

[10] *Effects of Phenylephrine on Nasal Congestion in Participants With Seasonal Allergic Rhinitis*, *supra* note 8.

[11]     *Efficacy of Oral Phenylephrine as a Nasal Decongestant* at 47, FDA, https://www.fda.gov/media/171915/download, last visited (Sept. 21, 2023).

[12] *Id.* at 46.

[13] *Id.* at 49.

change from baseline in instantaneous or reflective nasal congestion scores compared with the placebo group"[14]

27.     Merck and Bayer, and others in the industry like all Defendants, received additional confirmation of the ineffectiveness of PE at treating congestion in another clinical trial which was conducted between August and October 2011.

28.     This additional study is titled: "A Randomized, Placebo-Controlled Trial to Evaluate the Effects of Phenylephrine HCl 30 mg Extended-Release Tablets on Nasal Congestion in Subjects With Allergic Rhinitis" (the "Second 2011 Study").[15]

29.     The Second 2011 Study was also funded by Merck and Bayer was once again the Sponsor of the study. Just like the First 2011 Study, as the Sponsor of the Second 2011 Study, Bayer initiated the study and had authority and control over the study.[16]

30.     Once again, the Second 2011 Study "provides high-quality . . . evidence" regarding the effectiveness of orally administered PE and "[t]he primary efficacy results . . . showed no statistically meaningful difference between the active and placebo treatment groups."[17] Simply put, the Second 2011 Study "provides substantive evidence that PE is not effective as an orally administered decongestant."[18]

31.     Despite Defendants having knowledge of the ineffectiveness of PE at treating congestion, based on, *inter alia*, the First 2011 Study, the Second 2011 Study, previous industry

---

[14] Eli O. Meltzer, Paul H. Ratner, Thomas McGraw, *Oral Phenylephrine HCl for Nasal Congestion in Seasonal Allergic Rhinitis: A Randomized*, J. of Allergy & Clinical Immunology (July 2, 2015), https://pubmed.ncbi.nlm.nih.gov/26143019.
[15] *Effects of Phenylephrine Extended-Release Tablets on Allergy-Related Nasal Congestion*, Bayer (Mar. 11, 2023), https://clinicaltrials.gov/study/NCT01413958.
[16] *Effects of Phenylephrine on Nasal Congestion in Participants With Seasonal Allergic Rhinitis*, *supra* note 8.
[17] *Efficacy of Oral Phenylephrine as a Nasal Decongestant* at 49-50, *supra* note 11.
[18] *Id.* at 48.

studies, and reports in the pharmaceutical community regarding the ineffectiveness of PE, they continued to fraudulently market and sell the PE Products to unsuspecting consumers for the purpose of treating congestion for over a decade.

32.     Moreover, "during the 2017 to 2018 cold season" J&J (which Defendant Kenvue was part of until this year) conducted a randomized, double-blind placebo controlled clinical trial to evaluate the effectiveness of products which orally administer PE (the "J&J Study").[19]

33.     The J&J Study was "conducted in subjects with colds" and, like previous studies, showed "no beneficial effect of . . . PE treatment [for congestion] when compared with placebo."[20]

34.      Nonetheless, despite this additional confirmatory evidence that orally administered PE is ineffective at treating congestion, J&J, the predecessor in interest to the newly spun-off Kenvue, through its subsidiary Defendant McNeil, and the other Defendants, continued to sell the PE Products.

35.     Upon information and belief, all Defendants are manufacturers, distributors, and marketers of the PE Products, were aware of these numerous studies demonstrating that PE is ineffective as a nasal decongestant. Yet, for years, Defendants persisted in selling the PE Products which they knew could not treat congestion to unsuspecting consumers who believed Defendants' public assertions that the PE Products were effective decongestants.

**C.    Defendants Fraudulently Marketed Their PE Products as Effective in Treating Congestion**

36.     Each Defendant fraudulently marketed its PE Products as effective decongestants despite knowing that the PE Products were actually no better than a placebo at treating congestion.

---

[19] *Id.* at 51.
[20] *Id.* at 51, 53.

37.     For example, J&J (the predecessor in interest to Defendant Kenvue) touted its PE Products' effectiveness at treating nasal congestion asserting that Sudafed PE "provides maximum-strength . . . nasal congestion relief" and "relieves sinus congestion."



