**BEFORE THE UNITED STATES JUDICIAL PANEL
ON MULTIDISTRICT LITIGATION**

| | |
|---|---|
| **IN RE ORAL PHENYLEPHRINE MARKETING AND SALES PRACTICES LITIGATION** | **MDL No. 3089** |

**RESPONSE OF DEFENDANTS[1]
IN SUPPORT OF MOTION FOR TRANSFER OF ACTIONS
PURSUANT TO 28 U.S.C. § 1407**

---

[1] This response is joined by the 13 defendants reflected on the signature page.

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................... 1

BACKGROUND .................................................................................................... 3

    A.    For Decades, The FDA Has Recognized Phenylephrine As Safe and Effective and The Agency Has Never Determined Otherwise. ............................ 3

            1.    The FDA Recognized Phenylephrine as Safe and Effective Following a Years-long Monograph Process............................... 3

            2.    The FDA Continues to Recognize Phenylephrine as Safe and Effective. ............................................................................ 5

    B.    Pending Actions. .................................................................................. 6

PROCEDURAL STANDARD ............................................................................... 7

ARGUMENT ......................................................................................................... 8

I.     THE PANEL SHOULD CENTRALIZE ALL CLASS ACTIONS CHALLENGING THE MARKETING AND SALE OF PRODUCTS CONTAINING ORAL PHENYLEPHRINE. .................................................... 8

    A.    Centralization Would Eliminate the Risk of Inconsistent Rulings and Promote Just and Efficient Conduct of the Pretrial Proceedings. .......................... 8

            1.    The Actions Present Threshold Legal Issues. ............................... 8

            2.    Centralization Is Superior to Informal Coordination. ............................. 11

    B.    The Actions Touch on Common Factual Questions. ............................. 12

    C.    Centralization Would Serve the Convenience of the Parties and Witnesses by Reducing Duplicative Motions Practice and Discovery. ............................... 13

II.    THE ACTIONS SHOULD BE CENTRALIZED IN THE SOUTHERN OR EASTERN DISTRICTS OF NEW YORK. ........................................................ 14

    A.    The Southern or Eastern Districts of New York Are the Most Appropriate Venues. ................................................................................. 14

    B.    The District of New Jersey Is Not As Preferable. ................................. 17

    C.    The Other Proposed Districts Are Not Suitable Venues for this Complex Nationwide Proceeding. ......................................................... 17

CONCLUSION ..................................................................................................... 20

# TABLE OF AUTHORITIES

**Cases**

*In re Acetaminophen - ASD/ADHD Prod. Liab. Litig.*,
637 F. Supp. 3d 1372 (J.P.M.L. 2022)....................................................................9, 12, 13, 16

*In re Air Cargo Shipping Servs. Antitrust Litig.*,
435 F. Supp. 2d 1342 (J.P.M.L. 2006)....................................................................14

*In re Cable Tie Patent Litig.*,
487 F. Supp. 1351 (J.P.M.L. 1980)........................................................................7

*In re Exactech Polyethylene Orthopedic Prod. Liab. Litig.*,
637 F. Supp. 3d 1381 (J.P.M.L. 2022)....................................................................16

*In re Gardasil Prod. Liab. Litig.*,
619 F. Supp. 3d 1356 (J.P.M.L. 2022)....................................................................9

*Golden Hill Paugussett Tribe of Indians v. Weicker*,
39 F.3d 51 (2d Cir. 1994) ....................................................................................10

*In re Johnson & Johnson Aerosol Sunscreen Mktg., Sales Pracs. & Prod. Liab. Litig.*,
568 F. Supp. 3d 1412 (J.P.M.L. 2021)....................................................................13

*In re Mirena IUD Prod. Liab. Litig.*,
938 F. Supp. 2d 1355 (J.P.M.L. 2013)....................................................................14

*In re Mut. Fund Sales Antitrust Litig.*,
361 F. Supp. 638 (J.P.M.L. 1973)..........................................................................10

*Nat. Res. Def. Council, Inc. v. U.S. Food & Drug Admin.*,
710 F.3d 71 (2d Cir. 2013)....................................................................................3

*In re Nine W. LBO Sec. Litig.*,
464 F. Supp. 3d 1383 (J.P.M.L. 2020)....................................................................16

*In re One Apus Container Ship Incident on November 30, 2020*,
607 F. Supp. 3d 1344 (J.P.M.L. 2022)....................................................................16

*In re Onglyza and Kombiglyze Prod. Liab. Litig.*,
289 F. Supp. 3d 1357 (J.P.M.L. 2018)....................................................................11, 12

*Reiter v. Cooper*,
507 U.S. 258 (1993)..............................................................................................10

*In re Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust Litig.*,
289 F. Supp. 3d 1332 (J.P.M.L. 2018)....................................................................14

*In re Saturn L-Series Timing Chain Prod. Liab. Litig.*,
  2008 WL 4866604 (D. Neb. Nov. 7, 2008) ...............................................12

*In re SoClean, Inc., Mktg., Sales Pracs. & Prod. Liab. Litig.*,
  585 F. Supp. 3d 1355 (J.P.M.L. 2022)................................................9, 11

*In re Tepezza Mktg., Sales Pracs., & Prod. Liab. Litig.*,
  2023 WL 3829248 (J.P.M.L. June 2, 2023) .........................................9, 11

*In re: Trib. Co. Fraudulent Conv. Litig.*,
  831 F. Supp. 2d 1371 (J.P.M.L. 2011)....................................................14

*In re Zantac (Ranitidine) Prod. Liab. Litig.*,
  437 F. Supp. 3d 1368 (J.P.M.L. 2020)....................................................13

*In re: Zoloft (Sertraline Hydrochloride) Prod. Liab. Litig.*,
  856 F. Supp. 2d 1347 (J.P.M.L. 2012)....................................................18

