# Exhibit 10

# Docket Sheet and Complaint
## *Sanes, et al. v. Bayer Healthcare LLC,*
## No 2:23-cv-21163 (D.N.J.)

**Query**   **Reports**   **Utilities**   **Help**   Log Out

**U.S. District Court**
**District of New Jersey [LIVE] (Newark)**
**CIVIL DOCKET FOR CASE #: 2:23-cv-21163-CCC-MAH**

SANES et al v. BAYER HEALTHCARE LLC
Assigned to: Judge Claire C. Cecchi
Referred to: Magistrate Judge Michael A. Hammer
Cause: 28:1332 Diversity-(Citizenship)

Date Filed: 10/13/2023
Jury Demand: Plaintiff
Nature of Suit: 370 Other Fraud
Jurisdiction: Diversity

**Plaintiff**

**CLAUDETTE SANES**
*an individual*

represented by **KATRINA CARROLL**
LYNCH CARPENTER LLP
111 W. WASHINGTON, STE 1240
CHICAGO, IL 60602
312-750-1265
Email: katrina@lcllp.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**DANIEL FLICK**
*an individual*

represented by **KATRINA CARROLL**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**JANIS ZIMMERMAN**
*an individual, and on behalf of all others similarly
situated*

represented by **KATRINA CARROLL**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**BAYER HEALTHCARE LLC**

| Date Filed | # | Docket Text |
|---|---|---|
| 10/13/2023 | 1 | COMPLAINT against BAYER HEALTHCARE LLC (Filing and Admin fee $ 402 receipt number ANJDC-14790355) with JURY DEMAND, filed by JANIS ZIMMERMAN, DANIEL FLICK, CLAUDETTE SANES. (Attachments: # 1 Civil Cover Sheet, # 2 Summons, # 3 Exhibit A, # 4 Exhibit B)(CARROLL, KATRINA) Modified on 10/16/2023 (dam). (Entered: 10/13/2023) |
| 10/13/2023 | | Case Assigned to Judge Claire C. Cecchi and Magistrate Judge Michael A. Hammer. (ak, ) (Entered: 10/16/2023) |
| 10/16/2023 | 2 | SUMMONS ISSUED as to BAYER HEALTHCARE LLC. Attached is the official court Summons, please fill out Defendant and Plaintiffs attorney information and serve. (dam) (Entered: 10/16/2023) |
| 10/16/2023 | | CLERK'S QUALITY CONTROL MESSAGE - Please be advised, pursuant to Fed. R. Civ. P. 7.1(a)(2), unless the Court orders otherwise, in any action filed or removed to this Court, in which jurisdiction is based upon diversity under 28 U.S.C. 1332(a), a party or intervenor must file a disclosure statement naming and identifying the citizenship of every individual or entity whose citizenship is attributed to that party or intervenor. A party, intervenor or proposed intervenor must file the disclosure statement with its first appearance, pleading, petition, motion, response, or other request addressed to the Court. Click here to complete the Diversity Disclosure Statement, once complete, file it using the event Diversity Disclosure Statement. (dam) (Entered: 10/16/2023) |
| 10/16/2023 | | CLERK'S QUALITY CONTROL MESSAGE - The 1 Complaint submitted by Katrina Carroll on 10/13/2023 contains an improper electronic signature. Only Registered Users are permitted to sign electronically filed documents with an **s/**. PLEASE RESUBMIT THE DOCUMENT WITH A PROPER ELECTRONIC OR SCANNED SIGNATURE. Kindly file this document using the event **Exhibit (to Document)** , found under **Civil/Other Filings/Other Documents**. This submission will remain on the docket unless otherwise ordered by the court. (dam) (Entered: 10/16/2023) |

| 10/16/2023 | 3 | Exhibit to 1 Complaint, by DANIEL FLICK, CLAUDETTE SANES, JANIS ZIMMERMAN. (CARROLL, KATRINA) (Entered: 10/16/2023) |
| 10/18/2023 | 4 | SUMMONS Returned Executed by JANIS ZIMMERMAN, DANIEL FLICK, CLAUDETTE SANES. BAYER HEALTHCARE LLC served on 10/17/2023, answer due 11/7/2023. (CARROLL, KATRINA) (Entered: 10/18/2023) |

| **PACER Service Center** | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 10/25/2023 18:46:05 | | | |
| **PACER Login:** | cb091600 | **Client Code:** | 024262.00072.11718 |
| **Description:** | Docket Report | **Search Criteria:** | 2:23-cv-21163-CCC-MAH Start date: 1/1/1980 End date: 10/25/2023 |
| **Billable Pages:** | 2 | **Cost:** | 0.20 |

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| CLAUDETTE SANES, an individual; DANIEL FLICK, an individual; JANIS ZIMMERMAN, an individual, and on behalf of all others similarly situated,<br><br>          Plaintiffs,<br><br>     v.<br><br>BAYER HEALTHCARE LLC,<br><br>          Defendant. | Case No.<br><br><br><br>**CLASS ACTION COMPLAINT**<br>**JURY TRIAL DEMANDED** |

Plaintiffs Claudette Sanes, Daniel Flick and Janis Zimmerman (collectively, "Plaintiffs") bring this class action complaint against Defendant Bayer HealthCare LLC ("Defendant"), individually and on behalf of all others similarly situated, and allege upon personal knowledge as to their acts and experiences, and, as to all other matters, upon information and belief, including investigation conducted by Plaintiff's attorneys.

## NATURE OF THE ACTION

1.     This is a consumer protection class action arising out of Defendant's false and misleading advertising of its oral phenylephrine ("PE") Products.[1]

2.      Defendant distributes, markets, and sells oral PE Products marketed as nasal decongestants. Defendant represents and sells oral PE Products to provide benefits for the indications specified – to provide nasal congestion relief to all consumers who ingest oral PE Products. The claimed nasal congestion health benefits are the only reason a consumer would purchase oral PE Products. Defendant's advertising claims, however, are false, misleading, and reasonably likely to deceive the public.

3.     Each of the oral PE Products at issue in Defendant's cold relief product lines, through their labeling and packaging, and through Defendant's other

---

[1] This Complaint does not include intranasally or topically administered PE products. As referenced in this Complaint, "oral phenylephrine ("PE") products" mean PE products administered orally in either tablet or liquid form.

advertising and marketing materials, communicate the same substantive message to consumers: that oral PE Products provide meaningful nasal congestive relief health benefits. Defendant conveys this health message through extensive and uniform nationwide marketing campaigns and product labeling through which Defendant represent that oral PE Products relieve "9 sinus and cold symptoms" and that they provide "fast relief from your cough and congestion symptoms," constituting an implied advertising claim that the assertion is true and there is legitimate science substantiating the nasal congestive relief health benefits. These representations are designed to induce consumers to believe that Defendant's oral PE Products are capable of providing meaningful nasal congestion relief. These claims are a material reason a consumer would purchase oral PE Products.

4.     Defendant's oral PE Products, however, are incapable of supporting or providing nasal congestion health benefits because the ingredient in each of Defendant's oral PE Products at issue cannot support or benefit nasal decongestion. Numerous well designed and well conducted scientific studies have been conducted on the effects and efficacy of oral PE Products. These studies have demonstrated that oral PE Products are ineffective in providing relief of nasal congestion because PE is too rapidly metabolized by individuals, which does not allow it to reach the nostrils in time to provide relief. These studies apply to oral PE Products' target audience, which includes people with nasal congestion. Accordingly, Defendant's

nasal decongestion relief health representations are false, misleading, and deceptive, and its oral PE Products are worthless.

5.     Indeed, On September 12, 2023, a U.S. Food and Drug Administration ("FDA") advisory panel agreed, voting unanimously (16-0) that oral PE Products are not effective as a nasal decongestant.[2]

6.     Plaintiffs bring this action individually and on behalf of all other similarly situated consumers to obtain redress for those who have purchased Defendant's oral PE Products at issue.

## JURISDICTION AND VENUE

7.     The Court has original jurisdiction under 28 U.S.C. § 1332(d)(2) because the matter in controversy, exclusive of interest and costs, exceeds the sum or value of $5,000,000 and is a class action in which there are in excess of 100 class members, and some of the members of the class are citizens of states different from Defendant.

8.     This Court has personal jurisdiction over Defendant Bayer HealthCare LLC has its principal place of business in New Jersey.

---

[2] Haley Weiss, *With the Decongestant SNAFU, the FDA Tries Something New*, TIME (Sept. 14, 2023), https://time.com/6314120/fda-decongestant-phenylephrine-decision/#:~:text=That%20changed%20on%20Sep.%2012,be%20pulled%20from%20stores%20altogether (last accessed Sept. 22, 2023).

9. Defendant has marketed, promoted, distributed, and sold the oral PE Products at issue in New Jersey, rendering exercise of jurisdiction by New Jersey courts permissible.

10. Defendant's systematic and continuous contacts with the District of New Jersey in the form of conducting substantial business in New Jersey shows that this court has personal jurisdiction over Defendant, as they have purposefully availed themselves of the benefits and protections of the District of New Jersey.

11. Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(a) and (b) because a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in this district. Venue also is proper under 18 U.S.C. § 1965(a) because Defendant transact substantial business in this district.

## PARTIES

12. Plaintiff Claudette Sanes is a citizen of New York, and at all times relevant to this action, resided in Bronx County, New York. Plaintiff Sanes saw Defendant's representations when reading the label of an "Alka-Seltzer Plus Severe Cold & Cough Medicine for Adults" product package at Leroy Pharmacy during the class period. In reliance on Defendant's claims made on the product label, Plaintiff Sanes purchased the Alka-Seltzer product on at least eight occasions during the class period at the Leroy Pharmacy located at 2390 East 198th Street, Bronx, New York, 10458. Plaintiff Sanes suffered an injury in fact and lost money as a result of the

Alka-Seltzer product not providing the promised benefits. Had Plaintiff Sanes known the truth about Defendant's advertisements at the time of her purchase, she would not have purchased the Alka-Seltzer products. Plaintiff Sanes continues to desire to purchase an oral nasal decongestant product and believes she would purchase an Alka-Seltzer oral nasal decongestant product in the future if it worked as advertised. However, due to Defendant's ongoing false advertising and deceptive misrepresentations, Plaintiff Sanes will not be able to rely on Defendant's advertising in the future when deciding whether to purchase Alka-Seltzer products.

13.    Plaintiff Daniel Flick is a citizen of New York, and at all times relevant to this action, resided in Erie County, New York. Plaintiff Flick saw Defendant's representations by reading the label of an "Alka-Seltzer Plus Severe, Cold & Cough Medine for Adults" product package label at a Walmart located in Hamburg, New York, during the class period. In reliance on Defendant's claims at issue on the product label, Plaintiff Flick purchased Defendant's product during the class period at a Walmart store located at 5356 Southwestern Boulevard, Hamburg, New York, 14075. As a result of purchasing Defendant's deceptively advertised product, Plaintiff Sanes suffered an injury-in-fact and lost money because the Alka-Seltzer product does not provide the promised benefit. Had Plaintiff Sanes known the truth about Defendant's deceptive advertising at the time of his purchases, he would not have purchased Defendants' product. Plaintiff continues to desire an oral nasal

decongestant product and believes he would purchase an Alka-Seltzer oral nasal decongestant product in the future if it worked as advertised. However, as a result of Defendant's ongoing false advertising, Plaintiff Sanes will be unable to reply on Defendant's advertising when deciding whether to purchase Alka-Seltzer products in the future.