38.     J&J's representations on its website and other advertisements and promotions, were false and misleading. Contrary to J&J's statements, and undisclosed by J&J, PE was not effective for treating nasal congestion.

39.     Additionally, Defendant P&G markets its PE Products as effective for treating nasal congestion. For instance, P&G asserts that DayQuil and NyQuil "provide fast, powerful relief for your worst cold and flu symptoms" which a reasonable consumer would believe includes congestion and further asserts that DayQuil will "help relieve . . . nasal congestion."



40.     P&G further emphasized its drugs' effectiveness stating that DayQuil provides "relief" for "sinus congestion."



41.     Given PE's ineffectiveness in treating congestion when administered orally, P&G's representations on its website, and other advertisements and promotions, were materially false and

misleading. Contrary to P&G's representations, and undisclosed by P&G, PE was not effective at all for treating nasal congestion.

42.    Furthermore, Defendant Bayer marketed its own PE Products' effectiveness at treating nasal congestion. For example, Bayer asserted that its Alka-Seltzer Plus product provided "effective relief" for "nasal congestion."



**ALKA-SELTZER PLUS® MAXIMUM STRENGTH DAY & NIGHT COLD & FLU LIQUID GELS**

★★★★★  4.6 (243)   Write a review

When you need daytime and nighttime relief from your cold or flu symptoms — so you can tackle the next day — turn to Alka-Seltzer Plus® Maximum Strength Day & Night Cold & Flu Liquid Gels for fast, effective relief. In one convenient package you get:

**DAYTIME RELIEF FROM:**

- Nasal congestion
- Cough
- Headache and body ache
- Sore throat
- Sinus pressure
- Fever

43.    At all times, P&G, Kenvue, McNeil and Bayer each asserted that their respective PE Products were effective for treating nasal congestion, and warranted the products were merchantable and fit for this purpose.

<strong><u>TOLLING OF THE STATUTE OF LIMITATIONS</u></strong>

**A.    Discovery Rule Tolling**

44.    As a result of the acts and omissions of Defendants, Plaintiffs could not have discovered, through the exercise of reasonable due diligence, that PE in the PE Products was ineffective at treating congestion. Thus, the applicable limitations periods did not begin to accrue until Plaintiffs discovered, or through the exercise of reasonable diligence should have discovered, Defendants' wrongful acts and omissions.

## B.    Fraudulent Concealment Tolling

45.    All applicable statutes of limitation have also been tolled by Defendants' knowing and active fraudulent concealment and misrepresentations about the effectiveness of PE and the PE Products throughout the time period relevant to this action.

46.    Defendants are under a continuing duty to disclose the true character, quality, efficacy, safety issues, and safety concerns of PE and the PE Products to its users, including Plaintiffs specifically. To date, Defendants have nevertheless failed to adequately and fully inform consumers about these matters, as discussed above.

47.    Plaintiffs reasonably relied upon Defendants' knowing active concealment when Plaintiffs—and thousands of similarly-situated American consumers—purchased the PE Products based on the representations and advertisements touting the effectiveness of such products in the treatment of congestion and other associated cold and flu symptoms.

48.    Because Defendants actively concealed the true facts about the ineffectiveness of PE and the PE Products, they are estopped from relying on any statutes of limitations defense.

## <u>CLASS ACTION ALLEGATIONS</u>

49.    Plaintiffs bring this action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(2) and/or (b)(3) on behalf of the following Class and Subclasses:

> **Nationwide class**: All persons within the United States who purchased the PE Products manufactured by Defendants in the United States (the "Nationwide Class").

> **New York Subclass**: All persons who purchased the PE Products manufactured by Defendants in New York (the "New York Subclass").

> **New Jersey Subclass**: All persons who purchased the PE Products manufactured by Defendants in New Jersey (the "New Jersey Subclass") (collectively with the New York SubClass, the "Subclasses")

50.    Excluded from the Class and Subclasses are Defendants and their parents, subsidiaries and corporate affiliates. Plaintiffs reserve the right to revise the definition of the Class and Subclasses

based upon subsequently discovered information and reserve the right to establish additional subclasses where appropriate. The Class and Subclasses are collectively referred to herein as the "Classes."

51.     The Classes are so numerous that joinder of all members is impracticable. Plaintiffs believe that there are at least thousands of proposed members of the Classes throughout the United States.