**Statutes**

21 U.S.C. § 379r(a) ..............................................................................1, 9

28 U.S.C. § 1407 ...............................................................2, 7, 8, 11, 12

**Other Authorities**

21 C.F.R. § 330.1 ......................................................................................3

21 C.F.R. § 330.10(a)(3) ...........................................................................3

21 C.F.R. § 330.10(a)(7) ...........................................................................3

21 C.F.R. § 330.10(a)(9) ...........................................................................4

21 C.F.R. § 341.80 ....................................................................................5

21 C.F.R. § 341.85 .................................................................................5, 6

41 Fed. Reg. 38,312 (Sept. 9, 1976) .........................................................4

50 Fed. Reg. 2,220 (Jan. 15, 1985) .......................................................4, 5

59 Fed. Reg. 43,386 (Aug. 23, 1994).........................................................5

Fed. R. Civ. P. 23 .................................................................................8, 12

FDA clarifies results of recent advisory committee meeting on oral
  phenylephrine, U.S. FOOD & DRUG ADMIN. (Sept. 14, 2023) ...................1

MDL Statistics Report - Distribution of Pending MDL Dockets by District (September 15, 2023)...........................................................................................................15

NDAC Briefing Document: Oral Phenylephrine in the CCBA Monograph, U.S. FOOD & DRUG ADMIN. ...........................................................................................................6

U.S. District Courts–Combined Civil and Criminal Federal Court Management Statistics (June 30, 2023)..........................................................................................................15

## INTRODUCTION

Phenylephrine has long been generally recognized by the U.S. Food and Drug Administration ("FDA") as a safe and effective nasal decongestant when consumed orally. The FDA followed a rigorous process to conclude that phenylephrine is safe and effective, and that process culminated in the promulgation of extensive regulations (known as a "monograph") governing the dosing, labeling, and marketing of over-the-counter drugs containing phenylephrine as an active ingredient. Congress intended the FDA's judgment on this issue to reign supreme: the Federal Food, Drug, and Cosmetic Act ("FDCA") contains an express preemption clause that prohibits states from imposing requirements on over-the-counter medications that are "different from or in addition to, or that [are] otherwise not identical with" federal law. 21 U.S.C. § 379r(a).

In mid-September 2023, an FDA advisory committee disagreed with the FDA's longstanding determination regarding the efficacy of phenylephrine, opining that it was not effective as a nasal decongestant when consumed orally at the dosage levels FDA has approved for over-the-counter products. The FDA quickly issued a press release underscoring that "[a]dvisory committees provide independent advice and recommendations to FDA, but the agency makes the final decision."[2] The FDA's press release also stressed that the FDA had not yet made a decision about whether to change its position on the efficacy of oral phenylephrine at current dosages, and that the FDA was continuing to solicit public comment and to further study the evidence.

Although the FDA's review is ongoing and the agency has stated that it has not yet decided whether to issue a proposed order removing phenylephrine from the monograph, at least 78

---

[2] *See* FDA clarifies results of recent advisory committee meeting on oral phenylephrine, U.S. FOOD & DRUG ADMIN. (Sept. 14, 2023), *available at* https://tinyurl.com/b3kyk5jm.

putative consumer class-action lawsuits have already been filed across the country asking courts to use various state laws to declare oral phenylephrine to be ineffective (the "Actions").  The defendants in these cases include entities that have manufactured and/or sold products that contain oral phenylephrine in compliance with longstanding FDA regulations and the OTC monograph itself.

Defendants agree that the Actions should be centralized.  *See* ECF No. 1.  These cases readily satisfy the requirements for centralization under 28 U.S.C. § 1407.  Among other reasons, centralization will "promote the just and efficient conduct of" the Actions, because it will eliminate the need for multiple and possibly inconsistent rulings, including on the common threshold issues of whether the claims are preempted and whether to apply the doctrine of primary jurisdiction.

The Panel should centralize the Actions in the Southern or Eastern Districts of New York, each of which provides a strong connection to this litigation, a central, convenient location for the litigants, and a bench that has experience with the complex issues involved in this litigation such as preemption.  In addition to requests to certify nationwide classes in 74 cases, plaintiffs seek to certify New York subclasses in 19 cases.  Eighteen named plaintiffs allegedly reside in New York.  At least 14 plaintiffs' counsel and at least 13 defendants' counsel have offices in New York.  The Southern and Eastern Districts of New York are the most convenient Districts, with judicial caseloads that are conducive to an MDL; the Eastern District of New York, where five cases are pending, is the only jurisdiction supported both by plaintiffs and defendants.

## BACKGROUND

**A.**     **For Decades, The FDA Has Recognized Phenylephrine As Safe and Effective and The Agency Has Never Determined Otherwise.**

**1.**     **The FDA Recognized Phenylephrine as Safe and Effective Following a Years-long Monograph Process.**

The FDA regulates most over-the-counter ("OTC") medications through a monograph process.  A monograph is a set of regulations that describe the conditions under which a category of medications may be marketed without a prescription.  *See* 21 C.F.R. § 330.1; *Nat. Res. Def. Council, Inc. v. U.S. Food & Drug Admin.*, 710 F.3d 71, 75 (2d Cir. 2013) (describing the monograph process).  A monograph is "like a recipe" for each category of over-the-counter drugs: it "sets out the FDA-approved active ingredients for a given therapeutic class of OTC drugs" and specifies acceptable doses, formulations, and labeling for covered medications.  *Id.*; *see also* 21 C.F.R. § 330.1.  An OTC medication that complies with a monograph "is generally recognized as safe and effective and is not misbranded."  21 C.F.R. § 330.1.

The FDA's monograph process is rigorous.[3]  A monograph is developed only after the FDA has appointed an advisory panel of independent experts, which "review[s] all available data" and reports its "conclusions and recommendations" to the FDA "with respect to the safety and effectiveness of the drugs."  21 C.F.R. § 330.10(a)(3).  Based on the panel's recommendations, the FDA publishes a proposed monograph for public comment, and then proceeds to publish a "tentative final monograph" for further public comment.  *Id.* § 330.10(a)(7).  "After reviewing

---

[3] In 2020, the "Coronavirus Aid, Relief, and Economic Security Act" ("CARES"), overhauled the process by which the FDA administers the OTC monograph process.  Section 505G of the FDCA, added by CARES, converted existing monograph regulations to administrative orders and established an administrative order process to replace notice-and-comment rulemaking for establishing the conditions of use for OTC monograph drugs, along with user fees and associated performance goals. For the purpose of this Response, the previous process is summarized given the FDA published the final monograph for nasal decongestant products in 1994. *See infra* at 4-5.