14.    Plaintiff Janis Zimmermann ("Plaintiff Zimmermann") is a citizen of California, and at all times relevant to this action resided in Riverside County, California. Plaintiff Zimmermann saw Defendant's representations by reading the label of an "Alka-Seltzer Plus Severe Cold & Cough Medicine For Adults" product package label at a Walmart Supercenter store in Hemet, California, during the class period. In reliance on Defendant's claims at issue on the product label, Plaintiff Zimmermann purchased the Alka-Seltzer product on several occasions during the class period at the Walmart Supercenter store located at 1231 South Sanderson, Hemet, California 92545. As a result of purchasing Defendant's deceptively advertised product, Plaintiff Zimmermann suffered an injury-in-fact and lost money because the Alka-Seltzer product did not provide the promised benefits. Had Plaintiff Zimmermann known the truth about Defendant's deceptive advertisements at the time of her purchases, she would not have purchased the Alka-Seltzer product. Plaintiff Zimmerman continues to desire to purchase an oral nasal decongestant product and would purchase an Alka-Seltzer oral nasal decongestant product in the

future if it worked as advertised. However, because of Defendant's ongoing false and misleading advertising, Plaintiff Zimmermann will be unable to rely on Defendant's advertising in the future when deciding whether to purchase Alka-Seltzer products.

15.     Defendant Bayer HealthCare LLC is a Delaware Limited Liability Company with its principal place of business located at 100 Bayer Boulevard, Whippany, NJ 07981. Defendant, manufactures, markets, advertises, and distributes oral PE products under its "Alka Seltzer" product line.

## FACTUAL ALLEGATIONS

### I.     *Defendant's PE Products*

16.     Defendant sells Alka-Seltzer products through its website, www.alkaseltzer.com, and through various retail stores, including Walgreens, CVS, Walmart, Rite Aid and Target.

17.2.     Defendant's oral Alka-Seltzer products at issue include, but are not limited to:

  a. ALKA-SELTZER PLUS® MAXIMUM STRENGTH DAY & NIGHT SINUS CONGESTION & PAIN POWERMAX® GELS

  b. ALKA-SELTZER PLUS® MAXIMUM STRENGTH SINUS CONGESTION & PAIN POWERMAX® GELS

  c. ALKA-SELTZER PLUS® MAXIMUM STRENGTH SINUS, ALLERGY & COUGH POWERMAX® GELS

  d. ALKA-SELTZER PLUS® MAXIMUM STRENGTH DAY & NIGHT COUGH, MUCUS & CONGESTION POWERMAX® GELS

  e. ALKA-SELTZER PLUS® MAXIMUM STRENGTH NIGHT COLD & FLU POWERMAX® GELS

    f. ALKA-SELTZER PLUS® SEVERE COLD & COUGH POWERFAST FIZZ™ CITRUS EFFERVESCENT TABLETS

    g. ALKA-SELTZER PLUS® SEVERE COLD & FLU POWERFAST FIZZ™ CITRUS EFFERVESCENT TABLETS

18.    Alka-Seltzer Products contain anywhere from 2.5mg-10mg of PE per serving.

19.    Defendant market Alka-Seltzer Products to provide the purported health benefit of nasal congestion relief. Nasal congestion is a symptom of allergies, hay fever, and the common cold. These symptoms are also connected with several other conditions, including nasal polyps, deviated nasal septum, cystic fibrosis, HIV, and other immune system-related diseases.[3] A consumer research study found that there has been a rise in purchases of nasal decongestants since the start of the Covid-19 pandemic.[4] According to a consumer analysis by Profitero, searches for cold and flu medicine exploded at the onset of the pandemic in early 2020.[5]

20.    According to the FDA, estimates of 2022 retail sales data show an estimated 242 million over-the-counter ("OTC") cough, cold, and allergy oral products containing PE were sold from retail stores, representing approximately $1.763 billion in sales.[6]

---

[3] *Chronic sinusitis*, Mayo Clinic (Sept. 19, 2023), https://www.mayoclinic.org/diseases-conditions/chronic-sinusitis/symptoms-causes/syc-20351661.

[4] *Cold And Flu Sales On Amazon To Reach Record Highs In 2022*, Profitero (Jan. 25, 2022), https://www.profitero.com/blog/cold-and-flu-sales-on-amazon-2022.

[5] *Id.*

[6] *U.S. FOOD & DRUG ADMIN., EFFICACY OF ORAL PHENYLEPHRINE AS A NASAL DECONGESTANT 68 (Sept. 12, 2023), https://www.fda.gov/media/171915/download.*

21.     PE is a specific alpha-1 adrenergic receptor agonist that works as a nasal decongestant by temporarily constricting blood vessels.[7] However, a recent advisory panel brief to the FDA has confirmed that orally administered PE at monographed dosages is not effective as a decongestant.[8] In other words, oral Alka-Seltzer Products' active ingredient for nasal decongestion is worthless and does not provide the health benefits claimed by Defendant.

22.     Because nasal congestion is associated with a large range of conditions, many people purchase OTC cold medicine containing oral PE Products without any formal medical diagnosis. Knowing this, to induce consumers (including Plaintiffs and Class Members) to purchase its oral PE Products, Defendant advertises through its messaging that Alka-Seltzer Products provide maximum-strength nasal congestion relief.

23.     In addition to the fact that Oral PE products do not provide their indicated health benefits, oral PE Products also have side effects, including anxiety, nervousness, headache, trouble sleeping, heart palpitations, increased blood pressure and possible allergic reactions.[9]

---

[7] *Id.* at 13.

[8] *Id.* at 9.

[9]*Q&A: As FDA panel deems decongestants ineffective, experts discuss impact on allergy care*, healio.com (Sept. 22, 2023), https://www.healio.com/news/allergy-asthma/20230922/qa-as-fda-panel-deems-decongestants-ineffective-experts-discuss-impact-on-allergy-care.

## II.   *Defendant's False and Deceptive Advertising*

24.    Defendant market their products at all major pharmaceutical retailers and through television and internet advertisements, along with a Alka-Selzer-specific website.[10] Based on well-conducted consumer research, Defendant has finely honed their package labeling to ensure their oral PE Products are a household product by promising to relieve nasal congestion symptoms associated with the common cold or flu.

25.    Beginning with the package label for oral Alka-Seltzer Products and reinforced through other advertisements, Defendant conveys to consumers that its oral Alka-Seltzer Products will provide nasal congestion health benefits for anyone who takes oral Alka Seltzer® Products.



---

[10]https://www.alkaseltzer.com/.

26.     The front panels of the packaging for all oral Alka-Seltzer Products are materially the same and communicate the same implied advertising message. As an example of one label, on the front label, on the top right it says, "MAXIMUM STRENGTH Sinus Allergy & Cough;" the medicine is delivered through "POWERMAX GELS," which the label on the bottom says provides "*FAST* Relief Of: Sinus Congestion & Pressure…" Among other things, these statements convey the implied message that consumption of oral Alka Seltzer® Products can provide the health benefit of relief from nasal congestion.

27.     An example of an advertisement for an oral Alka Seltzer® Product appears as follows:



28.     To reinforce the nasal decongestant message, Defendant repeat similar claims about cold and flu symptoms throughout its packaging and marketing, including that oral Alka Seltzer Products relieves "9 sinus & cold symptoms."

29.     To add credibility to the advertising, Defendant provides consumers with an additional "reason to believe" the nasal decongestant message. Providing a

"reason to believe" advertising is a key psychological component to successful advertising. A "reason to believe" offered by Defendant is that oral Alka-Seltzer Products can provide "fast relief from your cough and congestion symptoms."[11] This message misleadingly promotes Defendant's oral PE Products as having decongestion benefits, despite the fact that this claim is clearly false.

### III. The FDA Finds Orally Administered PE Products Are Not Effective Nasal Decongestants Based on Scientific Studies

30.     Despite Defendant's representations, an advisory panel to the FDA has found that orally administered PE — as is used in Defendant's Products — is not an effective treatment for nasal congestion.[12]

31.     On September 12, 2023, the FDA published the Non-Prescription Drug Advisory Committee ("NDAC") Briefing Document (the "FDA Briefing"), which outlined the NDAC's findings and analysis supporting its conclusion that oral PE is not effective as a nasal decongestant.[13] The FDA Briefing detailed the NDAC's analysis of all the relevant scientific support of the efficacy of oral PE and the history of PE's approval by the FDA. The NDAC's extensive examination included an analysis of the following: (1) the fourteen original clinical trials that were the basis

---

[11] https://www.alkaseltzer.com/plus/mucus-cough/products/cough-mucus-congestion-day-night-powermax-liquid-gels
[12] U.S. Food & Drug Admin., Efficacy of Oral Phenylephrine as a Nasal Decongestant 9 (2023), https://www.fda.gov/media/171915/download.
[13] Id.

for the FDA's approval of PE, (2) the 2007 Citizen's Petition, (3) the 2007 NDAC meeting and two meta-analyses presented there, (4) bioavailability data which demonstrated that less than one percent (<1%) of an oral dose of PE is systemically available, (5) two Environmental Exposure Unit ("EEU") studies, (6) three modern clinical studies done since the 2007 NDAC meeting, and (7) the 2015 Citizen's Petition.[14] After reviewing this voluminous scientific evidence, the NDAC concluded that orally administrated PE is not an effective treatment for nasal congestion, and that oral PE usage for treatment of congestion has no scientific merit.[15] The NDAC voted 16-0 "that scientific evidence doesn't prove that the nasal decongestant is effective when taken orally at recommended doses."[16]

## Introduction to PE

32.      PE is a specific alpha-1 adrenergic receptor agonist.[17] PE can be used in both single ingredient and combination products, so long as the combination products comply with the FDA's list of permitted combinations. There are two forms of PE discussed by the NDAC: (1) orally administered phenylephrine hydrochloride ("PEH"), and (2) phenylephrine bitartrate ("PEB").

---

[14] *Id.* at 8.

[15] *Id.* at 9.

[16] Cailley Lapara, *Common Nasal Decongestant Doesn't Actually Work, According to FDA Advisors*, TIME, https://time.com/6313449/nasal-decongestant-phenylephrine-efficacy-fda/ (last accessed Sept. 22, 2023).

[17] U.S. FOOD & DRUG ADMIN., EFFICACY OF ORAL PHENYLEPHRINE AS A NASAL DECONGESTANT 13 (2023), https://www.fda.gov/media/171915/download.

33.    Alpha-1 adrenergic agonists, such as PE, pseudoephedrine ("PSE") and phenylpropanolamine ("PPA") can temporarily constrict the blood vessels in the nasal passages and reduce swelling in the sinuses and nose as a result.[18]

34.    However, extensive scientific studies have shown that orally administered PE, such as when taken in a tablet or a syrup form, is not effective at providing nasal congestion relief benefits. The NDAC agreed, stating "we have now come to the initial conclusion that orally administered PE is not effective as a nasal decongestant at the monographed dosage (10 mg of PE hydrochloride every 4 hours) as well as at doses up to 40 mg (dosed every 4 hours).[19]

### Previous Approvals

35.    In 1976, PE, PSE, and PPA were reviewed as possible over-the-counter ("OTC") products for nasal congestion treatment by the FDA. In 1994, PE, PSE, and PPA were approved by the FDA, at their respective monograph dosages,[20] and added to the FDA's Cough, Cold, Allergy, Bronchodilator, and Anti-Asthmatic Drug Products ("CCABAP") Final Monograph (the "Final Monograph," "FM" or "CCABAP Monograph") for OTC nasal decongestant drug products.[21] The CCABAP Monograph regulates and provides a list of permitted nasal decongestants,

---

[18] U.S. FOOD & DRUG ADMIN., EFFICACY OF ORAL PHENYLEPHRINE AS A NASAL DECONGESTANT 13 (2023), https://www.fda.gov/media/171915/download.
[19] *Id.* at 9.
[20] A "monograph dosage" is the dosage of the drug the FDA has officially approved for use.
[21] U.S. FOOD & DRUG ADMIN., EFFICACY OF ORAL PHENYLEPHRINE AS A NASAL DECONGESTANT 12 (2023), https://www.fda.gov/media/171915/download.

among other therapeutic classes of drugs. The FDA approved dosage of orally administered PE was 10 mg.[22]

36.     In 2000, PPA was removed from the market after it was found to cause hemorrhagic strokes in women.[23] Additionally, in 2006, the Combat Methamphetamine Epidemic Act ("CMEA") limited the availability of PSE by requiring the sale of PSE products to "behind-the-counter" sales made only to people with a prescription.[24] This restriction on OTC availability of PSE made by the CMEA was a result of the use of PSE to illegally produce methamphetamine.[25]

37.     Consequently, by 2006, PE became the only OTC oral decongestant listed in the CCABAP Monograph as FDA approved for OTC sales. As a result, manufacturers replaced or reformulated their PSE OTC oral decongestant products to now be formulated with PE. This was done to maintain OTC availability of products and reduce the new barrier to sales the CMEA created by requiring consumers to purchase PSE products "behind-the-counter."