52.     Common questions of law and fact exist as to all members of the Classes and predominate over any issues solely affecting individual members of the Classes. The common and predominating questions of law and fact include, but are not limited to:

     a.  Whether Defendants knew that PE was ineffective at treating congestion;

     b.  Whether Defendants failed to disclose that their PE Products did not effectively treat congestion;

     c.  Whether Defendants deceptively marketed and sold their PE Products as effective at treating congestion;

     d.  Whether Defendants have engaged and continue to engage in unfair, fraudulent, or unlawful business practices;

     e.  Whether Defendants' conduct was committed knowingly and/or intentionally;

     f.  Whether Defendants violated the New Jersey Consumer Fraud Act § 56:8-1;

     g.  Whether Defendants violated the New York General Business Law § 349;

     h.  Whether Defendants' conduct constitutes violation of the laws asserted herein;

     i.  Whether members of the Classes overpaid for Defendants' PE Products;

j. Whether Defendants were unjustly enriched by their conduct;

k. Whether, as a result of Defendants' misconduct as alleged herein, Plaintiffs and members of the Classes are entitled to restitution, injunctive and/or monetary relief and, if so, the amount and nature of such relief.

53.     Plaintiffs' claims are typical of the claims of the Classes Plaintiffs seek to represent. As alleged herein, Plaintiffs and the Classes sustained damages arising out of the same unlawful actions and conduct by Defendants.

54.     Plaintiffs are willing and prepared to serve the Classes in a representative capacity with all of the obligations and duties material thereto. Plaintiffs will fairly and adequately protect the interests of the Classes and have no interests adverse to or in conflict with the interests of the other members of the Classes.

55.      Plaintiffs' interests are co-extensive with and are not antagonistic to those of absent members within the Classes. Plaintiffs will undertake to represent and protect the interests of absent members within the Classes and will vigorously prosecute this action.

56.     Plaintiffs have engaged the services of the undersigned counsel. Counsel is experienced in complex litigation, will adequately prosecute this action and will assert and protect the rights of, and otherwise represent, Plaintiffs and absent members of the Classes.

57.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Plaintiffs know of no difficulty to be encountered in the management of this litigation that would preclude its maintenance as a class action.

58.     Class action status is warranted under Rule 23(b)(3) because questions of law or fact common to the members of the Classes predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

59.     The Classes may also be certified under Rule 23(b)(2) because Defendants have acted on grounds generally applicable to the Classes, thereby making it appropriate to award final injunctive relief or corresponding declaratory relief with respect to the Classes.

60.     The interest of members within the Classes in individually controlling the prosecution of separate actions is theoretical and not practical. The Classes have a high degree of similarity and are cohesive, and Plaintiffs anticipate no difficulty in the management of this matter as a class action.

61.     The nature of notice to the proposed Classes is contemplated to be by direct mail upon certification of the Classes or, if such notice is not practicable, by the best notice practicable under the circumstance including, *inter alia*, email, publication in major newspapers and/or on the internet.

## CAUSES OF ACTION

### COUNT I
### Fraud By Omission or Concealment
### On behalf of Plaintiffs and the Nationwide Class or alternatively on behalf of the Subclasses against all Defendants

62.     Plaintiffs reallege and incorporate the allegations made above as if fully set forth below.

63.     Plaintiffs bring this claim individually and on behalf of the Nationwide Class, or in the alternative, the Subclasses.

64.     Defendants intentionally and knowingly concealed, suppressed, and/or omitted material facts including the fact that PE is ineffective at treating congestion, with the intent that Plaintiffs and members of the Classes rely on Defendants' omissions. As a direct result of Defendants' fraudulent conduct, Plaintiffs and members of the Classes have suffered actual damages.

65.     Defendants knew (at the time Plaintiffs and members of the Classes purchased PE Products) that the PE Products were ineffective at treating congestion and concealed this fact. To

date, Defendants have not provided Plaintiffs and members of the Classes with a remedy for their purchase of products that did not work as Defendants claim they would.

66.     At all relevant times, Defendants had the duty and obligation to disclose to Plaintiffs and the members of the Classes the facts concerning the ineffectiveness of PE and the PE Products at treating congestion because Defendants possessed superior and exclusive knowledge regarding the ineffectiveness of PE. Instead, Defendants aggressively (and falsely) advertised the effectiveness of PE and the PE Products, despite the fact that each Defendant knew that PE and the PE Products were entirely ineffective against congestion that the PE Products were advertised to treat.