[any] objections, the entire administrative record including all new data and information and comments, and considering the arguments made at any oral hearing," the FDA publishes a final monograph "establishing conditions under which a category of OTC drugs or specific OTC drugs are generally recognized as safe and effective and not misbranded." *Id.* § 330.10(a)(9).

The FDA began the monograph process for over-the-counter cold and cough medications in 1972. *See* 41 Fed. Reg. 38,312, 38,314 (Sept. 9, 1976). The agency appointed an advisory panel of experts to evaluate the safety and efficacy of active ingredients used in cold and cough medications, including phenylephrine. *Id.* The panel, which included physicians and pharmacologists, thoroughly reviewed literature and data concerning the safety and efficacy of various ingredients. *Id.* at 38,319-418. The panel held more than 20 multi-day working meetings and considered presentations from more than 40 witnesses. *Id.* at 38,314.

After a rigorous review process, the panel "conclude[d] that phenylephrine hydrochloride is safe and effective as an oral and as a topical nasal decongestant for OTC use." *Id.* at 38,399. In support of this conclusion, it cited "[c]linical studies [that] have documented the effectiveness of phenylephrine as an oral nasal decongestant." *Id.* The FDA published the panel's findings in a notice of proposed rulemaking promulgated in 1976 and solicited public comment. *See generally* 41 Fed. Reg. 38,312.

In 1985, the FDA published the tentative final monograph for OTC nasal decongestants. 50 Fed. Reg. 2,220 (Jan. 15, 1985). One public comment "questioned the studies used by the Panel to substantiate the effectiveness of phenylephrine hydrochloride as an oral nasal decongestant" and "recommended that phenylephrine hydrochloride not be used as an oral nasal decongestant." *Id.* at 2,226. But the FDA did "not accept[]" the comment: "The agency has reviewed the information cited by the comment, the Panel's recommendations, and all of the supporting data and concludes

that, based on the studies cited by the Panel, information on clinical use and marketing experience, and the Panel's expertise in evaluating the clinical and marketing experience of this ingredient, there is sufficient basis to determine the phenylephrine hydrochloride is generally recognized as effective for OTC use as an oral nasal decongestant." *Id.*

In 1994, the FDA published the final monograph for nasal decongestant products. 59 Fed. Reg. 43,386 (Aug. 23, 1994). The agency recognized phenylephrine as generally safe and effective, *id.* at 43,408, and it promulgated specific labeling regulations for nasal decongestants, including oral products containing phenylephrine, *see id.* at 43,409-11 (codified at 21 C.F.R. § 341.80); *see also* 21 C.F.R. § 341.85 (labeling regulations for combination products, including those containing phenylephrine).

**2.      The FDA Continues to Recognize Phenylephrine as Safe and Effective.**

In 2007, a group of pharmacists submitted a citizen petition to the FDA regarding phenylephrine. The petition did not question phenylephrine's efficacy, but requested that the FDA increase the maximum dosage for patients over 12 years old and withdraw approval for patients younger than 12. The FDA held an advisory committee meeting on the petition on December 14, 2007. After hearing presentations from the citizen petitioners, members of the industry, and others, 11 of the 12 committee members voted to confirm that phenylephrine was effective. No changes were made to the final monograph as a result of the citizen petition, and the FDA continued to deem oral phenylephrine safe and effective.

In 2015, two of the petitioners from the unsuccessful 2007 citizen petition submitted another petition. This petition requested that the FDA reclassify oral phenylephrine as not generally recognized as safe and effective and remove it from the monograph. On September 11 and 12, 2023, the FDA's Non-prescription Drug Advisory Committee met to discuss the

effectiveness of oral phenylephrine.  In background materials prepared for the advisory committee, the agency noted that phenylephrine has been used as a medical treatment since 1938.[4]  But the advisory committee nevertheless voted that oral phenylephrine is ineffective as a decongestant.[5]  The advisory committee did not raise any concerns about the safety of oral phenylephrine.  *Id.*

Two days after the meeting, the FDA issued a press release to "clarif[y] results of [the] recent advisory committee meeting on oral phenylephrine."  *Id.*  The FDA emphasized that "neither FDA nor the committee raised concerns about safety issues with use of oral phenylephrine at the recommended dose."  *Id.*  It confirmed that "[a]dvisory committees provide independent advice and recommendations to FDA, but the agency makes the final decision.  FDA will consider the input of this advisory committee, and the evidence, before taking any action on the status of oral phenylephrine."  *Id.*  In other words, the FDA continues to deem phenylephrine safe and effective, and no changes have been made to the final monograph for oral decongestants.

**B.    Pending Actions.**

Despite the fact that the FDA has generally recognized oral phenylephrine as safe and effective when used consistent with the relevant OTC monograph for decades, companies that manufacture and/or sell OTC products containing oral phenylephrine have been targeted with a slew of putative class actions following the Advisory Committee's September 2023 vote.

To date, at least 78 cases have been filed in 22 different federal district courts against 25 different defendants by 34 groups of plaintiffs' lawyers.  Cases are pending in the District of Arizona, Western District of Arkansas, Eastern and Northern Districts of California, Northern, Middle, and Southern Districts of Florida, Northern District of Illinois, Eastern District of

---

[4] *See* NDAC Briefing Document: Oral Phenylephrine in the CCBA Monograph at 55 n.58, U.S. FOOD & DRUG ADMIN., *available at* https://tinyurl.com/2dk7248p.

[5] *See supra* n.2.