38.     However, there have been continuous concerns raised to the FDA by the scientific community regarding the lack of scientific merit of the original clinical studies done in 1976 that formed the basis for the FDA's approval of orally

---

[22] *Id.* at 9.
[23] U.S. FOOD & DRUG ADMIN., EFFICACY OF ORAL PHENYLEPHRINE AS A NASAL DECONGESTANT 12 (2023), https://www.fda.gov/media/171915/download.
[24] *Id.*
[25] *Id.*

administered PE. These concerns have been expressed and reviewed by FDA advisory panels by virtue of a 2007 Citizen's Petition, a 2007 Non-Prescription Drug Advisory Committee ("NDAC") Meeting, a 2015 Citizen's Petition, and a 2023 NDAC Meeting.[26] After the 2023 NDAC meeting, the FDA advisory panel voted 16-0 on September 12, 2023, that oral PE is not an effective treatment for nasal congestion.[27]

## Summary of the FDA Review Process

39.     The 1972 Kefauver-Harris Amendment to the Food, Drug, and Cosmetic Act requires drug manufacturers provide proof of the effectiveness and safety of their drugs before FDA approval.[28] The FDA's administrative process on reviewing OTC drugs[29] involves convening an Advisory Panel to review data relating to claims and active ingredients.[30] The Advisory Panel's reports and comments are published in the Federal Registrar as Advanced Notice(s) of Proposed Rulemaking ("ANPR" or "Proposed Rules") which, after FDA review, are published in a Tentative Final Monograph ("TFM") for each therapeutic class of drugs.[31] Each TFM establishes the conditions under which an ingredient within a drug class, or

---

[26] *Id.*

[27] *Id.*

[28] U.S. FOOD & DRUG ADMIN., EFFICACY OF ORAL PHENYLEPHRINE AS A NASAL DECONGESTANT 11 (2023), https://www.fda.gov/media/171915/download.

[29] The FDA's administrative review process for OTC drugs is often referred to as the Drug Efficacy Study Implementation ("DESI") process.

[30] U.S. FOOD & DRUG ADMIN., EFFICACY OF ORAL PHENYLEPHRINE AS A NASAL DECONGESTANT 11 (2023), https://www.fda.gov/media/171915/download.

[31] *Id.*

permitted combination of ingredients, is considered to be Category I "generally recognized as safe and effective" ("GRASE").[32] The final step is the publication of a Final Monograph ("FM") for each class of drugs, which provides a list of permitted ingredients, and ingredient combinations, along with required labeling, dosing, and marketing requirements.[33] Drugs manufactured and marketed in accordance with the FM requirements are considered GRASE.[34] This process allows for the FDA to amend the FM in response to a Citizen's Petition ("CP").

40.     Inclusion of ingredients, including PE, in the CCABAP Monograph was based on recommendations made by an Advisory Review Panel on Over-the-Counter Cold, Cough, Allergy, Bronchodilator, and Anti-asthmatic Products ("the "Panel" or the "Cough-Cold Panel").[35] The Panel was convened by the National Academy of Sciences / National Research Council, on behalf of the FDA, to review and provide recommendations to the FDA regarding the safety and efficacy of therapeutic groups of products, including PE.[36] The FDA published the Panel's recommendations as a Proposed Rule (ANPR) in 1976 and issued the CCABAP TFM in segments between 1982 and 1988.[37] The CCABAP Final Monograph for

---

[32] *Id.*

[33] *Id.*

[34] U.S. FOOD & DRUG ADMIN., EFFICACY OF ORAL PHENYLEPHRINE AS A NASAL DECONGESTANT 11 (2023), https://www.fda.gov/media/171915/download.

[35] *Id.* at 12.

[36] U.S. FOOD & DRUG ADMIN., EFFICACY OF ORAL PHENYLEPHRINE AS A NASAL DECONGESTANT 11 (2023), https://www.fda.gov/media/171915/download.

[37] *Id.*

nasal decongestants was published in 1994.[38]

41.    The Advisory Panel first reviewed PEH for OTC use as a nasal decongestant in 1976. The Agency then published the Panel's findings in the Federal Registrar as a Proposed Rule, and the CCABAP FM, which included PEH, was published in 1994.[39] The CCABAP FM classified PEH as a GRASE nasal decongestant when administered intranasally[40] or when administered orally.[41]

42.    In 2004, the FDA issued a Proposed Rule to add PEB as a GRASE OTC oral treatment for nasal decongestion in response to a drug manufacturer's Citizen Petition citing pharmacokinetic ("PK") data which represented PEB had similar bioavailability to PEH.[42] PEB is an immediate release ("IR") orally administered effervescent tablet form of PE.[43] In 2006, the FDA issued a Final Ruling which amended the CCABAP FM and added PEB as GRASE.[44]

43.    Amendments to the FM were rarely done until the passage of the Coronavirus, Aid, Relief, and Economic Security Act ("CARES Act") in 2020.[45]

---

[38] *Id.* at 11-12.
[39] *Id.* at 15.
[40] i.e. when the drug is applied directly into the nose, such as with a nasal spray or topical cream.
[41] U.S. FOOD & DRUG ADMIN., EFFICACY OF ORAL PHENYLEPHRINE AS A NASAL DECONGESTANT 13 (2023), https://www.fda.gov/media/171915/download.
[42] *Id.*
[43] *Id.*
[44] *Id.*
[45] U.S. FOOD & DRUG ADMIN., EFFICACY OF ORAL PHENYLEPHRINE AS A NASAL DECONGESTANT 13 (2023), https://www.fda.gov/media/171915/download; *see also* https://www.govinfo.gov/content/pkg/COMPS-15754/pdf/COMPS-15754.pdf.

The CARES Act created an updated administrative order process and authority for the FDA to issue, revise, and amend monographs, which simplified making any contemplated changes.[46] Additionally, the CARES Act also required the FDA to report to Congress yearly on the status of GRASE determinations or revisions to the CCABAP Monograph, and specifically required updates on any pediatric dosage issues.[47]

44.     Since the CCABAP Monograph's pediatric PE dosage was based on adult data and dosages for PE, and also since the FDA had recently received a 2015 Citizen's Petition containing concerns with the scientific merits and validity of the adult PE data, the new pediatric requirement in the CARES Act prompted FDA's 2023 reevaluation of the effectiveness of oral PE as a treatment for nasal congestion.[48]

45.     On September 12, 2023, the NDAC voted 16-0 that orally administered PE is not effective as a treatment for nasal congestion.[49]

---

[46] U.S. FOOD & DRUG ADMIN., EFFICACY OF ORAL PHENYLEPHRINE AS A NASAL DECONGESTANT 13 (2023), https://www.fda.gov/media/171915/download; *see also* https://www.govinfo.gov/content/pkg/COMPS-15754/pdf/COMPS-15754.pdf.
[47] U.S. FOOD & DRUG ADMIN., EFFICACY OF ORAL PHENYLEPHRINE AS A NASAL DECONGESTANT 13 (2023), https://www.fda.gov/media/171915/download
[48] *Id.* at 13.
[49] Haley Weiss, *With the Decongestant SNAFU, the FDA Tries Something New*, TIME (Sept. 14, 2023), https://time.com/6314120/fda-decongestant-phenylephrine-decision/#:~:text=That%20changed%20on%20Sep.%2012,be%20pulled%20from%20stores%20altogether (last accessed Sept. 22, 2023).

46.    The NDAC stated:

> The new data appear compelling that the monographed dosage of oral PE results in no meaningful systemic exposure or evidence of efficacy. Furthermore, the review suggests that higher does . . . have also not shown efficacy. These findings are supported by in vitro and in vivo clinical pharmacology data showing that orally administered phenylephrine undergoes high first-pass metabolism resulting in less than 1% bioavailability.[50]

The NDAC also stated that "studying higher doses would not be a viable option" because of dangerous rises in blood pressure associated with higher doses.[51]

47.    Specifically, the advisory panel to the FDA concluded:

> In accordance with the effectiveness standard for determining that a category of over-the-counter (OTC) drugs is generally recognized as safe and effective that is set forth in 21 CFR § 330.10(a)(4)(ii), which defines effectiveness as: "a reasonable expectation that, in a significant proportion of the target population, the pharmacological effect of the drug, when used under adequate directions for use and warnings against unsafe use, will provide clinically significant relief of the type claimed", **we have now come to the initial conclusion that orally administered PE is not effective as a nasal decongestant at the monographed dosage (10 mg of PE hydrochloride every 4 hours) as well as at doses up to 40 mg (dosed every 4 hours).**[52] (emphasis added).

---

[50] U.S. FOOD & DRUG ADMIN., EFFICACY OF ORAL PHENYLEPHRINE AS A NASAL DECONGESTANT 14 (2023), https://www.fda.gov/media/171915/download.

[51] Id.

[52] U.S. FOOD & DRUG ADMIN., EFFICACY OF ORAL PHENYLEPHRINE AS A NASAL DECONGESTANT 14 (2023), https://www.fda.gov/media/171915/download.

## The Original Clinical Trials Reviewed by the FDA

48.    The 1976 advisory panel's initial evaluation of oral PEH in 1976 included a review of seventeen safety studies and fourteen effectiveness studies.[53]

49.    All fourteen effectiveness studies used a methodology, nasal airway resistance ("NAR"), that is no longer used in modern medicine and that does not meet the FDA's current standards for FDA approval.[54] Thus, even if a study showed that oral PE Products were "effective" in 1976, they were based on a now invalid methodology.[55]

50.    Two of the fourteen studies evaluated by the advisory panel in 1976 on oral PE did not provide evaluable efficacy information.[56] Eleven of the fourteen effectiveness studies were from a single manufacturer of PE products, Sterling-Winthrop Labs ("Sterling-Winthrop").[57] These studies were small, single-center crossover studies that had significant issues.

---

[53] *Id.* at 15, 17.

[54] The 1976 studies measured the level of nasal congestion by using measurements of airflow and air pressure in the nasal passage to calculate NAR as an indirect measure of the level of nasal congestion as their endpoint. However, modern medicine no longer supports the NAR methodology, as science has evolved since these studies were reviewed in 1976. As a result, NAR is no longer used to evaluate congestion in clinical trials, and the FDA now recommends the use of nasal congestion symptom scores to evaluate congestion and other symptoms related to allergic rhinitis.

[55] U.S. FOOD & DRUG ADMIN., EFFICACY OF ORAL PHENYLEPHRINE AS A NASAL DECONGESTANT 17-18 (2023), https://www.fda.gov/media/171915/download.

[56] *Id.*

[57] *Id.* at 18.