67.     The fact that the PE Products could not treat congestion was material to Plaintiffs and members of the Classes because Plaintiffs and members of the Classes had a reasonable expectation that the PE Products would treat congestion. No reasonable consumer expects to purchase a product which is marketed as treating congestion that is actually no better at treating congestion than a placebo.

68.     Plaintiffs and members of the Classes would not have purchased the PE Products but for Defendants' omissions and concealment of material facts concerning the nature of the PE Products or would have paid less for the PE Products.

69.     Defendants knew their concealment and suppression of material facts was false and misleading and knew the effect of concealing those material facts. Defendants knew their concealment and suppression of the fact that the PE Products do not effectively provide relief from congestion would sell more PE Products. Further, Defendants intended to induce Plaintiffs and members of the Classes into purchasing the PE Products.

70.     Defendants acted with malice, oppression and fraud.

71.     Plaintiffs and members of the Classes reasonably relied on Defendants' knowing concealment and omissions. As a direct and proximate result of Defendants' omissions and active

concealment of material facts concerning the PE Products, Plaintiffs and members of the Classes suffered actual damages, including the overpayment of money to purchase the PE Products which Defendants knew were ineffective for their advertised purpose, in an amount to be determined at trial.

## COUNT II
### Breach Of Implied Warranty of Merchantability
On behalf of Plaintiffs against and the Nationwide Class or alternatively on behalf of the Subclasses against all Defendants

72.     Plaintiffs re-allege and incorporate the preceding paragraphs as if fully set forth herein.

73.     Plaintiffs bring this claim individually and on behalf of the Nationwide Class, or in the alternative, the Subclasses.

74.     At all times relevant all fifty States and the District of Columbia and Puerto Rico have codified and adopted the provisions of the Uniform Commercial Code governing the implied warranty of merchantability and fitness for ordinary purpose: Ala. Code § 7-2-314; Alaska Stat. § 45.02.314; Ariz. Rev. Stat. Ann. § 47-2314; Ark. Code. Ann. § 4-2-314; Cal. Com. Code § 2314; Colo. Rev. Stat. § 4-2-314; Conn. Gen. Stat. Ann. § 42a-2-314; 6 Del. Code. § 2-314; D.C. Code. § 28:2-314; Fla. Stat. Ann. § 672.314; Ga. Code. Ann. § 11-2-314; Haw. Rev. Stat. § 490:2-314; Idaho Code § 28-2-314; 810 Ill. Comp. Stat. Ann. 5/2-314; Kan. Stat. Ann. § 84-2-314; Ky. Rev. Stat. Ann. § 355.2-314; La. Civ. Code Ann. art. § 2520; 11 Me. Rev. Stat. Ann. tit. § 2-314; Md. Code. Ann. § 2-314; Mass. Gen. Law ch. 106 § 2-314; Mich. Comp. Laws Ann. § 440.2314; Minn. Stat. Ann. § 336.2-314; Miss. Code Ann. § 75-2-314; Mo. Rev. Stat. § 400.2-314; Mont. Code Ann. § 30-2-314; Nev. Rev. Stat. Ann. § 104.2314; N.H. Rev. Stat. Ann. § 382-A:2-314; N.J. Stat. Ann. § 12A:2-314; N.M. Stat. Ann. § 55-2-314; N.Y. U.C.C. Law § 2-314; N.C. Gen. Stat. Ann. § 25-2-314; N.D. Cent. Code Ann. § 41-02-314; Ohio Rev. Code Ann. § 1302.27; Okla. Stat. tit. 12A § 2-314; Or. Rev. Stat. § 72.3140; 13 Pa. Cons. Stat. § 2314; P.R. Laws. Ann. Tit. 31, § 3841, et seq.; R.I. Gen. Laws § 6A-2-

314; S.C. Code Ann. § 36-2-314; S.D. Stat. § 57A-2-314; Tenn. Code Ann. § 47-2- 314; Tex. Bus. & Com. Code Ann. § 2-314; Utah Code Ann. § 70A-2-314; Vt. Stat. Ann. tit. 9A § 2-314; Va. Code Ann. § 8.2-314; Wash. Rev. Code § 62A 2-314; W. Va. Code § 46-2-314; Wis. Stat. Ann. § 402.314; and Wyo. Stat. Ann. § 34.1-2-314.