Louisiana, District of Kansas, District of Maryland, District of Minnesota, Western District of Missouri, District of New Jersey, District of New Mexico, Eastern District of New York, Southern District of Ohio, District of Oregon, Eastern District of Pennsylvania, District of Rhode Island, District of South Carolina, and Western District of Washington. *See* ECF Nos. 1-2, 13, 24-25, 34, 43-45, 47-52, 65, 101, 109, 120, 122, 138, 141, 169, 173, 182, 195, 199, 204-05, 209, 212. All of the cases were filed in the last six weeks, and no case has progressed beyond the filing of the complaint.

The Actions are all based on the allegation that phenylephrine is ineffective as a nasal decongestant when consumed orally, and they assert claims under various states' consumer protection and warranty statutes and under state common law. No plaintiff claims he or she suffered bodily harm or personal injury. Instead, plaintiffs seek to recover their alleged economic harm and obtain injunctive relief, including the removal of products containing phenylephrine from the market notwithstanding the FDA's ongoing review. They also seek to represent overlapping nationwide and/or statewide consumer classes. New cases are being filed on virtually a daily basis.

## PROCEDURAL STANDARD

This Panel may centralize two or more civil cases for coordinated pretrial proceedings when (i) transfer "will promote the just and efficient conduct of such actions," (ii) the cases "involv[e] one or more common questions of fact," and (iii) transfer will further "the convenience of parties and witnesses." 28 U.S.C. § 1407(a). The party seeking centralization bears the burden of showing Section 1407's requirements have been met. *In re Cable Tie Patent Litig.*, 487 F. Supp. 1351, 1354 (J.P.M.L. 1980).

## ARGUMENT

## I. THE PANEL SHOULD CENTRALIZE ALL CLASS ACTIONS CHALLENGING THE MARKETING AND SALE OF PRODUCTS CONTAINING ORAL PHENYLEPHRINE.

Section 1407's requirements are met here.  *First*, centralization would eliminate the risk of inconsistent rulings by different federal courts around the country.  This is particularly true because all cases will face common threshold legal questions: whether the claims are preempted by federal law, or whether courts should defer to the FDA under the primary jurisdiction doctrine while the agency completes its review of oral phenylephrine.  Addressing these preliminary issues—and any later discovery, class certification, and Rule 702 motions—in one proceeding eliminates a risk of inconsistent rulings and would be more efficient for the parties and the judiciary than litigating similar issues across 78 cases in 22 different districts.  *Second*, although Defendants dispute these claims could ever be amenable for class treatment or could satisfy the requirements of Fed. R. Civ. P. 23, for purposes of Section 1407, all of the Actions raise factual questions about the efficacy of oral phenylephrine as a decongestant.  *Third*, centralization would be more convenient for the parties and witnesses than litigating across at least 22 districts from coast to coast.

### A. Centralization Would Eliminate the Risk of Inconsistent Rulings and Promote Just and Efficient Conduct of the Pretrial Proceedings.

#### 1. The Actions Present Threshold Legal Issues.

Courts in all 78 Actions will need to address at least two threshold issues: whether the claims are preempted, including by Section 379r of the FDCA, and whether the Actions should be dismissed or stayed under the primary jurisdiction doctrine.

For nearly 30 years, the FDA has generally recognized oral phenylephrine as safe and effective and included it in the final monograph for OTC nasal decongestants and combination cough and cold products.  While Defendants' products vary, all are manufactured and sold

pursuant to an applicable monograph that was promulgated following a rigorous process.  Section 379r(a) of the Food, Drug, and Cosmetic Act contains an express preemption provision for over-the-counter drugs that prohibits states from imposing requirements "different from or in addition to, or that [are] otherwise not identical with" federal law.  21 U.S.C. § 379r(a).  The Actions' state-law claims are preempted, including because they seek to use state law to impose a requirement—a ban on the sale and marketing of phenylephrine as an oral decongestant—that conflicts with federal law authorizing Defendants to sell products containing that ingredient.  Any conclusion that oral phenylephrine is ineffective is "different from" or "otherwise not identical with" federal law and is therefore expressly preempted.  *See* 21 U.S.C. § 379r(a).

As the Panel recently explained, where defendants make cross-cutting preemption arguments, "[w]e view having multiple judges resolve these common preemption arguments about the same drug as a highly inefficient arrangement that undermines judicial economy and needlessly increases the risk of inconsistent rulings."  *In re Tepezza Mktg., Sales Pracs., & Prod. Liab. Litig.*, 2023 WL 3829248, at *1 (J.P.M.L. June 2, 2023) (centralizing 37 related actions concerning alleged permanent hearing loss and tinnitus associated with the use of the drug Tepezza).  Indeed, the Panel regularly finds that "[a] single MDL is the most appropriate vehicle for resolving defendants' common defenses concerning preemption."  *In re Acetaminophen - ASD/ADHD Prod. Liab. Litig.*, 637 F. Supp. 3d 1372, 1374-75 (J.P.M.L. 2022) (fact that "all defendants are likely to assert the same preemption defense in each action" supported centralization); *In re Gardasil Prod. Liab. Litig.*, 619 F. Supp. 3d 1356 (J.P.M.L. 2022) (centralization would prevent inconsistent pretrial rulings, including as to preemption); *In re SoClean, Inc., Mktg., Sales Pracs. & Prod. Liab. Litig.*, 585 F. Supp. 3d 1355, 1356 (J.P.M.L. 2022) (same).