51.     Of the fourteen studies, half (seven) of the studies showed that oral PE did not have measurable efficacy results.[58] Six of the seven positive studies came from Sterling-Winthrop and formed "a large part of the basis for the original Panel's recommendations" to approve oral PE.[59] Additionally, five of the six studies done by Sterling-Winthrop were done in the same laboratory, Elizabeth Biochemical, which the NDAC stated had "potential bias and data integrity issues."[60]

52.     When the 1976 advisory panel requested public comment as part of their review process, two comments of note argued that oral PE should not be approved because the 1976 advisory panel based its decision on numerous unpublished studies and that the studies considered were "split evenly between mild successes and total failures," and that a published study in a peer-reviewed journal demonstrated no efficacy of oral PE; the comments also included two references which supported the notion that PE had no oral bioavailability.[61]

53.     After the 1976 advisory panel's review of these studies, the Panel stated that the data was "not strongly indicative of efficacy."[62] However, because the other safety trials reviewed demonstrated no apparent safety concerns, because

---

[58] U.S. FOOD & DRUG ADMIN., EFFICACY OF ORAL PHENYLEPHRINE AS A NASAL DECONGESTANT 18 (2023), https://www.fda.gov/media/171915/download.
[59] Id.
[60] U.S. FOOD & DRUG ADMIN., EFFICACY OF ORAL PHENYLEPHRINE AS A NASAL DECONGESTANT 32 (2023), https://www.fda.gov/media/171915/download.
[61] Id. at 22.
[62] Id.

seven of the ten studies presented to the FDA were "positive," and because the scientific community did not yet know NAR was an ineffective measurement, the Panel approved oral PE and it was published in the FM in 1994.[63]

### Meta-Analyses in 2007 Citizen's Petition & 2007 NDAC Meeting

54.      On February 1, 2007, Leslie Hendeles, PharmD, Randy C. Hatton, PharmD, and Jonathan J. Schuster, PharmD, ("Petitioners") filed a Citizen's Petition ("2007 Petition") with the FDA requesting that the dosage of oral phenylephrine be re-evaluated for patients over the age of 12 years old and that approval for use in children under the age of 12 years old also be withdrawn.[64]

55.      The basis for this 2007 Petition was Petitioners' systematic review and meta-analysis of the aforementioned clinical studies considered by the Agency when the FDA included oral PE in the FM for OTC nasal decongestant drug products, in addition to the fact that there is no data on the safety of PE in children under the age of 12 years old.[65]

56.      Well-conducted meta-analyses are considered a higher level of evidence than individual clinical trials as they provide a method to evaluate the

---

[63] *Id.* at 23.
[64] *Id.* (citing Hendeles, Hatton & Winterstein, Citizen Petition — Phenylephrine, https://www.regulations.gov/docket/FDA-2007-P-0108).
[65] *Id.*

aggregated results of all relevant studies according to their pooled effects and methodological quality.

57.   Petitioners obtained all the data used for these studies through the Freedom of Information Act ("FOIA") and performed a meta-analysis of the data.[66] This meta-analysis resulted in a different conclusion than that of the original Cough-Cold Advisory Panel data, as it instead found that oral PE is not effective at the monographed dosages.[67]

58.   In response to the 2007 Petition, the FDA convened a NDAC Committee ("2007 NDAC") on December 14, 2007.[68] The 2007 NDAC reviewed the 2007 Petition and the associated meta-analysis performed by Petitioners.[69] In addition, the 2007 NDAC attended a presentation done by Petitioners discussing the findings of their meta-analysis, and a presentation by the Consumer Healthcare Products Association ("CHPA"). CHPA, predictably, presented a second meta-analysis that they believed supported the findings of the original Panel to approve oral PE.[70] The data presented in both meta-analyses was then reviewed and presented by an FDA statistician, who then discussed his findings with the 2007

---

[66] *Id.*

[67] U.S. FOOD & DRUG ADMIN., EFFICACY OF ORAL PHENYLEPHRINE AS A NASAL DECONGESTANT 23 (2023), https://www.fda.gov/media/171915/download.

[68] *Id.*

[69] *Id.*

[70] U.S. FOOD & DRUG ADMIN., EFFICACY OF ORAL PHENYLEPHRINE AS A NASAL DECONGESTANT 23 (2023), https://www.fda.gov/media/171915/download.

NDAC.[71] Lastly, the Committee also attended presentations by several industry speakers from Scherling-Plough and Scheing-Plough Merck, who provided previously unpublished data that confirmed the proposition behind Petitioners' petition to withdraw PE from the FM — that oral PE is ineffective as a nasal decongestant.[72]

59.　　In Petitioners' presentation of their meta-analysis, they noted that the data from one company, Elizabeth Biochemical, drove the majority of the Panel's original decision.[73] Petitioners also noted that the studies done in other labs had not only found no difference between the effects of oral PE and a placebo, but when they did find any difference in effect, it was nowhere near the magnitude of the effect reported by Elizabeth Biochemical; Petitioners therefore believed this indicated an Elizabeth Biochemical reporting bias.[74] Petitioners also reviewed the literature and several negative studies that supported the ineffectiveness of oral PE, which provided further support to Petitioners' conclusion that oral PE was ineffective.[75]

60.　The industry presentations included two presentations by Schering-Plough and Schering-Plough Merck, which, the FDA advisory panel said "counterintuitively" presented data that supported Petitioners' belief that the

---

[71] U.S. FOOD & DRUG ADMIN., EFFICACY OF ORAL PHENYLEPHRINE AS A NASAL DECONGESTANT 25-26 (2023), https://www.fda.gov/media/171915/download.
[72] *Id.* at 23.
[73] *Id.* at 23-24.
[74] *Id.*
[75] *Id.* at 24.

monograph approved dose of oral PE is not effective, and they argued that higher doses would be needed.[76] The Advisory Panel notes that it appears these companies performed subsequent studies that they "hoped" supported the efficacy of oral PE in higher monographed doses.[77] However, their studies showed that oral PE was not even effective at up to four-fold (40 mg) of the FDA monograph dose — the maximum dose that could be safely marketed.[78] In other words, *even recent industry participant studies show that Oral PE at its maximum possible safe dosage is not effective at providing nasal congestion relief health benefits.*

61.   John, O'Mullane, PhD, the Group Vice-President of Consumer Healthcare Research and Development at Schering-Plough, presented to the 2007 NDAC data that showed 10 mg of oral PE is not "sufficient to provide efficacy."[79]

62.   The second presentation by Schering-Plough Merck reviewed the findings from two studies published in 2009. Both studies showed that "PE failed to provide any benefit over placebo."[80]

63.   Lastly, FDA statistician Dr. Stan Lin reviewed both sets of meta-analyses and four unpublished studies from Wyeth Consumer Healthcare and

---

[76]U.S. FOOD & DRUG ADMIN., EFFICACY OF ORAL PHENYLEPHRINE AS A NASAL DECONGESTANT 25-28 (2023), https://www.fda.gov/media/171915/download.
[77] U.S. FOOD & DRUG ADMIN., EFFICACY OF ORAL PHENYLEPHRINE AS A NASAL DECONGESTANT 25-28 (2023), https://www.fda.gov/media/171915/download.
[78] *Id.* at 26.
[79] *Id.*
[80]*Id.* at 28.

27

Schering-Plough and presented his conclusion to the Committee.[81] Dr. Lin noted that all of original studies used NAR as their primary clinical measure, which was sufficiently problematic because the FDA no longer accepts it as a clinical endpoint.[82] In summary, Dr. Lin noted that the small size, the lack of multicenter representation, the lack of reproducibility, and the problematic nature of the methodology used by the original studies suggest that the data reviewed by the original Panel is not conclusive of PE efficacy.[83]

64.    After the Committee's review of all of the presented material, it noted the inconsistent results, but due to the limitations of the data, nine of the twelve Committee members voted to recommend that additional clinical data was necessary before making any changes to the FDA's stance on PE, including new studies needed to evaluate the effect of higher doses of oral PE, new studies which do not use NAR as an endpoint, along with other recommended design elements for future trials.[84]

65.    In response to the 2007 NDAC Meeting, the Agency's Clinical Pharmacology team reviewed all of the "new" bioavailability data (data that had become available since the Agency's original GRASE determination in 1994) **and confirmed that the actual oral bioavailability of PE is less than one percent**

---

[81] U.S. FOOD & DRUG ADMIN., EFFICACY OF ORAL PHENYLEPHRINE AS A NASAL DECONGESTANT 28 (2023), https://www.fda.gov/media/171915/download.
[82] Id.
[83] U.S. FOOD & DRUG ADMIN., EFFICACY OF ORAL PHENYLEPHRINE AS A NASAL DECONGESTANT 29 (2023), https://www.fda.gov/media/171915/download.
[84] Id.

**(<1%).[85]** This effect was found to be due to the high-first pass metabolism effect that occurs when PE is administered orally.[86]

### 2015 Citizen's Petition

66.     On November 4, 2015, Leslie Hendeles, PharmD, and Randy C. Hatton, PharmD, FCCP, BCPS, filed a Citizen's Petition (the "2015 Petition") under 21 CFR Part 10.30 to request the removal of oral PE, both individually and in combination drug products, from the FM for OTC nasal decongestant products, and to remove phenylephrine bitartrate ("PEB") from the 2006 Amendment to the FM.[87]

67.     The 2015 Citizen's Petition cited their previously filed 2007 Citizen's Petition which requested the dosage of oral PE be re-evaluated and the approval for use in children under twelve years old be withdrawn.[88]

68.     The 2015 Petition outlined the results of the three new additional studies which were performed and published since the 2007 NDAC meeting and presented evidence which "provide further evidence of the absence of a decongestant effect from the FDA-approved nonprescription dose of 10mg," and showed that "PE was not significantly different from placebo in the mean change in subjective nasal

---

[85] U.S. FOOD & DRUG ADMIN., EFFICACY OF ORAL PHENYLEPHRINE AS A NASAL DECONGESTANT 9 (2023), https://www.fda.gov/media/171915/download (citing Hendeles & Hatton, Citizen Petition — Phenylephrine (2015), https://www.regulations.gov/docket/FDA-2015-P-4131).
[86] *Id.*
[87] *Id.*
[88] *Id.*

congestion scores."[89]

69.     In response to the 2015 Citizen's Petition, the American Academy of Allergy, Asthma and Immunology also filed a letter with the FDA citing their support of the 2015 Citizen's Petition's findings.[90]

### The Three Modern Clinical Trials

70.     Three large adequately controlled modern clinical trials have been conducted on PE.[91] These three trials represent the largest and most carefully conducted studies on the effects of oral PE.

71.     In 2011, Merck (formerly Schering-Plough Pharmaceuticals), conducted a multicenter, double-blind, placebo-controlled, multiple-dose crossover Phase 2 parallel trial on 539 subjects with allergic rhinitis to evaluate the potential for a higher than monographed dose of IR PE up to 40 mg.[92] The results of Merck's trial demonstrated not only demonstrated no effect of a higher than monographed dose of PE up to 40 mg, but also demonstrated no effect of orally administered PE at any dosage.[93]

72.     Merck also conducted a Phase 3, multicenter, randomized, double-blind, placebo-controlled, two-arm, parallel-group trial on 575 adult subjects with

---

[89] U.S. FOOD & DRUG ADMIN., EFFICACY OF ORAL PHENYLEPHRINE AS A NASAL DECONGESTANT 9 (2023), https://www.fda.gov/media/171915/download.
[90] *Id.* at 8.
[91] *Id.* at 43.
[92] *Id.*
[93] *Id.*

pollen allergens to evaluate the effect of 30 mg of a modified-release formulation of PEH. This study was conducted in 2011, and later published in 2016 in a peer-reviewed journal. The NDAC noted in its 2023 review that this study likely was an attempt to support an application for an extended-release PE product at a higher than monographed dose. However, the results of this study showed no statistically meaningful difference in nasal symptoms between the PE and placebo treatment groups. The NDAC notes in its 2023 review of this study that the results "clearly demonstrate that active treatment was numerically no better than placebo at any timepoint in the trial" and "the placebo arm had numerically more mean improvement over the course of the study." Further, the 2023 NDAC concluded that "this study provides high-quality (Level 1) evidence that PE is not an effective nasal decongestant when administered orally in a 30 mg formulation."

73. In addition, the Agency noted a third, additional interim analysis conducted in 2017-2018 by Johnson and Johnson in Canada on subjects with the common cold to evaluate a 30 mg ER oral PE product taken twice daily, along with a 12 mg IR product taken four times daily.[94] This analysis was a randomized, double-blind, double-dummy, placebo controlled, parallel group, which enrolled 193 subjects, although it had planned to enroll 450 subjects;[95] because of this, it was

---

[94] U.S. FOOD & DRUG ADMIN., EFFICACY OF ORAL PHENYLEPHRINE AS A NASAL DECONGESTANT 51 (2023), https://www.fda.gov/media/171915/download.
[95] Id.

terminated as a study and was designed as an interim analysis. In addition, this study used nasal symptom scores, not NAR, for its primary endpoint, thus aligning with the FDA's modern guidelines.[96] While only deemed an interim analysis, it was significant in that it **demonstrated that oral PE also had no effect on subjects with colds**.[97]

74.     All three trials used the clinically acceptable designs and endpoints that were missing in the original studies considered.