75.     Each Defendant was a merchant within the meaning of the above statutes.

76.     Each Defendant's PE Products constituted "goods" or the equivalent within the meaning of the above statutes. Each Defendant placed their PE Products in sealed packaging or other closed containers and placed them on the market.

77.     Defendants were obligated to provide Plaintiffs and the other Class members PE Products that were of merchantable quality, were reasonably fit for the purpose for which they were sold, and conformed to the standards of the trade.

78.     Each Defendant sold PE Products that they impliedly warranted to be effective at treating nasal congestion and warranted that the PE Product were of merchantable quality and fit for that purpose.

79.     Each Defendant breached its implied warranty because each Defendants' PE Products were not of merchantable quality and were not fit for the product's intended purpose.

80.     Plaintiffs and members of the Classes purchased the PE Products in reliance upon Defendants' skill and judgment and the implied warranties of fitness for the purpose.

81.     Each Defendants' PE Products did not fulfill their intended purpose. Plaintiffs and members of the Classes bargained for a product that performed as warranted. But each Defendants' PE Products did not perform as warranted.

82.     Plaintiffs and members of the Classes were the intended third-party beneficiary recipients of all arrangements Defendant had with downstream resellers of Defendants' PE Products. Plaintiffs and members of the Classes were those whose benefit any promises, affirmations, or

warranties were made by Defendant concerning the PE Products, as they were the intended end purchasers and end users of Defendants' PE Products, which Defendant knew by virtue of its position as manufacturer and seller of the PE Products.

83.     The PE Products were not altered by Plaintiffs and members of the Classes.

84.     As a direct and proximate result of each Defendants' breach of implied warranty, Plaintiffs and members of the Classes have been injured and suffered damages.

**COUNT III**
**Violation of the New Jersey Consumer Fraud Act ("NJCFA")**
**(N.J. Stat. Ann. § 56:8-1, *et seq.*)**
**On behalf of Plaintiffs and the Nationwide Class or alternatively, on behalf of Plaintiff Woods and the New Jersey Subclass, against Defendants Kenvue and Bayer**

85.     Plaintiffs incorporate and reallege each preceding paragraph as though fully set forth herein.

86.     Plaintiffs bring this claim individually and on behalf of the Nationwide Class, or in the alternative, on behalf of Plaintiff Woods and the New Jersey Subclass against Defendants Kenvue and Bayer.

87.     New Jersey has numerous contacts with the conduct alleged herein and a strong interest in applying the New Jersey Consumer Fraud Act to that conduct. Defendants are found, do business, or transact business within this district. Defendants' improper conduct set forth herein occurred in this district or was conceived of and executed from this district in whole or in part. Defendants Kenvue's and Bayer's principal place of business in the United States is in this District, and their pricing, sales, and distribution operations for their PE Products sold throughout the United States, which form the basis of this litigation, originate from and/or are controlled by, their offices in this district.

88.     As such, New Jersey's contacts to this litigation make it a desirable forum for this litigation and New Jersey's interest in applying the New Jersey Consumer Fraud Act in this litigation outweighs any interests other states or their laws may have.

89.     Defendants are each a "person," as defined by N.J. Stat. Ann. § 56:8-1(d).

90.     At all relevant times, the PE Products at issue constituted "merchandise," as defined by N.J. Stat. Ann. § 56:8-1(c).

91.     At all relevant times, Defendants' sales and/or distribution of the PE Products at issue met the definition of "sale" set forth by N.J. Stat. Ann. § 56:8-1(e).

92.     Plaintiffs and members of the Classes are consumers who purchased PE Products for personal, family, or household use.

93.     The NJCFA states: "The act, use or employment by any person of any commercial practice that is unconscionable or abusive, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice." N.J. Stat. Ann. § 56:8-2.

94.     In violation of the NJCFA, Defendants employed unconscionable commercial practices, deception, fraud, false pretense and/or false promise by selling PE Products as effective medications for treating congestion when they knew PE was actually ineffective at treating congestion. Further, Defendants misrepresented the standard, quality or grade of the PE Products which were sold despite their ineffectiveness in treating nasal congestion in violation of the NJCFA.

95.     Defendants' fraudulent omissions regarding the ineffectiveness of PE were material to Plaintiffs and members of the Classes. When Plaintiffs and members of the Classes purchased their

PE Products, they reasonably relied on the reasonable expectation that the PE Products would provide relief from nasal congestion.