All actions also implicate the primary jurisdiction doctrine, given the FDA's ongoing role in approving oral phenylephrine as effective. The FDA has long determined that oral phenylephrine is effective; each action alleges that it is not. The FDA also has issued a press release announcing that, in the wake of the Advisory Committee's vote, it intends to solicit public input on the effectiveness of oral phenylephrine and to consider whether further regulatory action is appropriate. *See supra* n.2. Since Congress designated the FDA, not the courts, as the entity to determine in the first instance whether oral phenylephrine should be recognized as effective, the doctrine of primary jurisdiction precludes plaintiffs' claims from proceeding. *See, e.g.*, *Reiter v. Cooper*, 507 U.S. 258, 268 (1993) (doctrine of primary jurisdiction applies to claims "within the special competence of an administrative agency"); *Golden Hill Paugussett Tribe of Indians v. Weicker*, 39 F.3d 51, 58-59 (2d Cir. 1994) (doctrine applies where "enforcement of the claim requires, or is materially aided by, the resolution of threshold issues . . . which are placed within the special competence of the administrative body" (citations omitted)). As with preemption, a single MDL is the most appropriate vehicle to resolve Defendants' primary jurisdiction arguments without risk of conflicting and inconsistent rulings. *See In re Mut. Fund Sales Antitrust Litig.*, 361 F. Supp. 638, 640 (J.P.M.L. 1973) (centralizing cases to "eliminate the potential for inconsistent pretrial rulings on these common issues," including "whether the doctrine of primary jurisdiction is applicable").

This same risk of inconsistent pretrial rulings would also exist at all other stages of the litigation, including on motions to dismiss, discovery motions, Rule 702 motions, class certification motions, and summary judgment motions. Although Defendants do not believe that any of the claims are amenable to class treatment, inconsistent class certification rulings alone could greatly complicate the litigation, and the Panel routinely cites the need to avoid such

inconsistencies in centralizing proceedings.  *See, e.g.*, *In re SoClean*, 585 F. Supp. 3d at 1356 (finding need to prevent inconsistent pretrial rulings, including with respect to class certification, warranted centralization).

### 2.    Centralization Is Superior to Informal Coordination.

Centralization would also promote the just and efficient resolution of the Actions, which appear to involve at least 34 different groups of plaintiffs' lawyers and at least 25 different defendants, but not every case includes the same defendants.  *See* 28 U.S.C. § 1407(a).  The Panel has recognized that informal coordination becomes difficult when case numbers approach those at issue here. *See In re Tepezza Mktg.,* 2023 WL 3829248, at *1 (observing that "[i]nformally coordinating these cases will be increasingly challenging for the parties and the courts if the number of actions rise[s] [above 37 cases pending in eight districts] . . . and motion practice proceeds in each action."); *see also In re Onglyza and Kombiglyze Prod. Liab. Litig.*, 289 F. Supp. 3d 1357, 1358 (J.P.M.L. 2018) (finding that informal coordination of 84 cases "scattered across the nation does not seem feasible").

No active litigation has occurred in any of the Actions.  All cases are at a very early stage, the earliest case having been filed on September 12, 2023.  Allowing 34 groups of plaintiffs' lawyers to pursue 78 different cases in 22 different courts would unnecessarily burden numerous federal courts, some of which carry some of the heaviest caseloads in the country and are located in jurisdictions in which judicial emergencies have been declared.[6]  "Centralization will eliminate duplicative discovery; prevent inconsistent pretrial rulings (particularly on such matters as

---

[6] *See* Judicial Emergencies (last updated Oct. 1, 2023), *available at* https://tinyurl.com/yp7u76r9 (last visited Oct. 16, 2023) (indicating that judicial emergencies existed in the Eastern District of Louisiana, the Northern District of California, and the Middle and Southern Districts of Florida).

preemption of plaintiffs' claims and *Daubert* rulings); and conserve the resources of the parties, their counsel, and the judiciary." *In re Onglyza*, 289 F. Supp. 3d at 1358.

While the Panel ordinarily disfavors industrywide MDLs, this is one of the rare cases in which an industrywide MDL is appropriate.  In *In re Acetaminophen*, for example, the Panel determined that an industrywide MDL was appropriate even though the defendants sold different store-brand products, because "the active ingredient at issue is the same in all actions: acetaminophen."  637 F. Supp. 3d at 1374.  Here, while product formulations or strengths may differ, all contain phenylephrine.  In *Acetaminophen*, the Panel also noted that defenses related to causation and preemption would be common across defendants, as would "discovery of common suppliers, regulatory agencies, and other third parties."  *Id.* at 1375; *see also id.* n.5 (collecting cases creating industrywide MDLs where common issues included general causation and background science).  The Panel also expressed confidence that "the transferee judge can accommodate any issues involving the different products and defendants, including confidentiality and retailer-specific discovery, in a manner that guarantees the just and efficient resolution of all cases."  *Id.* The same is true here, and the same result should follow.

### B.    The Actions Touch on Common Factual Questions.

Although there are myriad differences that ultimately will make the claims not amenable to class treatment, all Actions were triggered by the Advisory Committee's vote that phenylephrine is not effective as a nasal decongestant when consumed orally.[7]  The significance of that finding,

---

[7] By acknowledging that the Actions include "common questions of fact" under 28 U.S.C. § 1407, Defendants do not concede that the requirements for class certification under Federal Rule of Civil Procedure 23 are satisfied.  These standards are "entirely separate."  *In re Saturn L-Series Timing Chain Prod. Liab. Litig.*, 2008 WL 4866604, at *25 n.21 (D. Neb. Nov. 7, 2008) ("[T]he MDL Panel's determination that [certain] cases meet the 'common questions of fact' standard required by 28 U.S.C. § 1407 is not determinative of whether [those] cases meet the requirement of Fed. R. Civ. Pro. 23 that common issues of fact 'predominate' over individualized issues of fact").

the weight of competing scientific studies, and what action, if any, the FDA takes in response, are issues that justify centralized proceedings. *See In re Acetaminophen*, 637 F. Supp. 3d at 1374 (fact that "the background science[] and regulatory history will be substantially the same in all actions" supported centralization).   So too do questions regarding whether the efficacy of oral phenylephrine varies across patients and products, the regulatory history of these products, dosing instructions, and certain labeling statements required by the FDA.   The Panel frequently finds that cases should be centralized when they concern common questions of product development, labeling, and regulation.   *See, e.g.*, *In re Zantac (Ranitidine) Prod. Liab. Litig.*, 437 F. Supp. 3d 1368, 1369 (J.P.M.L. 2020) (finding centralization appropriate in part based on shared fact questions including "the impact of any findings made by the U.S. Food and Drug Administration, which is investigating this issue").