75.     All three of these trials demonstrate lack of efficacy of IR oral PE doses up to 40 mg as well as no efficacy of extended-release ("ER") doses of oral PE up to 30 mg. As a result, all three of these trials demonstrated that there was no difference between the effects of a placebo in comparison to either the monographed dose of PE or a higher than monograph dose of PE.

76.     In the NDAC's 2023 review, the NDAC notes that these studies are consistent, substantial, and believable and they confirm that orally administered PE is not effective at any dose that can be developed.[98]

---

[96] *Id.*
[97] *Id.* at 51-52.
[98] *Id.* at 42.

## September 2023: FDA Advisory Panel Votes 16-0 on Inefficacy of Oral PE as Nasal Decongestant

77.    The 2020 CARES Act provides that the CCBAP Monograph may be amended via a new administrative order process established under Section 505G of the Food, Drug, and Cosmetic Act (rather than the ANRP process).[99] The NDAC states this provides a "simplified" process to contemplate changes to the CCBAP Monograph.[100] The NDAC readily admitted that past changes to the monograph were delayed by the "time and resources needed to fully review the issues."

78.    As a result of the 2015 Citizen's Petition and the simplified monograph review process established by the CARES Act, the FDA's NDAC met on September 11, and 12, 2023.[101] As a result of an extensive review of all the relevant material (as summarized above), the NDAC members voted unanimously (16-0) that orally administered PE is not effective as a nasal decongestant.[102]

79.    The NDAC's conclusion was made after extensive review of the following: (1) the fourteen original clinical trials that were the basis for the FDA's approval of PE, (2) the 2007 Citizen's Petition, (3) the 2007 NDAC meeting and two meta-analyses presented there, (4) bioavailability data which demonstrated that less than one percent (<1%) of an oral dose of PE is systemically available, (5) two EEU

---

[99] U.S. FOOD & DRUG ADMIN., EFFICACY OF ORAL PHENYLEPHRINE AS A NASAL DECONGESTANT 12 (2023), https://www.fda.gov/media/171915/download.
[100] *Id.*
[101] *Id.* at 9-13.
[102] *Id.* at 9-14.

studies, (6) three modern clinical studies done since the 2007 NDAC meeting, and (7) the 2015 Citizen's Petition.[103]

80.    The NDAC found that this information demonstrated that oral PE is ineffective as a nasal decongestant, especially after considering the results of the new data from the three modern studies, the significant methodological and statistical issues with the design and conduct of the original studies, and the use of NAR rather than nasal symptom scores as an endpoint.[104]  The NDAC also noted that all but one of the original studies evaluated the common cold, not allergy symptoms; the common cold has significant symptomatic variation between individuals and is therefore not an efficient barometer to study whether oral PE provides its stated benefits.[105] In addition, thirteen of the fourteen original studies evaluated extremely small sample sizes, and no original study controlled for bias or multiplicity.[106]

81.    The NDAC also noted that ten of the original studies were all from one sponsor and were small, single-center crossover studies with significant issues; six of these ten studies formed the basis to support oral PE's GRASE designation; two

---

[103] *Id.*

[104] In 2018, the FDA issued new guidance instructing the industry to use nasal congestion symptom scores, not NAR, as a primary endpoint to evaluate nasal congestion in studies moving forward. *See* https://www.fda.gov/files/drugs/published/Allergic-Rhinitis--Developing-Drug-Products-for-Treatment-Guidance-for-Industry.pdf.

[105] U.S. FOOD & DRUG ADMIN., EFFICACY OF ORAL PHENYLEPHRINE AS A NASAL DECONGESTANT 32-34 (2023), https://www.fda.gov/media/171915/download.

[106] *Id.*

of the single sponsor studies were the most positive and their results were unable to be replicated.[107]

82.     The NDAC also reviewed the EEU studies presented at the 2007 NDAC meeting and concluded that in both studies, PE failed to provide any benefit over placebo, while PSE provided good relief of congestion symptoms in one of the studies.[108]

83.     The NDAC also reviewed the findings of three large clinical trials since the 2007 meeting.

84.     The NDAC concluded that as a result of their evaluation of all the aforementioned scientific evidence, they believe the new efficacy data outweighs the outdated data provided for the original Panel's review, and, along with the modern clinical trials and data, their evaluation demonstrated that: (1) oral PE at monographed dosages is not effective as a decongestant, (2) oral doses up to 40 mg would also not be effective, (3) finding an effective oral dose that is also safe is not feasible, and (4) an appropriate dosing interval for oral PE has not been established. Therefore, the Agency concluded that "in addition to lack of efficacy, there may be no path to evaluating higher doses of oral PE as a nasal decongestant."[109]

---

[107] *Id.* at 32-33.
[108] *Id.* at 32.
[109] *Id.* at 33.

## IV.    Misbranded/mislabeled and/or Adulterated Drugs are Illegal to Sell

85.    Drugs in the United States that are not manufactured in accordance with Current Good Manufacturing Practices ("cGMPs") are deemed "adulterated" or "misbranded" and thus may not be distributed or sold in the United States.[110] States have similar laws adopting or mirroring these federal standards. Defendant, as manufacturer of oral PE Products sold OTC, is bound by these requirements.

86.    Oral PE products are OTC drug products regulated by the FDA and thus would be required to meet specified safety, quality, purity, identity, and strength standards.[111] The FDA has worldwide jurisdiction to enforce these regulations if the facility is making drugs intended to be distributed in the United States.

87.    Defendant's oral PE Products are "adulterated" as defined by the Food, Drug and Cosmetic Act ("FDCA") because they are a "drug" and the "methods used in, or the facilities or controls used for, its manufacture, processing, packing, or holding do not conform to or are not operated or administered in conformity with current good manufacturing practice to assure that such drug meets the requirements of this chapter as to safety and **has the identity and strength**, and meets the quality

---

[110] 21 U.S.C. §§ 331(a), 351(a)(2)(B). cGMPs establish "minimum current good manufacturing practice for methods to be used in, and the facilities or controls to be used for, the manufacture, processing, packing, or holding of a drug to assure that such drug meets the requirements of the act as to safety, and has the identity and strength and meets the quality and purity characteristics that it purports or is represented to possess." 21 C.F.R. § 210.1(a).
[111] 21 U.S.C. § 351(a)(2)(B).

and purity characteristics, **which it purports or is represented to possess**."
(emphasis added).

88.     Because Defendant's oral PE Products do not have the identity and
strength claimed, its products cannot be distributed or sold in the United States under
federal law.

89.     A drug is considered "misbranded" if: "its labeling is false or
misleading in any particular…."[112] The manufacture and sale of misbranded drugs
is prohibited under federal law, as is the introduction of any misbranded product into
the stream of interstate commerce.

90.     Because Defendant's oral PE Products do not provide the stated nasal
decongestion health benefits as labeled on its oral PE Products, its products are
misbranded and are in violation of federal law.

91.      Plaintiff's reference to federal law in this Complaint is to demonstrate
that its state law tort claims do not impose additional obligations on Defendant
beyond what they are already required to comply with under federal law for the
distribution of oral PE Products.

## V.     *The Impact of Defendant's Wrongful Conduct*

92.     Despite  clinical  studies  demonstrating  oral  PE  Products'
ineffectiveness, Defendant conveyed and continues to convey one uniform nasal

---

[112]21 U.S.C. § 352(a)(1)

congestion relief health message: that oral PE Products are nasal decongestion over-the-counter medicines capable of providing nasal decongestion health benefits.

93.    As the manufacturer of oral PE Products, Defendant possesses specialized knowledge regarding their content and effects of their ingredients, and Defendant is in a superior position to know whether the oral PE Products' work as advertised.

94.    Specifically, Defendant knew, but failed to disclose, or should have known, that the oral PE Products cannot provide nasal decongestion health benefits, and that well-conducted clinical studies have found the oral PE Products' primary ingredients are unable to support or benefit nasal decongestion.

95.    Plaintiffs and the class members have been and will continue to be deceived or misled by Defendant's false and deceptive nasal decongestion health representations.

96.    Defendant's nasal decongestion health representations and omissions were a material factor in influencing Plaintiffs and the class members' decision to purchase the oral PE Products. In fact, the only purpose for purchasing the oral PE Products is to obtain the represented nasal decongestion health benefits.

97.    Defendant's conduct has injured Plaintiffs and the class members because Defendant's oral PE Products are worthless and cannot support or benefit nasal decongestion health in any way.

98.    Had Plaintiffs and the class members known the true nature of Defendant's oral PE Products, they would not have purchased the oral PE Products and would not have paid the prices they paid for the oral PE Products.

99.    Plaintiffs and each class member were harmed by purchasing Defendant's oral PE Products because they are not capable of providing their advertised benefits. As a result, Plaintiffs and each class member lost money and property by way of purchasing Defendant's ineffective and worthless nasal decongestion over-the-counter medicines.

## CLASS DEFINITION AND ALLEGATIONS

100.    Plaintiffs, pursuant to Fed. R. Civ. Pro. 23(b)(2) and 23(b)(3), bring this action on behalf of the following Class:

> All persons who purchased in the United States any of Defendant's oral PE Products for personal or household use.

101.    Excluded from the Class is Defendant, its parents, subsidiaries, affiliates, officers, and directors, those who purchased the oral PE Products for resale, all persons who make a timely election to be excluded from the Class, the judge to whom this case is assigned and any immediate family members thereof, and those who assert claims for personal injury.

102.    Plaintiffs reserve the right to amend the definition of the Class if discovery or further investigation reveals that the Class should be expanded or otherwise modified.

103. Plaintiffs, pursuant to Fed. R. Civ. Pro. 23(b)(2) and 23(b)(3), also bring this action on behalf of the following Subclasses:

**California Subclass**

All persons who purchased in the state of California any of Defendant's oral PE Products for personal or household use.

**New York Subclass**

All persons who purchased in the state of New York any of Defendant's oral PE Products for personal or household use.

104. Excluded from the Subclasses are Defendant, its parents, subsidiaries, affiliates, officers, and directors, those who purchased the PE Products for resale, all persons who make a timely election to be excluded from the Class, the judge to whom this case is assigned and any immediate family members thereof, and those who assert claims for personal injury.

105. Certification of Plaintiffs' claims for class wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

106. **Numerosity – Federal Rule of Civil Procedure 23(a)(1).** The members of the Class are so numerous that individual joinder of all Class members is impracticable. Defendant has sold many thousands of units of the oral PE Products to Class members.

107. **Commonality and Predominance – Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3).** This action involves common questions of law and fact, which predominate over any questions affecting individual Class members. Specifically, whether Defendant's representations regarding its oral PE Products and their health benefits are misleading and deceptive is a question common to the class. Similarly, oral PE Products are either capable of providing nasal decongestive health benefits or they are not, and Defendant's uniform representation that oral PE Products are OTC medicines capable of providing nasal decongestive health benefits either is true or false. These questions and others like them are common to the Class and predominate over individual issues.

108. **Typicality – Federal Rule of Civil Procedure 23(a)(3).** Plaintiffs' claims are typical of the other Class members' claims because, among other things, all Class members were comparably injured through the uniform prohibited conduct described above.

109. **Adequacy of Representation – Federal Rule of Civil Procedure 23(a)(4).** Plaintiffs are adequate representatives of the Class because Plaintiffs' interests do not conflict with the interests of the other Class members Plaintiffs seek to represent; Plaintiffs have retained counsel competent and experienced in complex commercial and class action litigation; and Plaintiffs intend to prosecute this action

vigorously. The interests of the Class members will be fairly and adequately protected by Plaintiffs and their counsel.