96. Each Defendant knew or should have known about the ineffectiveness of its PE Products for nasal decongestion as a result of, among other things, their own clinical studies, clinical studies conducted in the industry, and/or other industry guidance dating back years.

97. Defendants knowingly concealed, suppressed, and/or omitted the ineffectiveness of their PE Products in treating nasal congestion at the time of sale and at all relevant times thereafter.

98. Defendants unconscionably marketed the PE Products to unwitting consumers in order to maximize profits by selling additional PE Products containing the undisclosed fact that they were ineffective in treating nasal congestion.

99. Had Defendants disclosed that the PE Products were ineffective in treating nasal congestion, Plaintiffs and members of the Classes would not have purchased the PE Products or would have paid less for them.

100. As a direct and proximate result of Defendants' improper conduct in violation of the NJCFA, Plaintiffs and members of the Classes have suffered actual damages and ascertainable losses of moneys by paying more for PE Products than they would have, and/or by purchasing PE Products that they would not have purchased, in amounts to be determined at trial.

101. As a result of Defendants' fraudulent and/or deceptive conduct, misrepresentations and/or knowing omissions, Plaintiffs and members of the Classes are entitled to actual damages, treble damages, costs, attorneys' fees, and other damages to be determined at trial. See N.J. Stat. Ann. § 56:8-19.

## COUNT IV
### Violation of New York General Business Law ("New York GBL") § 349
### N.Y. Gen. Bus. Law § 349, *et seq.*
### On behalf of Plaintiff Thomas and the New York Subclass against all Defendants

102.   For purposes of this section "Plaintiff" refers to Plaintiff Thomas.

103.   Plaintiff Thomas incorporates and realleges the allegations in the preceding paragraphs as if fully set forth herein.

104.   Plaintiff Thomas brings this claim on behalf of himself and the New York Subclass.

105.    Plaintiff Thomas and the New York Subclass members are "persons" within the meaning of New York General Business Law ("New York GBL") § 349(h).

106.   Defendants are "persons," "firms," corporations," or "associations" within the meaning of New York GBL § 349.

107.   New York GBL § 349 makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce." N.Y. Gen. Bus. Law § 349. Defendants' conduct, as described herein, constitutes "deceptive acts or practices" within the meaning of the New York GBL. All of Defendants' deceptive acts and practices were intended to materially mislead consumers, including Plaintiff and members of the New York Subclass, regarding the ability of the PE Products to treat congestion. Defendants' deceptive acts and practices constitute "consumer-oriented" conduct directed at consumers. Further, Plaintiff and the members of the New York Subclass suffered injury as a result of the deceptive acts and practices.

108.    Defendants' actions, as set forth above, occurred in the conduct of business, trade or commerce.

109.    Defendants participated in unfair or deceptive trade practices that violated the New York GBL as described below and alleged throughout the complaint. By failing to disclose the ineffectiveness of PE Products at treating congestion, by concealing the fact that PE Products do not

treat congestion, by marketing their PE Products as effective at treating congestion, and by presenting itself as a reputable manufacturer, Defendants knowingly and intentionally misrepresented and/or omitted material facts in connection with the sale of the PE Products. Defendants systematically misrepresented, concealed, suppressed, and/or omitted material facts relating to the PE Products in the course of their business.

110.    Defendants also engaged in unlawful trade practices by employing deception, deceptive acts, deceptive practices, fraud, misrepresentations, concealment, suppression, and/or omission of any material fact with the intent that others rely upon such concealment, suppression, and/or omission, in connection with the sale of the PE Products.

111.    Defendants' unfair and deceptive acts or practices occurred repeatedly in Defendants' trade or business and were capable of deceiving a substantial portion of the purchasing public.

112.    Defendants knew that the PE Products could not effectively treat congestion, and were not suitable for their intended use.

113.    Defendants knew or should have known that its conduct violated the New York GBL.

114.    Plaintiff Thomas and members of the New York Subclass reasonably relied on Defendants' misrepresentations and/or omissions of material facts in its advertisements of the PE Products and in the purchase of the PE Products as a reasonable consumer would.

115.    Had Plaintiff Thomas and members of the New York Subclass known that the PE Products were ineffective at treating congestion, they would not have purchased the PE Products, or would have paid less for them. Plaintiff Thomas and members of the New York Subclass did not receive the benefit of their bargain as a result of Defendants' misconduct and overpaid for the PE Products.