To be clear, coordination will involve coordinating discovery of many different plaintiffs and Defendants, especially because these cases do not involve the same products.   But as with other industrywide MDLs, the presiding court should be able to develop procedures to coordinate and manage such differences among parties.

### C.     Centralization Would Serve the Convenience of the Parties and Witnesses by Reducing Duplicative Motions Practice and Discovery.

Section 1407's third requirement also is satisfied because centralization would be more convenient for the parties and witnesses than litigating practically identical issues in 78 cases across 22 districts from Rhode Island to California.   Absent centralization, Defendants will be forced to file serial motions to dismiss in different jurisdictions that a variety of different courts will need to address.   If one or more of the Actions proceed separately and survive motions to dismiss, there will be duplicative discovery and motions practice.   Centralization thus would "offer[] substantial opportunity to . . . reduce duplicative discovery," *In re Johnson & Johnson*

*Aerosol Sunscreen Mktg., Sales Pracs. & Prod. Liab. Litig.*, 568 F. Supp. 3d 1412, 1414 (J.P.M.L. 2021), easing the burden on witnesses and parties.

## II.    THE ACTIONS SHOULD BE CENTRALIZED IN THE SOUTHERN OR EASTERN DISTRICTS OF NEW YORK.

### A.    The Southern or Eastern Districts of New York Are the Most Appropriate Venues.

As the Panel has repeatedly recognized, the Southern and Eastern Districts of New York are both convenient and easily accessible forums for nationwide litigation.  *See In re Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust Litig.*, 289 F. Supp. 3d 1332, 1334 (J.P.M.L. 2018) (the Eastern District of New York "presents a convenient and accessible forum"); *In re Mirena IUD Prod. Liab. Litig.*, 938 F. Supp. 2d 1355, 1358 (J.P.M.L. 2013) (Southern District of New York is "easily accessible for . . . nationwide litigation"); *In re: Trib. Co. Fraudulent Conv. Litig.*, 831 F. Supp. 2d 1371, 1372 (J.P.M.L. 2011) (Southern District of New York was a convenient and accessible forum for most parties "[g]iven the wide dispersal of these actions across the country"); *In re Air Cargo Shipping Servs. Antitrust Litig.*, 435 F. Supp. 2d 1342, 1344 (J.P.M.L. 2006) (recognizing Eastern District of New York is "easily accessible").

In this matter, evidence and witnesses are located in or near New York:  Defendants Pfizer and Price Chopper Foods are located in New York, and five other Defendants—Johnson & Johnson Consumer Inc., Bayer HealthCare LLC, RB Health (US) LLC (incorrectly named as Reckitt Benckiser LLC), GlaxoSmithKline Consumer Healthcare Holdings (US) LLC d/b/a Haleon (incorrectly sued as GlaxoSmithKline LLC, Haleon plc, and GSK plc), and Church & Dwight Co.—are headquartered in nearby New Jersey.  New York also would be convenient for the plaintiffs and their counsel: 18 plaintiffs reside in New York, 29 cases feature plaintiffs' counsel with offices in New York, and plaintiffs' counsel in 50 cases are located elsewhere on the East Coast.  And at least 13 defendants' counsel have offices in New York City, as do 14 plaintiffs'

counsel.  The Southern and Eastern Districts of New York are easily accessible: three nearby major airports offer frequent direct flights to the rest of the country, and the jurisdictions are easily accessible by train.  Defendants expect many witnesses will be available in New York, and Defendants and their counsel are likewise willing to travel to New York.

The current judicial caseload profiles for the Southern and Eastern Districts further weigh in favor of transfer to either district.  Both districts have lower average judicial caseloads than other proposed transferee districts, making them both relatively less congested.  The Southern District has an average of 626 cases per judgeship and the Eastern District has 869 cases per judgeship.[8]  The Southern District has 13 pending MDLs assigned to 11 different judges in the district, but has 17 judges that are currently not assigned any MDL.  The Eastern District has just two pending MDLs assigned to two different judges and has 14 judges not currently assigned any MDL.[9]  These facts suggest that the bench in either district has capacity to take on these proceedings.  In addition, with filings in the Southern District down 1.4% from last year as of June 30, 2023 and down 4.5% from 2018, *see supra* n.8, the Southern District appears to have increased capacity to preside over this litigation.

In contrast to the relatively low levels of congestion in the Eastern and Southern Districts of New York, other proposed transferee districts are comparatively more congested.  For example, the Northern District of Florida has 60,336 cases per judgeship; the District of New Jersey has

---

[8] U.S. District Courts–Combined Civil and Criminal Federal Court Management Statistics (June 30, 2023), *available at* https://tinyurl.com/ye2w25r5.

[9] *See* MDL Statistics Report - Distribution of Pending MDL Dockets by District (September 15, 2023), *available at* https://tinyurl.com/mwy3asee.

3,732; the Eastern District of Louisiana has 1,374; and the Northern District of California has 989.[10]

Jurists in the Southern and Eastern Districts of New York have not only the capacity, but also the experience to take on this complex industrywide litigation, which supports consolidation in either district. *See In re One Apus Container Ship Incident on November 30, 2020*, 607 F. Supp. 3d 1344, 1345 (J.P.M.L. 2022) (assigning centralized actions to a jurist in the Southern District of New York because he was "an experienced transferee judge *with the capacity to take on this litigation*") (emphasis added); *In re Exactech Polyethylene Orthopedic Prod. Liab. Litig.*, 637 F. Supp. 3d 1381, 1382 (J.P.M.L. 2022) (describing the Eastern District of New York as "a relatively underutilized transferee district"); *In re Acetaminophen*, 637 F. Supp. 3d at 1376 (stating that "complex industrywide litigation is in need of an experienced transferee judge").

The Eastern District of New York has five Actions pending and is the only district that both Plaintiffs and Defendants support as a transferee district.  Plaintiff Yousefzadeh supports the centralization in the Eastern District of New York based on the "the jurisdiction's experienced jurists, low case numbers for those jurists, and easy access for all parties," and Plaintiffs Cronin and Ozuzu note its geographic proximity to "where the products at issue were developed," that the docket is "less congested than other Districts," and that it is "easily accessible."  ECF No. 140 at 1; ECF No. 207 at 4-5.