110. **Superiority – Federal Rule of Civil Procedure 23(b)(3).** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiffs and the other Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendant, so it would be impracticable for Class members to individually seek redress for Defendant's wrongful conduct. Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## CLAIMS ALLEGED

### COUNT I
### Breach of Express Warranty

111. Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

112.   Plaintiffs bring this claim on behalf of themselves, and those members of the Class who purchased oral PE Products in states with similar warranty laws as applied to the facts of this case, or, in the alternative, on behalf of the Subclasses.

113.   Defendant, by affirmation of fact and/or promises set forth in its promotions, advertisements, packaging and/or labeling for oral PE Products created an express warranty that oral PE Products would conform to the affirmation and/or promises.

114.   The affirmations of fact and/or promises made by Defendant on the oral PE Products' labels and advertising, which related to the health benefits of oral PE Products, are express warranties, became part of the basis of the bargain, and are part of a standardized contract between Plaintiffs and the members of the Class on the one hand and Defendant on the other.

115.   Plaintiffs and the Class members performed all conditions precedent under the contract between the Parties.

116.   Defendant is in privity with Plaintiffs and members of the Class. Plaintiffs and Class members, not the retailers, were the intended beneficiaries of Defendant's products and the associated written warranties. Defendant created the advertising and labeling at issue for oral PE Products and warranted the products to Plaintiffs and members of the Class directly and/or through the doctrine of agency. Defendant's sale of the oral PE Products was either direct or through authorized

sellers. Purchase through authorized sellers is sufficient to create privity because such authorized sellers are Defendant's agents for the purpose of the sale of the products. Further, Defendant knew the identity, purpose and requirements of Plaintiffs and members of the Class and manufactured the oral PE Products to meet their requirements.

117. Defendant breached the terms of the express warranty between the Parties including the express warranties related to the benefits of oral PE with Plaintiffs and the Class by not providing the oral PE Products in a manner that conformed to the affirmations and/or promises.

118. Defendant's breach of this express warranty has directly and proximately caused Plaintiffs and members of the Class to suffer damages in the amount of the purchase price of the oral PE Products.

119. Within a reasonable time of discovering the breach of express warranty by Defendant, Plaintiffs through counsel notified Defendant of the breach of warranty.

## <u>COUNT II</u>

**Unjust Enrichment**
**(On Behalf of a Multistate Class or the State Subclasses)**

120. Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

121.   Plaintiffs bring this claim on behalf of themselves, and those members of the Class who purchased oral PE Products in states with similar unjust enrichment laws as applied to the facts of this case, or, in the alternative, on behalf of the Subclasses.

122.   As a direct and proximate result of its misrepresentations concerning the health benefits of the oral PE Products and its failure to disclose that oral PE Products are ineffective in providing the advertised nasal decongestion health benefits, Defendant has profited through the sale of its oral PE Products to Plaintiffs and Class members.

123.   Defendant's unlawful and wrongful acts, as alleged above, enabled Defendant to unlawfully receive money from Plaintiffs and the Class it would not have otherwise obtained.

124.   Plaintiffs and the Class members have conferred benefits on Defendant, which Defendant has knowingly accepted and retained.

125.   Defendant's retention of the benefits conferred by Plaintiffs and the Class members would be against fundamental principles of justice, equity, and good conscience.

126.   Plaintiffs and the Class members seek to disgorge Defendant's unlawfully retained money resulting from their unlawful conduct and seek restitution and rescission for the benefit of Plaintiffs and the Class members.

127. Plaintiffs and the Class members are entitled to the imposition of a constructive trust upon Defendant, such that its unjustly retained money is distributed equitably by the Court to and for the benefit of Plaintiffs and the Class members.

## COUNT III
### Negligent Misrepresentation
### (On Behalf of a Multistate Class or the State Subclasses)

128. Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

129. Plaintiffs bring this claim on behalf of themselves, and those members of the Class who purchased oral PE Products in states with similar negligent misrepresentation laws as applied to the facts of this case, or, in the alternative, on behalf of the Subclasses.

130. Defendant represented to Plaintiffs and the other members of the Class that oral PE Products will relieve nasal congestion or its symptoms. These representations were made by Defendant in its advertising, packaging, and labeling for oral PE Products disseminated to Plaintiffs and the other members of the Class prior to their purchases of oral PE Products.

131. These representations of the health benefits oral PE Products provide were false and misleading because the scientific evidence demonstrates oral PE

Products and their ingredients are incapable and do not provide the advertised nasal decongestion health benefits.

132.   Defendant represented that the above-identified facts that oral PE Products will relieve nasal congestion or its symptoms were true when it had no reasonable grounds for believing them to be true.

133.   Defendant made the representations concerning the nasal decongestion health benefits of oral PE Products with the intent to induce Plaintiffs and the other members of the Class to purchase oral PE Products.

134.   Plaintiffs and the other members of the Class believed that Defendant's representations as to the health benefits of taking oral PE Products were true and materially complete and did not know of the falsity of the representations. In reliance on Defendant's representations and in belief the representations were materially complete, Plaintiffs and the other members of the Class purchased oral PE Products and have been damaged in an amount to be determined at trial.

## COUNT IV

### Fraud
### (On Behalf of a Multistate Class or the State Subclasses)

135.   Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

136.   Plaintiffs bring this claim on behalf of themselves, and those members of the Class who purchased oral PE Products in states with similar common law

fraud laws as applied to the facts of this case, or, in the alternative, on behalf of the Subclasses.

137.   As alleged herein, Defendant knowingly made material misrepresentations and omissions regarding PE Products in its advertisements, labeling and packaging for oral PE Products.

138.   Defendant made these material misrepresentations and omissions in order to deceive Plaintiffs and Class members into purchasing oral PE Products.

139.   Defendant knew that its representations concerning the health benefits of oral PE Products made to Plaintiffs and the Class were false and untrue at the time the representations were made, or recklessly made the statements with no belief in the truth of the statements, but nevertheless made such representations through the marketing, advertising and oral PE Products' labeling, including through its representation that oral PE Products relieve "9 sinus and cold symptoms" and that they provide "fast relief from your cough and congestion symptoms." In reliance on these and other similar misrepresentations, Plaintiffs and Class members were induced to, and did, pay monies to purchase the oral PE Products.

140.   Plaintiffs and Class members did not know—nor could they have known through reasonable diligence—that oral PE Products do not provide the advertised nasal decongestion health benefits and is indeed incapable of providing the claimed benefits.

141.   Plaintiffs and Class members have been reasonable in relying on Defendant's misrepresentations and omissions in making their decisions to purchase oral PE Products.

142.   Had Plaintiffs known the truth about the oral PE Products, including that they do provide the advertised health benefits, they would not have purchased the oral PE Products.

## COUNT V

### Violation of the New Jersey Consumer Fraud Act
### N.J.S.A. §§ 56:8-1, *et seq.*
### (On Behalf of a Multistate Class or the State Subclasses)

143.   Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

144.   Plaintiffs bring this claim individually, and on behalf of those members of the Class who purchased oral PE Products in states with state consumer laws that are similar to the New Jersey Consumer Fraud Act, N.J.S.A. §§ 56:8-1, *et seq.* (the "NJCFA") as applied to the facts of this case, or, in the alternative, on behalf of the Subclasses.

145.   This cause of action is brought pursuant to the New Jersey Consumer Fraud Act, N.J.S.A. §§ 56:8-1, *et seq.*

146.   Section 56:8-2 of the NJCFA provides, in relevant part:

The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise,

misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice . . . .

147. Plaintiffs, other members of the Class, and Defendant are "persons" within the meaning of the NJCFA.

148. Plaintiffs and other members of the Class are "consumers" who purchased "merchandise" – oral PE Products – pursuant to a consumer transaction for personal use and are, therefore, subject to protection under the New Jersey Consumer Fraud Act, N.J.S.A. §§ 56:8-1, *et seq.*

149. Defendant conducted trade or commerce within the meaning of the NJCFA.

150. The acts, practices, misrepresentations, concealments, and omissions by Defendant were made in connection with the sale and advertisement of its oral PE Products and with the intent that others rely upon such concealment, suppression and omission, and constitute unlawful, deceptive and unconscionable commercial practices within the meaning of the NJCFA.

151. Defendant also knowingly concealed, suppressed and consciously omitted material facts about the inefficacy of oral PE Products to Plaintiffs and other

members of the Class knowing that consumers would rely on the advertisements and packaging to purchase oral PE Products.

152. Defendant's misrepresentations and omissions about oral PE Products were material and were intended to, and likely to, deceive a reasonable consumer.

153. As a result of the use and employment by Defendant of the unlawful acts, Plaintiffs and other Class members have suffered ascertainable losses in the form of, *inter alia*, monies spent to purchase oral PE Products, and they are entitled to recover such damages, together with appropriate penalties, including treble damages, attorneys' fees and costs of suit pursuant to N.J.S.A. §§ 56:8-2.11, 56:8-2.12 and 56:8-19. As alleged above, oral PE Products do not provide the advertised health benefits to the user and, thus, are worthless.

154. Additionally, pursuant to N.J.S.A. § 56:8-19, Plaintiffs and members of the Class seek injunctive relief to stop the ongoing deceptive advertising and for a corrective advertising campaign.

## COUNT VI
### Violation of the California Unfair Competition Law ("UCL")
### Cal. Bus. & Prof. Code §§17200, *et seq.*

155. Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

156. Plaintiffs bring this claim individually and on behalf of the Class.

157. Plaintiffs and Defendant are "persons" within the meaning of the UCL.

Cal. Bus. & Prof. Code §17201.

158.   The UCL defines unfair competition to include any "unlawful, unfair or fraudulent business act or practice," as well as any "unfair, deceptive, untrue or misleading advertising." Cal. Bus. Prof. Code §17200.

159.   In the course of conducting business, Defendant committed unlawful business practices by, among other things, making the representations (which also constitutes advertising within the meaning of §17200) and omissions of material facts, as set forth more fully herein, and violating Civil Code §§1572, 1573, 1709, 1711, 1770(a)(5), (7), (9) and (16) and Business & Professions Code §§17200, *et seq.*, 17500, *et seq.*, 21 U.S.C. 343(r)(6), and the common law.

160.   Plaintiffs reserve the right to allege other violations of law, which constitute other unlawful business acts or practices. Such conduct is ongoing and continues to this date.

161.   In the course of conducting business, Defendant committed "unfair" business practices by, among other things, making the implied and express representations (which also constitute advertising within the meaning of §17200) and omissions of material facts regarding oral PE Products in its advertising and labeling, including on the oral PE Products' packaging, as set forth more fully herein. There is no societal benefit from false and misleading advertising – only harm. Plaintiffs and the other Class members paid for a valueless product that is not capable

of conferring the benefits promised. While Plaintiffs and the other Class members were harmed, Defendant was unjustly enriched by its false misrepresentations and omissions. As a result, Defendant's conduct is "unfair," as it offended an established public policy. Further, Defendant engaged in immoral, unethical, oppressive, and unscrupulous activities that are substantially injurious to consumers.

162.   Further, as set forth in this Complaint, Plaintiffs allege violations of consumer protection, unfair competition, and truth in advertising laws in California and other states, resulting in harm to consumers. Defendant's acts and omissions also violate and offend the public policy against engaging in false and misleading advertising, unfair competition, and deceptive conduct towards consumers. This conduct constitutes violations of the unfair prong of Business & Professions Code §§17200, *et seq*.

163.   There were reasonably available alternatives to further Defendant's legitimate business interests, other than the conduct described herein. Business & Professions Code §§17200, *et seq*., also prohibits any "fraudulent business act or practice." In the course of conducting business, Defendant committed "fraudulent business act or practices" by, among other things, making the implied and express representations (which also constitute advertising within the meaning of §17200) and omissions of material facts regarding the oral PE Products in its advertising, including on the oral PE Products' packaging and labeling, as set forth more fully

herein. Defendant made the misrepresentations and omissions regarding the efficacy of its oral PE Products, among other ways, by misrepresenting on each and every oral PE Products' packaging and labeling that the oral PE Products are effective when taken as directed, when, in fact, the representations are false and deceptive, and the oral PE Products are not capable of conferring the promised health benefits.