116.    Defendants: (a) possessed superior and exclusive knowledge of the inability of PE Products to treat congestion (b) intentionally concealed the fact that PE Products cannot treat

congestion from Plaintiff Thomas and the members of the New York Subclass; and/or (c) made incomplete representations regarding the ability of PE Products to treat congestion, while purposefully withholding material facts from Plaintiff Thomas and the New York Subclass members that contradicted these representations.

117.    These omitted and concealed facts were material because they are likely to mislead a reasonable consumer and directly impact the value of the PE Products purchased by Plaintiff Thomas and the members of the New York Subclass. Defendants represented to Plaintiff Thomas and the members of the New York Subclass that they were purchasing PE Products that are effective at treating congestion, when in fact the PE Products were not effective decongestants. Plaintiff Thomas and the members of the New York Subclass relied on these material representations and/or omissions as a reasonable consumer would.

118.    Plaintiff Thomas and the members of the New York Subclass suffered injury in fact to a legally protected interest. As a result of Defendants' conduct, Plaintiff Thomas and members of the New York Subclass were harmed and suffered actual damages in the form of overpayment damages and/or the diminished value of the PE Products.

119.    As a result of Defendants' conduct, Plaintiff Thomas and the members of the New York Subclass were harmed and suffered actual damages as a result of Defendants' misrepresentations and/or omissions with regard to their PE Products because they purchased PE Products at inflated prices and which do not perform as advertised.

120.    As a direct and proximate result of Defendants' unfair or deceptive acts or practices, Plaintiff Thomas and the members of the New York Subclass suffered and will continue to suffer injury in fact and/or actual damages.

121.    Pursuant to N.Y. Gen. Bus. Law § 349(h), Plaintiff Thomas and each member of the New York Subclass seek actual damages or $50, whichever is greater, in addition to discretionary

three times actual damages up to $1,000 for Defendants' willful and knowing violation of N.Y. Gen. Bus. Law § 349. Plaintiff Thomas and members of the New York Subclass also seek attorneys' fees, and any other just and proper relief available under the New York GBL.

**COUNT V**
**UNJUST ENRICHMENT**
**On behalf of Plaintiffs and the Nationwide Class or alternatively on behalf of the Subclasses against all Defendants**

122.    Plaintiffs re-allege and incorporate the preceding paragraphs as if fully set forth herein.

123.    Plaintiffs bring this claim individually and on behalf of the Nationwide Class, or in the alternative, the Subclasses.

124.    As alleged herein, each Defendant was unjustly enriched at the expense of Plaintiffs and members of the Classes by virtue of the latter's paying for Defendants' PE Products.

125.    Each Defendant profited immensely from knowingly introducing an ineffective drug into the United States for human consumption and for the treatment of nasal congestion.

126.    Plaintiffs and members of the Classes were unjustly deprived of money obtained by each Defendant as a result of the improper amounts paid for Defendants' PE Products. It would be inequitable and unconscionable for each Defendant to retain the profit, benefit, and other compensation obtained from Plaintiffs and members of the Classes as a result of Defendants' wrongful conduct alleged in this Complaint.  There is no adequate remedy at law for Plaintiffs and members of the Classes.

127.    Plaintiffs and members of the Classes are entitled to seek and do seek restitution from each Defendant as well as an order from this Court requiring disgorgement of all profits, benefits, and other compensation obtained by each Defendant by virtue of its wrongful conduct.

## PRAYER FOR RELIEF

For these reasons, Plaintiffs pray for the following judgment:

A.  An order certifying this action as a class action;

B.  An order appointing Plaintiffs as Class Representatives, and appointing undersigned counsel as Class Counsel to represent the Classes;

C.  A declaration that Defendants are liable under the above-enumerated causes of action;

D.  An order enjoining Defendants from continuing their unlawful conduct;

E.  Payment to Plaintiffs and members of the Classes of all damages, including compensatory, statutory, exemplary or punitive damages, and/or restitution associated with the conduct for all causes of action in an amount to be proven at trial, including but not limited to the full amounts paid or reimbursed for the PE Products; the costs to replace or return PE Products; and/or the increases in the amounts paid for appropriate substitute products;

F.  An award of attorneys' fees and costs, as provided by applicable law and/or as would be reasonable from any recovery of monies recovered for or benefits bestowed on the Plaintiffs and members of the Classes;

G.  An award of statutory penalties to the extent available;

H.  Interest as provided by law, including but not limited to, pre-judgment and post-judgment interest as provided by rule or statute; and

I.  Such other and further relief as this Court may deem just, equitable, or proper.

## JURY DEMAND

Plaintiffs respectfully request a trial by jury on all causes of action so triable.