While no cases currently are pending in the Southern District of New York, "[t]hat a related action is not [yet] pending in the Southern District of New York is not a bar to centralization there." *In re Nine W. LBO Sec. Litig.*, 464 F. Supp. 3d 1383, 1386 (J.P.M.L. 2020); *see also In re*

---

[10] *See supra* n.8.  The Western District of Missouri has a relatively low average of 485 cases per judgeship but is an inconvenient forum with very little connection to this litigation and the judges proposed within that district already preside over one or more MDLs.  *See infra* Part II.C.

*Acetaminophen*, 637 F. Supp. 3d at 1376 & n.6 (centralizing cases in Southern District of New York despite lack of pending related action there and explaining that "absence of a related action in the transferee district is no obstacle to assignment of the actions there").

**B.     The District of New Jersey Is Not As Preferable.**

Although the Motion and two responses—one of which was filed by the same plaintiffs' counsel who filed the Motion—support the District of New Jersey, *see* ECF Nos. 1, 159, 179 at 10, that jurisdiction is less preferable than the Southern or Eastern District of New York because the District of New Jersey's docket is relatively congested. The District of New Jersey has 3,732 pending cases per judgeship, compared with only 626 cases per judgeship in the Southern District of New York and 869 per judgeship in the Eastern District. *See supra* n.8. The median time from filing to disposition is also longer in New Jersey, at 10.8 months, than it is for the Southern District of New York (6 months) or the Eastern District of New York (5.2 months). *Id.* Finally, the District of New Jersey currently has 12 pending MDLs assigned to 8 different judges (with 9 judges not currently assigned any MDL); the Southern District of New York has 13 pending MDLs assigned to 11 different judges (with 17 judges not currently assigned any MDL); and the Eastern District of New York has just two pending MDLs assigned to two different judges (with 14 judges not currently assigned any MDL). In addition, there are nearly twice as many plaintiffs from New York (18) than from New Jersey (10). Accordingly, the interests of efficiency for all litigants— not just those in this proceeding—would be better served by centralizing this case in the Southern or Eastern Districts of New York.

**C.     The Other Proposed Districts Are Not Suitable Venues for this Complex Nationwide Proceeding.**

The remaining jurisdictions proposed are not suitable venues for centralization. *See* ECF Nos. 23, 140 at 7, 144, 156, 158, 176, 179, 194.

**Eastern District of Pennsylvania.**  Four responses—several of which appear to be copied-and-pasted from each other—support centralization in the Eastern District of Pennsylvania.  ECF Nos. 176, 179, 213, 214.  That jurisdiction already has nine pending MDLs, significantly more than the Eastern District of New York, which only has two.  *See supra*, n.8.  Plaintiffs argue that the Eastern District of Pennsylvania has a long history of managing high-profile MDLs, but the cases they cite—all of which were centralized more than ten years ago—do not support transfer to that district now.  *See* ECF No. 176 at 6.  In each of those cases, the Panel sought out a jurist with extensive MDL experience, but two of those judges (Judges Bechtle and Stengel) are no longer on the bench, and the third, Judge Rufe, is now a senior judge and already oversees two other MDLs.  Moreover, one of the cases plaintiffs cite involved unique factors weighing in favor of Pennsylvania that are not at issue here, including that more than half of all pending cases were filed in the Eastern District of Pennsylvania and that court would be able to more easily coordinate with parallel state court proceedings.  *See In re: Zoloft (Sertraline Hydrochloride) Prod. Liab. Litig.*, 856 F. Supp. 2d 1347, 1348 (J.P.M.L. 2012).  And there are far fewer plaintiffs from Pennsylvania (3) than New York (18).

**Northern District of California.**  Two responses support the Northern District of California, including one response that supports centralization in the Eastern District of New York but also suggests the Northern District of California in the alternative.  ECF No. 140 at 7, 194.  That jurisdiction is less appropriate than the Eastern District of New York.  The Northern District of California already presides over 16 MDLs distributed across 16 of the district's 23 judges, and most judges who do not already have an MDL are new to the bench.  *See* ECF No. 140 at 6 n.4, 7.  A judicial emergency also exists in the district, *see supra* n.6, and the average caseload per judgeship is 989, higher than both the Eastern and Southern Districts of New York, *supra* n.8.  No

Defendant has headquarters or relevant operations in the Northern District of California, and there are no other significant ties between the Actions and that district.  Given that most plaintiffs, defendants, and their counsel are based on the East Coast, travel to California would be significantly more burdensome than travel to New York for nearly everyone involved.

**Eastern District of Louisiana.**  Two responses advocate for centralization in the Eastern District of Louisiana.  ECF Nos. 23, 158.  Other than a very small number of plaintiffs residing there (4), Louisiana has no other connection to this dispute.  No Defendant has relevant operations or key witnesses located there.  Louisiana would also be less convenient for the litigants and their counsel than New York (particularly Manhattan and Brooklyn).  To Defendants' knowledge, only two cases involve plaintiffs' counsel located in Louisiana.  For nearly everyone else, traveling to Louisiana would be significantly more burdensome than traveling to New York.  Moreover, there is a judicial emergency in the Eastern District of Louisiana, and at 1,374 pending cases per judgeship, it has a heavier caseload than the Southern or Eastern Districts of New York.[11]

**Northern District of Florida.**  Although his counsel initially advocated for another forum, *see* ECF No. 23, Plaintiff Morgan argues the Actions should be centralized in the Northern District of Florida before Judge Rodgers, ECF No. 144.  As this plaintiff concedes, Judge Rodgers already presides over the largest MDL in history.  *Id.* at 2.  The district's caseload statistics are also significantly less favorable than the Southern or Eastern Districts of New York, with 60,336