164. Defendant's actions, claims, omissions, and misleading statements, as more fully set forth above, were also false, misleading and/or likely to deceive the consuming public within the meaning of Business & Professions Code §§17200, *et seq*.

165. Plaintiffs and the other members of the Class have in fact been deceived as a result of their reliance on Defendant's material representations and omissions, which are described above. This reliance has caused harm to Plaintiffs and the other members of the Class, each of whom purchased Defendant's oral PE Products. Plaintiffs and the other Class members have suffered injury in fact and lost money as a result of purchasing the oral PE Products and Defendant's unlawful, unfair, and fraudulent practices.

166. Defendant knew, or should have known, that its material misrepresentations and omissions would be likely to deceive and harm the consuming public and result in consumers making payments to Defendant for oral PE Products that are valueless and that are incapable of actually supporting,

maintaining, improving or benefiting nasal decongestion health.

167. As a result of its deception, Defendant were unjustly enriched by receiving payments from Plaintiffs and the Class in return for providing Plaintiffs and the Class, the oral PE Products that do not perform as advertised.

168. Unless restrained and enjoined, Defendant will continue to engage in the unlawful, unfair and fraudulent conduct described herein.

169. Accordingly, Plaintiffs, individually and on behalf of all others similarly situated, and on behalf of the general public, seeks restitution from Defendant of all money obtained from Plaintiffs and the other members of the Class collected as a result of Defendant's unfair competition, and awarding all other relief this Court deems appropriate.

## COUNT VII

**Violation of the California Consumers Legal Remedies Act ("CLRA")**
**Cal. Civ. Code §§1750, *et seq.***

170. Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

171. Plaintiffs bring this claim individually and on behalf of the Class.

172. Plaintiffs are "consumer(s)," and Defendant is a "person," and the oral PE Products are "goods" within the meaning of the CLRA. Cal. Civ. Code §1761(a), (c) and (d).

173. Defendant's sale and advertisement of its oral PE Products constitutes

"transactions" within the meaning of the CLRA. Cal. Civ. Code §1761(e).

174. The CLRA declares as unlawful the following unfair methods of competition and unfair or deceptive acts or practices when undertaken by any person in a transaction intended to result, or which results in the sale of goods to any consumer:

> (5)     Representing that goods … have . . . approval, characteristics, . . . uses [and] benefits . . . which [they do] not have . . . .
> (7)     Representing that goods … are of a particular standard, quality or grade . . . if they are of another.
> (9)     Advertising goods . . . with intent not to sell them as advertised.
> (16)   Representing that [goods] have been supplied in accordance with a previous representation when [they have] not.
> Cal. Civ. Code §1770(a)(5), (7), (9) and (16).

175. Defendant violated the CLRA by representing that its oral PE Products are beneficial for nasal decongestion health, when, in reality, the oral PE Products cannot provide their advertised benefits and the oral PE Products' ingredients are ineffective at improving, supporting, maintaining, or benefiting the health of nasal congestion.

176. Defendant knew or should have known its health representations were false and misleading, and that by omitting the ineffectiveness of its oral PE Products it was omitting a material fact that would alter any consumer's decision to purchase the oral PE Products.

177.   Defendant's violations of the CLRA proximately caused injury in fact to Plaintiffs and the Class.

178.   Plaintiffs and the Class members purchased Defendant's oral PE Products in the belief that they would receive the advertised health benefits from the oral PE Products. Indeed, no consumer would purchase an oral PE Product unless he or she believed it was capable of providing meaningful nasal decongestive benefits.

179.   Defendant's oral PE Products, however, are worthless and cannot provide any of their advertised benefits. Since the oral PE Products lack any value, Plaintiffs and each Class member were injured by the mere fact of their purchase.

180.   Pursuant to Cal. Civ. Code §1780, Plaintiffs, individually and on behalf of the other members of the Class, seek a Court order to enjoin the Defendant's improper sale and marketing of the oral PE Products.

181.   Pursuant to Cal. Civ. Code §1782(a), Defendant were notified in writing by certified mail of the particular violations of Section 1770 of the CLRA, which notification demanded that Defendant rectify the problems associated with the actions detailed above and give notice to all affected consumers of Defendant's intent to so act. Copies of the letters are attached hereto as Exhibits A.

182.   If Defendant fail to rectify or agree to rectify the problems associated with the actions detailed above and give notice to all affected consumers within 30

days of the date of written notice pursuant to §1782 of the Act, Plaintiffs will amend this claim to seek actual, punitive, and statutory damages, as appropriate.

183.　Defendant's conduct is fraudulent, wanton, and malicious.

184.　Pursuant to §1780(d) of the Act, attached hereto as Exhibit B is the affidavit showing that this action has been commenced in the proper forum.

## COUNT VIII

### Violation of New York Consumer Protection from Deceptive Acts and Practices Act ("NYDAPA")
### N.Y. GBL § 349, et seq.
### *(On Behalf of Plaintiffs and the New York Subclass)*

185.　Plaintiffs repeat and re-allege the allegations contained in every preceding paragraph as if fully set forth herein.

186.　Plaintiffs bring this claim individually and on behalf of the members of the proposed New York Subclass against Defendant for violations of NYDAPA, N.Y. GEN. BUS. LAW § 349.

187.　NYDAPA makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce." N.Y. GEN. BUS. LAW § 349. Defendant's conduct, as set forth herein, constitutes deceptive acts or practices under this section.

188.　Plaintiffs and members of the proposed New York Subclass are "persons" under NYDAPA, N.Y. GEN. BUS. LAW § 349(h), and Defendant's actions

as set forth herein occurred in the conduct of "business, trade or commerce" under NYDAPA.

189.   In the course of its business, Defendant advertised false statements about its oral PE Products that gave consumers, including Plaintiffs and members of the proposed New York Subclass, the impression that its products provide nasal congestion relief; therefore, leading to the false impression that the products Defendant sold were worth their cost when they were actually worthless.

190.   Plaintiffs and members of the proposed New York Subclass had no way of discerning that Defendant's representations were false and misleading.

191.   Defendant thus violated and continues to violate NYDAPA by making statements that, when considered as a whole from the perspective of a reasonable consumer, gives the false impression that the products sold by Defendant are worth more than they actually are.

192.   Defendant knew or should have known that its conduct violated NYDAPA and owed a duty to Plaintiffs and members of the proposed New York Subclass to refrain from engaging in deceptive acts or practices, and to disclose the truth about its oral PE Products.

193. Defendant intentionally and knowingly made affirmative misrepresentations and failed to disclose material facts regarding the efficacy of its

oral PE Products with intent to mislead Plaintiffs and members of the proposed New York Subclass.

194. Defendant's misleading and false advertisements were material to Plaintiffs and members of the proposed New York Subclass, as they relate to the price and efficacy of the product the consumer is receiving and paying for. A reasonable consumer would attach importance to such representations and would be induced to act thereon in deciding whether or not to purchase the product.

195. Defendant's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs and members of the proposed New York Subclass, about the efficacy of its oral PE Products. Plaintiffs and members of the proposed New York Subclass reasonably relied upon Defendant's false statements when purchasing the oral PE Products from Defendant. Plaintiffs and members of the proposed New York Subclass would not have made such purchases but for Defendant's representations regarding the nasal congestion relief health benefits of its oral PE Products.

196. Defendant's violation of NYDAPA, through its unlawful, unfair, and fraudulent business practices, are ongoing and present a continuing threat that Plaintiffs, members of the proposed New York Subclass, and the public will be deceived into purchasing products based on false statements regarding the efficacy

of Defendant's oral PE Products. These false statements lead to financial damage for consumers like Plaintiffs and members of the proposed New York Subclass.

197. As a direct and proximate result of Defendant's misleading and false advertisements, as well as Defendant's deceptive and unfair acts and practices made during the course of Defendant's business, Plaintiffs and members of the proposed New York subclass suffered ascertainable loss and actual damages.

198. Plaintiffs and members of the proposed New York subclass are entitled to all of the damages, remedies, fees, and costs available under NYDAPA, including but not limited to, injunctive relief, recovery of actual damages and/or fifty dollars in statutory damages, whichever is greater, as well as treble damages, reasonable attorneys' fees, and all other remedies this Court deems proper.

### COUNT IX
**Violation of New York False Advertising Act ("NYFAA")**
**N.Y. GBL § 350, et seq.**
**(On Behalf of Plaintiffs and the New York Subclass)**

199. Plaintiffs repeat and re-allege the allegations contained in every preceding paragraph as if fully set forth herein.

200. Plaintiffs bring this claim individually and on behalf of the members of the proposed New York Class against Defendant for violations of NYFAA, N.Y. GEN. BUS. LAW § 350.

201. The NYFAA makes unlawful "[f]alse advertising in the conduct of any business, trade or commerce." N.Y. GEN. BUS. LAW § 350. False advertising

includes "advertising, including labeling of a commodity . . . if such advertising is misleading in a material respect," taking into account "the extent to which the advertising fails to reveal facts material in light of such representations [made] with respect to the commodity . . ." N.Y. GEN. BUS. LAW § 350(a).

202.  Defendant's routine of advertising oral PE Products which do not provide nasal congestion relief constitutes an unfair, untrue, and misleading practice. This deceptive marketing practice gave consumers the false impression that the products nasal congestion relief.

203.  Defendant intentionally and knowingly misled consumers by making untrue and misleading statements and failing to disclose material facts regarding the efficacy of its oral PE Products with intent to mislead Plaintiffs and members of the proposed New York Subclass.

204.  Defendant's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs and members of the proposed New York Subclass, about the efficacy of its oral PE Products. Plaintiffs and members of the proposed New York Subclass reasonably relied upon Defendant's false oral PE Product claims when purchasing its oral Alka Seltzer products. Plaintiffs and members of the proposed New York Subclass would not have made such purchases but for Defendant's representations regarding the efficacy of its oral PE Products in relieving nasal congestion symptoms.

205.    Defendant's violation of the NYFAA, through its unlawful, unfair, and fraudulent business practices, are ongoing and present a continuing threat that Plaintiffs, members of the proposed New York Subclass, and the public will be deceived into purchasing products based on false claims of efficacy for its oral PE Products. These false statements lead to financial damage for consumers like Plaintiffs and members of the proposed New York Subclass.

206.    As a direct and proximate result of Defendant's misleading and false advertisements, as well as Defendant's deceptive and unfair acts and practices made during the course of Defendant's business, Plaintiffs and members of the proposed New York Subclass suffered ascertainable loss and actual damages.

207.    Plaintiffs and members of the proposed New York Subclass are entitled to all of the damages, remedies, fees, and costs available under NYFAA, including but not limited to, injunctive relief, recovery of actual damages and/or five hundred dollars per violation, whichever is greater, as well as treble damages, reasonable attorneys' fees, and all other remedies this Court deems proper.