Dated: October 4, 2023

Respectfully submitted,

/s/ James E. Cecchi
James E. Cecchi
Donald A. Ecklund
Jordan M. Steele
**CARELLA, BYRNE, CECCHI,**
  **BRODY & AGNELLO, P.C.**
5 Becker Farm Road
Roseland, New Jersey 07068
Telephone: (973) 994-1700
jcecchi@carellabyrne.com
decklund@carellabyrne.com
jsteele@carellabyrne.com

Joseph H. Meltzer
jmeltzer@ktmc.com
Melissa L. Yeates
myeates@ktmc.com
Jordan E. Jacobson
jjacobson@ktmc.com
**KESSLER TOPAZ**
  **MELTZER & CHECK, LLP**
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056

Adam J. Levitt
John E. Tangren
Daniel R. Schwartz
**DICELLO LEVITT LLP**
Ten North Dearborn Street, Sixth Floor
Chicago, Illinois 60602
Telephone: (312) 214-7900
alevitt@dicellolevitt.com
jtangren@dicellolevitt.com
dschwartz@dicellolevitt.com

Paul J. Geller
Stuart A. Davidson
**ROBBINS GELLER RUDMAN**
  **& DOWD LLP**
225 NE Mizner Boulevard, Suite 720
Boca Raton, Florida 33432
Telephone: (561) 750-3000
pgeller@rgrdlaw.com

sdavidson@rgrdlaw.com

Christopher A. Seeger
David R. Buchanan
Scott A. George
**SEEGER WEISS LLP**
55 Challenger Road, 6th Floor
Ridgefield Park, New Jersey 07660
Telephone: (973) 639-9100
cseeger@seegerweiss.com
dbuchanan@seegerweiss.com
sgeorge@seegerweiss.com

*Counsel for Plaintiffs and the Proposed
Classes*

**U.S. District Court**
**District of New Jersey [LIVE] (Trenton)**
**CIVIL DOCKET FOR CASE #: 3:23-cv-20895**

THOMAS et al v. KENVUE, INC. et al                     Date Filed: 10/04/2023
Assigned to:                                           Jury Demand: Plaintiff
Cause: 28:1332 Diversity-Product Liability             Nature of Suit: 360 P.I.: Other
                                                       Jurisdiction: Diversity

**Plaintiff**

**SHAWN L. THOMAS**                 represented by    **JAMES E. CECCHI**
                                                      CARELLA BYRNE CECCHI BRODY &
                                                      AGNELLO, P.C.
                                                      5 BECKER FARM ROAD
                                                      ROSELAND, NJ 07068
                                                      (973) 994-1700
                                                      Fax: (973) 994-1744
                                                      Email: jcecchi@carellabyrne.com
                                                      *ATTORNEY TO BE NOTICED*

**Plaintiff**

**CHARLES GEOFFREY WOODS**          represented by    **JAMES E. CECCHI**
                                                      (See above for address)
                                                      *ATTORNEY TO BE NOTICED*

V.

**Defendant**

**KENVUE, INC.**

**Defendant**

**MCNEIL CONSUMER HEALTHCARE**

**Defendant**

**PROCTOR & GAMBLE CO.**

**Defendant**

**BAYER CORPORATION**

**Defendant**

**BAYER HEALTHCARE LLC**

| Date Filed | # | Docket Text |
|---|---|---|
| 10/04/2023 | 1 | COMPLAINT against BAYER CORPORATION, BAYER HEALTHCARE LLC, KENVUE, INC., MCNEIL CONSUMER HEALTHCARE, PROCTOR & GAMBLE CO. ( Filing and Admin fee $ 402 receipt number ANJDC-14762944) with JURY DEMAND, filed by SHAWN L. THOMAS, CHARLES GEOFFREY WOODS. (Attachments: # 1 Civil Cover Sheet)(CECCHI, JAMES) (Entered: 10/04/2023) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 10/05/2023 14:01:46 | | |
| **PACER Login:** | mlyeates | **Client Code:** |