---

[11] *See supra* nn.6, 8.  Although these plaintiffs suggest that the Eastern District of Louisiana is not congested because it has "an average of 482 pending civil cases per judgeship," ECF No. 23 at 10; *see also* ECF No. 158 at 8 (similar), that number represents the average number of *filings*, not civil cases.  The correct number of pending *cases* per judge in the Eastern District of Louisiana is 1,374, and the median time from filing to disposition is also more than ten times higher in the Eastern District of Louisiana (68.2 months) than the Southern District of New York (6 months).  *See supra* n.8.  In addition, the two proposed jurists—Judge Fallon and Judge Milazzo—already have two pending MDLs each, in addition to a lengthy backlog of pending cases, and Judge Fallon also recently announced his intention to take senior status no later than January 1, 2024.

pending cases per judgeship and a median time to disposition of 26.2 months for civil cases.[12]  No Defendant has headquarters or relevant operations in the Northern District of Florida, and Morgan identifies no other significant ties between the Actions and the district.  There are fewer plaintiffs from Florida (11) than New York (18).  Traveling to Pensacola would also be significantly more burdensome than traveling to New York for nearly all parties and counsel, and no other plaintiff supports centralization there.

**Western District of Missouri.**  One response argues for centralization in the Western District of Missouri before Judge Bough or, in the alternative, Chief Judge Phillips or Judge Wimes.  ECF No. 156.  Many of the same factors counseling against other venues apply to the Western District of Missouri with equal force.  No other plaintiffs and no Defendants support centralization in the Western District of Missouri.  Aside from the few plaintiffs who reside there (3), there is no connection between the Actions and Missouri—no Defendants have key witnesses or relevant operations there.  Chief Judge Phillips already presides over two MDLs and Judges Bough and Wimes each preside over one MDL.  *See id.* at 8.  The location is also less convenient than New York for nearly all litigants and their counsel, as only three cases feature Missouri-based counsel.

## CONCLUSION

The Actions listed on the Schedule of Actions, the Notices of Related Actions, and any related tag-along cases, should be centralized for pretrial proceedings in the Southern or Eastern District of New York.

---

[12] *See supra* n.8.  This is true even if all 346,922 cases ever associated with the *In re 3M Combat Arms Earplug Products Liability Litigation*, No. 19-md-2885 (N.D. Fla.), are excluded.  Divided among eight Article III judges, the *3M* MDL contributes at most 43,250 pending cases per judgeship, whereas the overall number of pending cases per judgeship is more than 60,000.

Dated: October 25, 2023                          Respectfully submitted,


                                                 /s/ Andrew Soukup
                                                 Andrew Soukup
                                                 COVINGTON & BURLING LLP
                                                 850 Tenth Street NW
                                                 Washington, DC 20001
                                                 Telephone: (202) 662-5066
                                                 asoukup@cov.com

                                                 *Counsel for Defendant*
                                                 *The Procter & Gamble Company*


                                                 /s/ Amanda L. Groves
                                                 Amanda L. Groves
                                                 WINSTON & STRAWN LLP
                                                 333 South Grand Ave.
                                                 Los Angeles, CA 90071
                                                 Telephone: (213) 615-1700
                                                 agroves@winston.com

                                                 *Counsel for Defendant*
                                                 *Albertson's Companies, Inc.*


                                                 /s/ Robert W. Sparkes, III
                                                 Robert W. Sparkes, III
                                                 K&L GATES LLP
                                                 1 Congress St., Suite 2900
                                                 Boston, MA 02114
                                                 Telephone: (617) 951-9134
                                                 Robert.sparkes@klgates.com

                                                 *Counsel for Defendant*
                                                 *Amazon.com, Inc.*

21

/s/ E. Paige Sensenbrenner
E. Paige Sensenbrenner
Adams and Reese, LLP
Hancock Whitney Center
701 Poydras St., Suite 4500
New Orleans, LA 70139
Telephone: (504) 581-3234
Paige.Sensenbrenner@arlaw.com

*Counsel for Defendants*
*Associated Wholesale Grocers, Inc.;*
*Valu Merchandisers Company*


/s/ Christopher G. Campbell
Christopher G. Campbell
DLA PIPER
1201 W. Peachtree Street, Suite 2800
Atlanta, GA 30309
Telephone: (404) 736-7808
Christopher.campbell@us.dlapiper.com

*Counsel for Defendant*
*Bayer HealthCare LLC*


/s/ Sara K. Thompson
Sara K. Thompson
GREENBERG TRAURIG
3333 Piedmont Rd NE, Suite 2500
Atlanta, GA 30305
Telephone: (678) 553-2392
Sara.thompson@gtlaw.com

*Counsel for Defendants*
*CVS Pharmacy, Inc.,*
*Target Corp., Walgreen Co.*

/s/ Jay P. Lefkowitz
Jay P. Lefkowitz
KIRKLAND & ELLIS LLP
601 Lexington Ave.
New York, NY 10022
Telephone: (212) 446-4970
lefkowitz@kirkland.com

*Counsel for Defendants*
*GlaxoSmithKline Consumer Healthcare*
*Holdings (US) LLC,*
*Haleon US Capital LLC*


/s/ Hannah Y. Chanoine
Hannah Y. Chanoine
O'MELVENY & MYERS LLP
7 Times Square
New York, NY 10036
Telephone: (212) 326-2128
hchanoine@omm.com

*Counsel for Defendant*
*Johnson & Johnson Consumer Inc.*


/s/ Lauren S. Colton
Lauren S. Colton
HOGAN LOVELLS US LLP
100 International Dr., Suite 2000
Baltimore, MD 21202
Telephone: (410) 659-2733
Lauren.colton@hoganlovells.com

*Counsel for Defendant*
*RB Health (US) LLC*

23

/s/ Livia M. Kiser
Livia M. Kiser
KING & SPALDING LLP
110 N Wacker Drive, Suite 3800
Chicago, IL 60606
Telephone: (312) 764-6911
lkiser@kslaw.com

*Counsel for Defendants*
*Walmart Inc. and Wal-Mart Stores East, LP*