## **JURY DEMAND**

208.    Plaintiffs demand a trial by jury of all claims in this Complaint so triable.

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of the other members of the proposed Class, respectfully requests that the Court enter judgment in Plaintiffs' favor and against Defendant as follows:

A. Declaring that this action is a proper class action, certifying the Class as requested herein, designating Plaintiffs as Class Representatives and appointing the undersigned counsel as Class Counsel;

B. Ordering restitution and disgorgement of all profits and unjust enrichment that Defendant obtained from Plaintiffs and the Class members as a result of Defendant's unlawful, unfair and fraudulent business practices;

C. As to the CLRA claim, Plaintiffs seek an order enjoining Defendant's improper sale and marketing of the oral PE products;

D. Ordering actual, treble, statutory and punitive damages;

E. Ordering Defendant to pay attorneys' fees and litigation costs to Plaintiffs and the other members of the Class;

/ / /

/ / /

/ / /

F.  Ordering Defendant to pay both pre- and post-judgment interest on any

amounts awarded; and

G.  Ordering such other and further relief as may be just and proper.


Dated: October 13, 2023                    Respectfully submitted,


By: */s/Todd D. Carpenter*

**LYNCH CARPENTER LLP**           **LYNCH CARPENTER LLP**
Todd D. Carpenter (SBN 234464)*      Katrina Carroll (NJ 26212000)
*To be admitted *Pro Hac Vice*       katrina@lcllp.com
todd@lcllp.com                       111 W. Washington Street, Suite 1240
Scott G. Braden (SBN 305051)*        Chicago, IL 60602
*To be admitted *Pro Hac Vice*       Telephone: 312.750.1265
scott@lcllp.com
1234 Camino del Mar                  **LYNCH CARPENTER LLP**
Del Mar, CA 92014                    Gary Lynch (PA 56887)*
Tel:619-762-1910                     *To be admitted *Pro Hac Vice*
Fax:724-656-1556                     gary@lcllp.com
                                     Kelly K. Iverson (PA 307175)*
                                     *To be admitted *Pro Hac Vice*
                                     kelly@lcllp.com
                                     Patrick Donathen (PA 330416)*
                                     *To be admitted *Pro Hac Vice*
                                     Patrick@lcllp.com
                                     1133 Penn Avenue, 5th Floor
                                     Pittsburgh, PA 15222
                                     Telephone: 412.322.9243
                                     Facsimile 412.231.0246
                                     *Attorneys for Plaintiffs*

Case 2:23-cv-21063-JXN-JRA Document 23-12 Filed 10/13/23 Page 69 of 78 PageID: 66

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
CLAUDETTE SANES, an individual; DANIEL FLICK, an individual; JANIS ZIMMERMAN, an individual, and on behalf of all others similarly situated

**(b)** County of Residence of First Listed Plaintiff **Bronx**
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
**Todd D. Carpenter 1234 Camino del Mar, Del Mar, CA 92014 (619) 762-1910**

**DEFENDANTS** BAYER HEALTHCARE LLC,

County of Residence of First Listed Defendant **Morris**
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | |
|---|---|
| ☐ 1 U.S. Government Plaintiff | ☐ 3 Federal Question *(U.S. Government Not a Party)* |
| ☐ 2 U.S. Government Defendant | ☒ 4 Diversity *(Indicate Citizenship of Parties in Item III)* |

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)* *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | **INTELLECTUAL PROPERTY RIGHTS** | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | | | ☐ 820 Copyrights | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | | ☐ 830 Patent | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | | ☐ 840 Trademark | ☐ 460 Deportation |
| | ☐ 350 Motor Vehicle | ☒ 370 Other Fraud | **LABOR** | ☐ 880 Defend Trade Secrets Act of 2016 | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 710 Fair Labor Standards Act | | ☐ 480 Consumer Credit (15 USC 1681 or 1692) |
| ☐ 160 Stockholders' Suits | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 720 Labor/Management Relations | **SOCIAL SECURITY** | ☐ 485 Telephone Consumer Protection Act |
| ☐ 190 Other Contract | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 740 Railway Labor Act | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 195 Contract Product Liability | | | ☐ 751 Family and Medical Leave Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 196 Franchise | | | ☐ 790 Other Labor Litigation | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 791 Employee Retirement Income Security Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | **FEDERAL TAX SUITS** | ☐ 896 Arbitration |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | ☐ 871 IRS—Third Party 26 USC 7609 | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

| | |
|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court ☐ 3 Remanded from Appellate Court ☐ 4 Reinstated or Reopened ☐ 5 Transferred from Another District *(specify)* ☐ 6 Multidistrict Litigation - Transfer ☐ 8 Multidistrict Litigation - Direct File |

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C. § 1332(d)(2)
Brief description of cause:
Violation of NJCFA, Violation of UCL, Violation of CLRA, Violation of GBL

## VII. REQUESTED IN COMPLAINT:
☒ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.
DEMAND $
CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*
JUDGE _____ DOCKET NUMBER _____

DATE 10/13/2023
SIGNATURE OF ATTORNEY OF RECORD /s/ Todd D. Carpenter

**FOR OFFICE USE ONLY**

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

## Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.(a)**  **Plaintiffs-Defendants.**  Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

**(b)**  **County of Residence.**  For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

**(c)**  **Attorneys.**  Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.**  **Jurisdiction.**  The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked**. (See Section III below; **NOTE: federal question actions take precedence over diversity cases.)**

**III.**  **Residence (citizenship) of Principal Parties.**  This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.**  **Nature of Suit.**  Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: <u>Nature of Suit Code Descriptions.</u>

**V.**  **Origin.**  Place an "X" in one of the seven boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File. (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
**PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.**  Origin Code 7 was used for historical records and is no longer relevant due to changes in statute.

**VI.**  **Cause of Action.**  Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.**  Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service.

**VII.**  **Requested in Complaint.**  Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.**  **Related Cases.**  This section of the JS 44 is used to reference related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.**  Date and sign the civil cover sheet.

AO 440 (Rev. 12/09) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

District of New Jersey

| | |
|---|---|
| CLAUDETTE SANES, an individual; DANIEL FLICK, an individual; JANIS ZIMMERMAN, an individual, and on behalf of all others similarly situated, | ) |
| | ) |
| _____ | ) |
| *Plaintiff* | ) |
| v. | ) Civil Action No. |
| BAYER HEALTHCARE LLC, | ) |
| | ) |
| _____ | ) |
| *Defendant* | ) |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*    BAYER HEALTHCARE LLC,
100 Bayer Boulevard, Whippany, NJ 07981

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:    Todd D. Carpenter
1234 Camino del Mar
Del Mar, CA 92014

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____        _____
*Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 12/09)  Summons in a Civil Action (Page 2)

Civil Action No.

**PROOF OF SERVICE**

*(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

   ❐ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

   ❐ I left the summons at the individual's residence or usual place of abode with *(name)* _____

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

   ❐ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

   ❐ I returned the summons unexecuted because _____ ; or

   ❐ Other *(specify):*

                                                                                   .

My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00   .

I declare under penalty of perjury that this information is true.

Date: _____

                                          _____

                                              *Server's signature*

                                          _____

                                            *Printed name and title*

                                          _____

                                            *Server's address*

Additional information regarding attempted service, etc:

# EXHIBIT A



1234 Camino Del Mar
San Diego, CA 92014
Phone: 619.762.1910
Fax: 619.756.6991
www.lynchcarpenter.com

**VIA CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**

October 13, 2023

Bayer Healthcare LLC,
100 Bayer Boulevard
Whippany, NJ 07981

> **Re:** **Consumers Legal Remedies Act Notice and Demand**

To Whom it May Concern:

Our law firm represents Claudette Sanes, Daniel Flick and Janis Zimmerman ("Plaintiffs") on whose behalf we are sending this letter pursuant to California Civil Code § 1782 in order to notify Bayer Healthcare LLC, ("Bayer Healthcare") of the nature of their claims, and to demand curative actions. Plaintiffs intend to pursue violations of California Civil Code § 1750, *et seq.* (the California Consumer Legal Remedies Act or "CLRA") against Bayer Healthcare on behalf of themselves and all other similarly situated consumers. Plaintiff intends to seek damages pursuant to § 1782(b) of the CLRA unless Bayer Healthcare agrees within 30 days to take all of the corrective actions demanded herein.

Specifically, Plaintiffs hereby notify Bayer Healthcare that it has engaged in ongoing unlawful, fraudulent, and unfair business acts and practices in connection with the sales and marketing of its oral Alka Seltzer products (the "Products") with false and misleading statements in the State of California at various retail locations and through its websites. In its marketing and advertising of the Products, Bayer Healthcare represents that its oral Alka Seltzer containing phenylephrine products provide nasal congestion relief, when its products cannot provide such relief and are thus worthless.

The above acts and practices constitute violations of the CLRA under *inter alia*, the following:

1.    in violation of §§ 1770(a)(5), (7), (9), and (16), Bayer Healthcare has made false or misleading statements of fact concerning reasons for, or existence of, a nasal congestion relief benefit from ingestion of its oral phenylephrine products.

Pursuant to California Civil Code § 1782, Plaintiffs, on behalf of themselves and all similarly situated consumers, hereby demands that Bayer Healthcare immediately correct and rectify its violations of California Civil Code § 1770. Specifically, Plaintiffs demand that Bayer Healthcare undertake all of the following actions to satisfy the requirements of California Civil Code § 1782(c):

1.    immediately identify or make a reasonable attempt to identify all persons who have purchased the Products during the relevant time period from the date of filing the enclosed Complaint through the present;

2.    immediately notify Plaintiff and all purchasers of the Products and, upon their request, make appropriate remedy for Bayer Healthcare's wrongful actions, including refunds of



the purchase price of the Products and payment for all damages, interests, costs, and fees to all purchasers of the Products;

3.      immediately cease and desist from its present marketing and promotion of the Products, which state or imply that the Products provide nasal congestion relief health benefits; and

4.      immediately engage in a corrective advertising campaign to inform consumers that Bayer Healthcare's representations that the Products provide nasal congestion relief health benefits are not true.

If Bayer Healthcare refuses to perform any of the above items immediately, Bayer Healthcare should state why the item cannot be done immediately and promise to undertake such action within a reasonable time. Plaintiff intends to seek actual damages, punitive damages, and any other damages permitted under the CLRA if Bayer Healthcare does not provide a full and adequate response to this letter showing compliance with California Civil Code § 1782(c) within 30 days.

Should you have any questions regarding this matter or wish to discuss or resolve Plaintiffs' and the Class's claims, please have your attorney contact us. We await your response.

Very truly yours,

*Todd D. Carpenter*

Todd D. Carpenter
**LYNCH CARPENTER, LLP**

# EXHIBIT B

# IN THE UNITED STATES DISTRICT COURT

# DISTRICT OF NEW JERSEY

| | |
|---|---|
| CLAUDETTE SANES, an individual; DANIEL FLICK, an individual; JANIS ZIMMERMAN, an individual, and on behalf of all others similarly situated, | Case No.: **DECLARATION IN SUPPORT OF JURISDICTION** |
| Plaintiffs, | |
| v. | |
| BAYER HEALTHCARE LLC, | |
| Defendants. | |

I, Todd D. Carpenter, declare under penalty of perjury the following:

1.     I am an attorney duly licensed to practice before all of the courts in the State of California. I am a partner and part-owner of Lynch Carpenter, LLP, and the counsel of record for Plaintiffs in the above-entitled action.

2.     Defendant Bayer Healthcare LLC, is a corporation or other business entity which conducts business in the State of New Jersey and its principal executive offices are located in New Jersey.

3.     Defendants conduct sufficient business with sufficient minimum contacts in New Jersey, and/or otherwise intentionally avails itself to the New Jersey market through the sales and distribution of its products within the State of New Jersey.

I declare under penalty of perjury under the laws of the State of New Jersey that the foregoing is true and correct. Executed October 13, 2023, in San Diego, California.

Dated: October 13, 2023

Respectfully submitted,


By: */s/Todd D. Carpenter*


**LYNCH CARPENTER LLP**
Todd D. Carpenter (SBN 234464)*
*To be admitted *Pro Hac Vice*
todd@lcllp.com
Scott G. Braden (SBN 305051)*
*To be admitted *Pro Hac Vice*
scott@lcllp.com
1234 Camino del Mar
Del Mar, CA 92014
Tel:619-762-1910
Fax:724-656-1556


**LYNCH CARPENTER LLP**
Katrina Carroll (NJ 26212000)*
katrina@lcllp.com
111 W. Washington Street, Suite 1240
Chicago, IL 60602
Telephone: 312.750.1265


**LYNCH CARPENTER LLP**
Gary Lynch (PA 56887)*
*To be admitted *Pro Hac Vice*
gary@lcllp.com
Kelly K. Iverson (PA 307175)*
*To be admitted *Pro Hac Vice*
kelly@lcllp.com
Patrick Donathen (PA 330416)*
*To be admitted *Pro Hac Vice*
Patrick@lcllp.com
1133 Penn Avenue, 5th Floor
Pittsburgh, PA 15222
Telephone: 412.322.9243
Facsimile 412.231.0246


*Attorneys for Plaintiffs*