**BEFORE THE
UNITED STATES JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION**

| | | |
|---|---|---|
| IN RE: XARELTO® PRODUCTS LIABILITY LITIGATION | §<br>§<br>§ | MDL No. 2592 |

**BRIEF OF DEFENDANTS JANSSEN PHARMACEUTICALS, INC., JANSSEN RESEARCH & DEVELOPMENT, LLC, JANSSEN ORTHO LLC AND JOHNSON & JOHNSON IN RESPONSE AND OPPOSITION TO PLAINTIFFS' MOTION FOR TRANSFER AND COORDINATION UNDER 28 USC SECTION 1407**

**[ORAL ARGUMENT REQUESTED]**

**I.**

**INTRODUCTION**

Defendants Janssen Pharmaceuticals, Inc., Janssen Research & Development, LLC, Janssen Ortho LLC (hereinafter "Janssen Defendants") and Johnson & Johnson ("J&J") hereby respond to and oppose Plaintiffs' Motion for Transfer of personal injury cases involving the alleged use of the prescription medication Xarelto® to a Multi-District Litigation ("MDL") proceeding.[1]  For the reasons set forth below, Plaintiffs' Motion should be denied.

From the outset, this Panel should not be influenced or guided by Plaintiffs' unfounded and speculative assertions that cases involving Xarelto® will be similar to the cases pending as part of *In re: Pradaxa Products Liability Litigation* (MDL 2385).  Xarelto® is a different medication with a different mechanism of action, different indications and a different label, and will involve different issues altogether.  Xarelto® is an anticoagulant medication that was first approved by the United States Food and Drug Administration ("FDA") in July, 2011.  Xarelto® is a life-saving medication for many patients and is prescribed to reduce the risk of stroke, deep

---

[1] Plaintiffs have not served all named defendants in some of the actions identified in their Motion.  In responding to and opposing Plaintiffs' Motion, Defendants do not waive service and reserve all rights.

ACTIVE/ 77529470.5

**Exhibit B**

vein thrombosis (DVT) and pulmonary embolism (PE) after hip and knee replacement surgeries and to treat and reduce the risk of recurrent of DVT and PE in a diverse patient population. Xarelto® provides substantial benefits over the older medications that are used to reduce these risks. All such medications carry the risk of bleeding, and the Xarelto® prescribing information has always warned of the risks that allegedly give rise to Plaintiffs' claims in the small number of lawsuits recently filed on the heels of a multi-million dollar advertising campaign by the plaintiffs' bar. Twenty-nine personal injury actions involving Xarelto® have been identified as pending in federal court.[2] Discovery has not commenced in any of them.

An MDL proceeding "is not a cure-all for every group of complicated cases"; the decision to centralize requires a careful balancing of the benefits of the existing framework and resources that may be adequate to manage the current docket, against those of an MDL, with the ultimate goal of promoting convenience and judicial economy. *In re: Uponour, Inc., F1960 Plumbing Fittings Prods. Liab. Litig.*, MDL No. 2393 (J.P.M.L. 2012), 9/27/12 Order at p. 3. These factors decidedly weigh in favor of the Panel declining to adopt an MDL proceeding here.

Litigation involving a relatively small group of lawyers with the substantial number of cases before a handful judges and the same defense counsel is particularly suited to the type of informal cooperation and coordination between counsel that this Panel has encouraged, without the added burden, expense and uncertainty of a formal MDL proceeding. Nearly half of the 30 Xarelto® cases involve 2 plaintiff law firms, and the vast majority of the cases are pending before 3 courts. These are circumstances that weigh in favor of informal coordination and will promote convenience and judicial economy consistent with § 1407 without an MDL.

---

[2] Plaintiffs' Motion identified 21 actions. An additional 9 actions have been identified through notices of related actions for a total of 30 actions pending before the Panel. A complete Schedule of Actions is attached hereto as Exhibit A.

ACTIVE/ 77529470.5           2

If the Panel is inclined to establish an MDL, it should **not** go to the United States District Court for the Southern District of Illinois before The Honorable David Herndon or Staci Yandle as requested by Plaintiffs. Based on recent statistics, the Southern District of Illinois is overtaxed and has 3,228 cases pending per judgeship, more than 5 times the national average of 622 cases per judge. Moreover, Judge Herndon is already assigned to *In re: Pradaxa Products Liability Litigation* (MDL 2385) and the *In re: Yasmin and Yaz Marketing, Sales Practices and Products Liability Litigation* (MDL 2100), collectively involving more than 9,000 cases, the highest of any MDL court in the country. The pendency of these 2 MDL proceedings before Judge Herndon is precisely why any proposed Xarelto® coordinated proceeding should not be transferred to the Southern District of Illinois. Aside from the significant burden that another MDL proceeding would impose on that court, to the probable detriment on that litigation, as well as any subsequent proceedings involving Xarelto®, this Panel has traditionally assigned MDL proceedings involving competitor products to different courts.

While the defense does not believe an MDL proceeding is appropriate, if this Court is inclined to transfer cases to an MDL proceeding based on the current record, the Janssen Defendants and J&J respectfully request that the Panel transfer these actions to the District of New Jersey. Many of the Janssen Defendants as well as Defendant Bayer Healthcare Pharmaceuticals Inc. have principal places of business there, and many documents and witnesses are located in New Jersey. The Honorable Stanley Chesler, Robert Kugler, William Martini, Jerome Simandle or Freda Wolfson in the United States District Court for the District of New Jersey are well qualified to serve as an MDL judge. The courthouses where these judges preside are in metropolitan areas with easy access to airports and hotels to accommodate counsel.

For these and other reasons set forth in more detail below, the Janssen Defendants and J&J respectfully request that Plaintiffs' motion be denied, or in the alternative that any MDL for Xarelto® be assigned to one of several judges in the District of New Jersey.

## II.

## BACKGROUND

Xarelto® is an anticoagulant medication that was first approved by the United States Food and Drug Administration on July 1, 2011. Anticoagulants are important and potentially life-saving medications that aid in the treatment of individuals who may be at an increased risk of developing deadly blood clots.

Xarelto® is known as a Novel Oral Anticoagulant ("NOAC") and was developed as an alternative to the drug Warfarin that was first marketed in 1954. At the time of its approval, the FDA noted that "Xarelto® is the first oral anti-clotting drug approved to treat and reduce the recurrence of blood clots since the approval of warfarin nearly 60 years ago."[3] Warfarin has proven to be unpredictable and difficult to manage in patients, including a narrow therapeutic window. It also is susceptible to hundreds of food and drug interactions. Warfarin requires that a patient's blood be actively monitored frequently so that the individual is not at risk for stroke or bleeding. Warfarin takes longer to reach a therapeutic dose than NOACs generally.

There are currently three NOAC's sold in the United States that have been approved by the FDA: (1) Xarelto®, a product of Janssen Pharmaceuticals, Inc. and Bayer HealthCare AG, (2) Pradaxa sold by Boehinger Ingelheim Pharmaceuticals, Inc. and (3) Eliquis sold by Pfizer

---

[3] Ex. B, FDA Press Release (11/2/2012), "FDA expands use of Xarelto to treat, reduce recurrence of blood clots" (http://www.fda.gov/NewsEvents/Newsroom/PressAnnouncements/ucm326654.htm).

ACTIVE/ 77529470.5    4

and Bristol-Myers Squibb. As a class, these medications have fewer interactions with food and other medications, have rapid onset and do not require blood monitoring.

Although in the same class, NOACs differ from each other in significant ways. For example, Xarelto® and Pradaxa have different labels with different warnings, different mechanisms of action and different directions for use. Xarelto® is a factor Xa inhibitor that is taken once a day, whereas Pradaxa is a direct thrombin inhibitor that is taken twice a day. Each medication works differently in reducing the risk of blood clots. These medications also have different indications for use. Since approval in July, 2011, Xarelto® has five approved indications including: (1) to reduce the risk of stroke and systemic embolism in patients with nonvalvular atrial fibrillation; (2) for treatment of deep vein thrombosis ("DVT"); (3) for the treatment of pulmonary embolism ("PE"); (4) for the reduction in the risk or recurrence of DVT and PE; and (5) for the prophylaxis of DVT, which may lead to PE, in patients undergoing knee or hip replacement surgery.

Since November 2011, the prescribing information for Xarelto® has stated as follows:

> Risk of bleeding: XARELTO® increases the risk of bleeding and can cause serious or fatal bleeding.
>
> . . . .
>
> In deciding whether to prescribe XARELTO® to patients at increased risk of bleeding the risk of thrombotic events should be weighed against the risk of bleeding.
>
> . . . .
>
> Promptly evaluate any signs or symptoms of blood loss. Discontinue XARELTO® in patients with active pathological hemorrhage.
>
> . . . .
>
> A specific antidote for riveraroxaban is not available.

Ex. C (current Prescribing Information) (available at http://www.accessdata.fda.gov/

Drugsatfda_docs/label/2014/022406s011lbl.pdf).

ACTIVE/ 77529470.5         5

Case MDL No. 3089   Document 264-2   Filed 11/02/23   Page 6 of 20

The prescribing information also warns of the increased risk of blood clots and other events upon discontinuation of Xarelto®. *Id.*

The Xarelto® litigation began this summer with the plaintiffs' bar aggressively advertising for Xarelto® cases - they spent $2.3 million in August, 2014 alone.[4] Many of these advertisements portray Xarelto® as a harmful medication and suggest that Plaintiffs should stop use immediately, contrary to the FDA approved labeling which states that any decision to stop using Xarelto® should be under the direction and supervision of a physician, particularly since Plaintiffs have underlying health conditions that could lead to a serious health event if a blood clot develops upon discontinuation of the medication.[5]

To date, 30 personal injury actions alleging injuries from Xarelto® have been identified as pending in federal court. Thirteen of these actions were filed by 2 law firms and 18 actions are pending before 3 courts. *See* Ex. A. There are 9 cases pending in the Southern District of Illinois, 5 cases in the Eastern District of Louisiana, and 5 cases in the Eastern District of New York. *Id.* None of the plaintiffs who filed suit in the Eastern District of New York are residents of New York and at least one of the plaintiffs in the Southern District of Illinois is not a resident of Illinois. The remaining actions are pending before the U.S. District Courts for the Western District of Kentucky, Eastern District of Kentucky, Southern District of Ohio, District of Vermont, Southern District of Florida, Northern District of Florida, District of Utah, Southern District of West Virginia, Eastern District of Pennsylvania, Northern District of Georgia and Southern District of California. *Id.* Answers have been filed in some but not all of these cases.

---

[4] Ex. D, The Silverstein Group, Mass Tort Advertising Report, Sept. 2014, (http://us7.campaign-archive2.com/?u=35ed1e6f2b2f1244337e3f989&id=f7e7b27aac&e=f8b2648c2f).

[5] Ex. E, Law Firm Advertising, (http://www.nationalinjuryhelp.com/defective-drugs/xarelto-lawsuit/) (Advertisement from Schmidt Law Group)), (http://mcgartland.com/defective-prescription-drugs/xarelto/)(Advertisements from McGartland Law Firm PLLC)).

Discovery has not commenced in any case. There are also a couple dozen cases filed in state court in Pennsylvania primarily by out-of-state residents which are the subject of pending *forum non conveniens* motions.

## III.

## ARGUMENT

### A. Plaintiffs Have Not Satisfied Their Burden Under 28 U.S.C. § 1407

This Panel is authorized to transfer cases to an MDL proceeding if the requirements of 28 U.S.C. § 1407 are satisfied.

> When civil actions involving one or more common questions of fact are pending in different districts, such actions may be transferred to any district for coordinated or consolidated proceedings. Such transfers shall be made by the judicial panel on multidistrict litigation authorized by this section upon its determination that transfers for such proceedings will be for the convenience of the parties and witnesses and will promote the just and efficient conduct of such actions.

The failure of the moving party to demonstrate any one of these elements based on the existing inventory of cases is reason to deny a motion for transfer and coordination. In ruling on motions for coordination under § 1407, this Panel has used a balancing test that considers issues of commonality and weighs the convenience and efficiencies of proceeding with or without an MDL proceeding. It has been noted that the most important criteria under § 1407 is a demonstration that the actions will proceed in a just and efficient manner. Charles A. Wright et al., Federal Practice and Procedure: Jurisdiction and Related Matters, § 3863, at 489 (2013).

This Panel has not traditionally applied a litmus test based on a specific number of cases. Rather the analysis of the Panel has focused on the goals of convenience and judicial economy, taking into consideration the number and type of actions, their complexity, counsel of record, and other criteria. In applying these factors, this Panel has declined, under certain circumstances

where disputed, to coordinate a multitude of personal injury actions, including where more than 100 cases were pending. *See, e.g., In re Ambulatory Pain Pump Chondrolysis Products Liability Litigation*, 709 F. Supp. 2d 1375 (J.P.M.L. 2010) (declining to establish an MDL proceeding for 102 cases); *see also In re: Electrolux Dryer Products Liability Litigation*, 978 F. Supp. 2d 1376 (J.P.M.L. 2477) (declining to establish an MDL based on 35 actions pending in 21 districts).

The Panel also has been cognizant that transfer may have unintended consequences that undermine the purposes of § 1407. There is a concern in this litigation, as has been the case elsewhere, that the creation of multidistrict proceedings pursuant to § 1407 may encourage the filing of numerous actions with little or no merit. Although the Panel has only briefly addressed this issue in other litigation and did not formally adopt this view under the facts of other cases, Plaintiffs' Motion in Xarelto® comes on the heels of significant lawyer advertising in the months leading up to the motion. *See., e.g, In re Seroquel Prods. Liab. Litig.*, 447 F. Supp. 2d 1376, 1378 (J.P.M.L. 2006) (commenting on argument that MDL may invite lawsuits). With this aggressive advertising and Plaintiffs' counsel's desire to generate more lawsuits, transferring cases to an MDL creates the potential to encourage the filing of new copycat cases without diligent efforts to ensure the viability of claims, in attempt to gain leverage based on a large volume of cases. The filing of these copycat actions would be contrary to the purposes of § 1407 and would create additional burdens and expense for the parties. The goals of convenience and economy are promoted where the parties and lawyers will be able to effectively and efficiently reach the merits of a smaller group of cases without the distraction of an MDL proceeding involving claims, particularly where individual issues predominate.

As discussed in more detail below, Plaintiffs have not satisfied their burden to prove the requirements of § 1407. The factors of convenience and economy are best promoted in these 30

ACTIVE/ 77529470.5                                8

personal injury cases involving highly individualized issues where the parties and a small group of lawyers and courts informally coordinate without an MDL proceeding.

> **1. These Personal Injury Cases Involve Highly Individualized Issues**

Plaintiffs assert that Xarelto® cases involving personal injuries "arise out of the same or similar nucleus of operative facts" including (1) whether the label was adequate, (2) whether there was adequate testing and (3) whether there was a breach of warranty. Pl. Mot. at 1, 7. But each of these and other issues will turn on individual issues particular to each plaintiff's claims, and where a common issue is found to exist, it is seldom sufficient, by itself, to justify granting the motion to transfer. *In re: Electrolux Dryer Prods. Liab. Litig,* 978 F. Supp. 2d 1376; Charles A. Wright et al., Federal Practice and Procedure: Jurisdiction and Related Matters, § 3863, at 468 (2013) ("that common question of fact [exist] seldom is sufficient, by itself, to justify granting the motion to transfer.").

Multiple decisions of this Panel have held, in contested motions, that "individual questions of fact concerning the circumstances of each patient's alleged injuries" predominate over convenience and economy, including issues of liability, causation, reliance and damages. *In re Intuitive Surgical, Inc. Da Vinci Robotic Surgical System Prod. Liability Litig.*, 883 F. Supp. 2d 1339 (J.P.M.L. 2012); *In re Abbott Laboratories, Inc. Similac Prod. Liab. Litig.*, 763 F. Supp. 2d 1376, 1377 (J.P.M.L. 2011) ("Although plaintiffs are correct that some factual overlap exists among the present actions, the proponents of centralization have failed to convince us that any shared factual questions in these actions are sufficiently complex and/or numerous to justify Section 1407 transfer at the present time.").[6]

---

[6] *See also In re Ambulatory Pain*, 709 F. Supp. 2d 1375, 1377 (J.P.M.L. 2010) ("individual issues of causation and liability continue to appear to predominate, and remain likely to

A review of the 30 Xarelto® complaints demonstrates that Plaintiffs' claims will turn on different facts, circumstances and alleged injuries. The issues in each case will be highly individualized and case-specific. Plaintiffs' medical histories, underlying health conditions and risk profiles, the treatment decisions by the prescribing physicians, the label as read by the treating physicians, the cause of the alleged injuries and the extent of the alleged injuries will be unique to each plaintiff. None of these significant issues will be subject to common evidence. *In re: Shoulder Pain Pump-Chondrolysis Products Liability Litigation*, 571 F. Supp. 2d 1367, 1368 (J.P.M.L. 2008) (any "efficiencies that might be gained by centralization [are] overwhelmed by multiple individualized issues (including ones of liability and causation) that these actions appear to present.")

Accordingly, Plaintiffs have not satisfied their burden to demonstrate that common issues predominate in these personal injury cases, and their motion should be denied.

**2. Centralization of The Current Inventory of Cases Will Not Promote Convenience, Economy or Efficiency**

Under § 1407, convenience and economy are factors that require a careful balancing in ascertaining whether to transfer cases to an MDL proceeding. In weighing these factors, this Panel has considered the number and type of cases, counsel of record involved and the existing framework to ascertain whether the current inventory of cases can be managed efficiently and

---

overwhelm any efficiencies that might be gained by centralization."); *In re: American-Manufactured Drywall Products Liability Litigation*, 716 F. Supp. 2d 1367 (J.P.M.L. 2160) ("any efficiencies from centralization would outweigh the multiple individual issues, including ones of liability and causation…"); *In re: Northeast Contaminated Beef Prods. Liab. Litig.*, 856 F .Supp. 2d 1354, 1354-55 (J.P.M.L. 2012) (noting the individualized issues of causation and one narrow common legal theory did not support centralization); *In re Watson Fentyl Patch Prods. Liab. Litig.*, 2012 U.S. Dist. LEXIS 112485 (J.P.M.L. Aug. 7, 2012) (*citing In re: Yellow Brass Plumbing Component Prods. Liab. Litig.*, 844 F. Supp. 2d 1377 (J.P.M.L. 2012)); *In re Bair Corp. Chenille Robe Prods. Liab. Litig.*, 703 F.Supp.2d 1379, 1380 (J.P.M.L. 2010).

ACTIVE/ 77529470.5                                    10

effectively without an MDL proceeding, or whether those interests would be best served with an MDL.

Plaintiffs' Motion does not consider the decisions of this Panel declining to transfer cases to an MDL or that encourage parties to work together to promote the goals of convenience and economy without a formalized proceeding. This Panel has held that "informal cooperation among the involved attorneys and courts is both practicable and preferable" where there are a manageable number of lawyers and courts. *See, e.g., In re Intuitive Surgical*, 853 F. Supp. 2d at 1340; *In re: Waggin' Train Chicken Jerky Pet Treat Prods. Liab. Litig.*, 893 F.Supp.2d 1357, 1358 (J.P.M.L. 2012) (noting that informal cooperation among counsel was preferable to centralization); *In re: Northeast Contaminated Beef Prods. Liab. Litig.*, 856 F.Supp.2d 1354, 1354-55 (J.P.M.L. 2012) ("informal cooperation among the involved attorneys and courts is both practicable and preferable.").[7]

Many of the Xarelto® actions were brought by the same plaintiffs' counsel who are working in conjunction to pursue this litigation before a handful of judges. *See In re American Manufactured Drywall Prods. Liab. Litig.*, 716 F.Supp.2d 1367, 1368 (J.P.M.L. 2010). Nearly half of the cases (13) are being handled by 2 law firms, 19 of the cases are before only 3 courts, and the same national defense counsel is involved in all of these cases. *See* Ex. A (Schedule of Actions). Defense counsel have experience litigating and managing a similar caseload of actions across jurisdictions and are well poised to work cooperatively with Plaintiffs' counsel to focus and advance the litigation in ways that will conserve the resources of the parties and each of the

---

[7] *See also In re: Fresh Dairy Prods. Antitrust Litig.*, 856 F. Supp. 2d 1344, 1345 (J.P.M.L. 2012); *In re: Gaiam, Inc., Water Bottle Marketing, Sales Practices and Prods. Liab. Litig.*, 672 F. Supp. 2d 1371, 1374 (J.P.M.L. 2010); *In re: Louisiana-Pacific Corp. Trimboard Siding Marketing, Sales Practices & Prods. Liab. Litig.*, 867 F. Supp. 2d 1346, 1347-(J.P.M.L. 2012).

ACTIVE/ 77529470.5     11

courts where actions are pending. Formal centralization would not meaningfully enhance the convenience or judicial economy in these actions.

Mechanisms such as cross-noticing depositions, stipulated use of common discovery and cooperation between counsel are sufficient to promote the goals of Section 1407. This Panel has previously recognized that informal coordination weighs in favor of denying a motion to transfer.

> We observe that suitable alternatives to Section 1407 transfer are available in order to minimize the possibility of duplicative discovery. For example, notices for a particular deposition could be filed in all actions, thereby making the deposition applicable to each action; the parties could seek to agree upon a stipulation that any discovery relevant to more than one action may be used in all those actions; and any party could seek orders from...courts directly the parties to coordinate their pretrial efforts. .

*In re Eli Lilly & Co. (Cephalexin Monohydrate Patent Litig.)*, 446 F. Supp. 2d 242, 244 (J.P.M.L. 1978) (citations omitted); *see also In re Fout & Wuederman Litig.*, 657 F. Supp. 2d 1371 (J.P.M.L. 2009). The Xarelto® cases are particularly well suited for informal coordination because discovery has not commenced in any action.

Plaintiffs argue that a centralized proceeding is necessary because they expect that thousands of cases will be filed in the future. Pl. Br. at 1. But this Panel need not, and should not, entertain such speculation as a reason to transfer cases to an MDL. In ruling on disputed motions for coordination, this Panel has consistently looked to the cases currently on file in applying the factors set forth in § 1407. *See In Re Intuitive Surgical*, 883 F. Supp. 2d 1339, 1340 (J.P.M.L. 2012) (denying motion to transfer, noting, "[w]hile proponents maintain that this litigation may encompass 'hundreds' of cases or 'over a thousand' cases, we are presented with" far fewer.).

Whether additional cases – much less thousands of cases – will be filed has yet to be seen, and this Panel should not speculate about what might happen in this litigation based on Plaintiffs' counsel's suppositions. There is no history of mass filings for Xarelto® since it was approved in 2011, and no party has ever previously moved to create a Xarelto® MDL proceeding. Nor do any of the plaintiffs who have filed suit make any allegations that some new fact or risk was not previously disclosed at the time that Plaintiffs used the medication. The prescribing information for Xarelto® has always warned of these risks.

Transferring cases to an MDL proceeding will invite lawsuits and add substantial expense and burdens to a litigation that is now manageable under the existing court system and framework. Where a request for an MDL is designed to facilitate the interests of counsel, the Panel has viewed those motions less favorably. This Panel has stated, "the Panel's primary purpose is not to divine the motives and strategies of the various litigants. . . Nevertheless, where a Section 1407 motion appears intended to further the interests of particular counsel more than those of the statute, we would certainly find less favor with it." *In re: Louisiana-Pacific Corp. Trimboard Siding Marketing, Sales Practices & Prods. Liab, Litig.*, 867 F. Supp. 2d at 1347 (quoting *In re CVS Caremark Corp. Wage and Hour Emp't Practices Litig.*, 684 F. Supp. 2d 1377, 1379 (J.P.M.L. 2010)).

Convenience and economy do not require an MDL for the current docket and can both be achieved without transfer, while at the same time not encouraging mass filings that have no merit. To the extent that there are overlapping issues of discovery from the Janssen Defendants in these cases, this discovery can be readily coordinated through, among other things, cross-

noticed depositions and shared document discovery. The moving parties have not made any showing that informal coordination is or will be inadequate for this limited number of cases.

Accordingly, Plaintiffs' motion should be denied, and the small group of counsel and parties should be permitted to work informally to achieve convenience and judicial economy without the uncertainties and burdens that may result from an MDL proceeding.

**B.      The District of New Jersey Is the Best Suited to Manage an MDL Proceeding and Not the Southern District of Illinois**

The selection of a site for an MDL Court is generally guided by multiple factors and balancing of various interests "based on the nuances of a particular litigation." *See* Robert A. Cahn, A Look at the Judicial Panel on Multidistrict Litigation, 72 F.R.D. 211, 214 (1977). Factors that have been considered include (1) the location of relevant documents and witnesses, (2) the backlog of a court's civil docket and the extent to which it is overtaxed with other MDL cases, (3) the existence and number of cases pending in various jurisdictions, (4) a centrally located forum for national litigation, and (5) the preference of the parties. *See id.* at §§ 6:1-6:23; *In re Inter-Op Hip Prosthesis Prods. Liab. Litig.*, 149 F. Supp. 2d 931, 933-934 (J.P.M.L. 2001); *In re: Express Scripts, Inc., Pharmacy Benefits Mgmt. Litig.*, 368 F. Supp. 2d at 357; *In re Thaxton Group, Inc. Sec. Litig.*, 323 F. Supp. 2d 1374, 1375 (J.P.M.L. 2004); *In re Cuisinart*, 506 F. Supp. 2d 651, 653 (J.P.M.L. 1981).

**1.      The Southern District of Illinois Should Not Be the Venue for Coordination**

This Panel should reject Plaintiffs' proposal that if the Panel decides to transfer cases to an MDL proceeding, it should be venued in the United States District Court for the Southern District of Illinois. Based on the most recent caseload statistics, the Southern District of Illinois is overtaxed and has the second highest caseload per judgeship of all districts in the country. In

ACTIVE/ 77529470.5                                         14

the district, there are 3,228 actions pending per judgeship, more than 5 times the national average of 622 actions.[8] Six of the 9 Xarelto® cases currently pending in the Southern District of Illinois were filed by the same lead counsel, the same counsel who filed the Motion to Transfer, and at least one plaintiff is not a resident of Illinois.[9]

Plaintiffs' rationale for selecting the Southern District of Illinois does not consider the caseload of the district or Judge Herndon but simply points out that The Honorable David R. Herndon has been presiding over the *In re: Pradaxa Products Liability Litigation* (MDL 2385) and *In re: Yasmin and Yaz Marketing, Sales Practices and Products Liability Litigation* (MDL 2100). From these 2 proceedings, Judge Herndon has the highest number of cases pending in MDLs of any judge presiding over a coordinated proceeding under § 1407. As of October 15, 2014, the most recent statistics published by the Federal Judicial Center, Judge Herndon was presiding over 9,430 cases between the 2 MDL proceedings.[10] There are currently 2,479 actions pending in *In re: Pradaxa Products Liability Litigation* and 6,951 cases pending in *In re: Yasmin and Yaz Marketing, Sales Practices and Product Liability Litigation. Id.*

Plaintiffs assert that Judge Herndon's familiarity with Pradaxa and separately his familiarity with Bayer as a defendant in the Yasmin litigation are factors that weigh in favor of

---

[8] Ex. F, United States District Court – Judicial Caseload Profile (Southern District of Illinois) (http://www.uscourts.gov/viewer.aspx?doc=/uscourts/Statistics/FederalCourtManagementStatistics/2014/district-fcms-profiles-june-2014.pdf&page=49); Ex. G, United States District Court – National Judicial Caseload Profile, (http://www.uscourts.gov/viewer.aspx?doc=/uscourts/Statistics/FederalCourtManagementStatistics/2014/district-fcms-profiles-june-2014.pdf&page=49).

[9] On October 29, 2015, counsel for Plaintiff Robert Bivens filed a Response of Interested Party in Support of Plaintiffs' Motion for Transfer and Coordination. Plaintiff Bivens is a resident of Virginia resident, not Illinois, and has not alleged facts that in any way demonstrate that his claims have any connection to Illinois.

[10] *See* Ex. H, MDL Statistics Report – Distribution of Pending MDL Dockets by District (Oct. 15, 2014) (http://www.jpml.uscourts.gov/sites/jpml/files/Pending_MDL_Dockets_By_District-October-15-2014.pdf ).

ACTIVE/ 77529470.5            15

assigning a Xarelto® proceeding to the Southern District of Illinois. But these are not facts that support coordination in that district, and are precisely the reasons, consistent with prior decisions of this Panel, why any MDL for Xarelto® should not be assigned to Judge Herndon. Coordination of the Xarelto® litigation before the same court handling the Pradaxa litigation will not serve the purposes of § 1407 and has the potential to be prejudicial to all parties involved. On numerous occasions, this Panel has separated claims or actions involving prescription medications in the same class that are competitor products, and has declined to assign two competitor products to the same court or judge. *See*, *e.g.*, *In re Vioxx Prods. Liab. Litig.*, 360 F. Supp. 2d 1352, 1354 (J.P.M.L. 2005) (different judges and courts assigned to claims involving Celebrex (a COX 2-inhibitor) against Pfizer from those involving Vioxx (another COX-2 inhibitor) against Merck). As previously noted by the Panel, "we are typically hesitant to centralize litigation against multiple, competing defendants which marketed, manufactured and sold similar products." *In re: Yellowstone Brass Plumbing Component Products Liability Litigation*, 844 F. Supp. 2d 1377 (J.P.M.L. 2012).

Similarly, different MDL judges were assigned to the *In re Zyprexa Prods. Liab. Litig.*, MDL Docket No. 1596, and *In re Seroquel Prods. Liab. Litig.*, 447 F. Supp. 2d 1376, 1378 (J.P.M.L. 2006). *See In re Seroquel Prods. Liab. Litig.*, 447 F. Supp. 2d 1376, 1378 (J.P.M.L. 2006). Different judges also were assigned to handle the statin litigation, hip implant litigation and birth control litigation.[11] Any MDL proceeding involving Xarelto® should not be assigned to the same court handling lawsuits involving the competitor product Pradaxa.

---

[11] *In re: Lipitor Marketing, Sales Practices and Products Liability* Litigation (MDL 2502) (pending in the District of South Carolina); *In re: Baycol Products Liability Litigation* (MDL 1431) (pending in the District of Minnesota); *In re: DePuy Orthopaedics, Inc. ASR Hip Implant Products Liability Litigation* (MDL 2197) (pending in the Northern District of Ohio); *In re: DePuy Orthopaedics, Inc. Pinnacle Hip Implant Products Liability Litigation* (MDL 2244)

In addition to Judge Herndon, Plaintiffs assert that The Hon. Staci Yandle is a potential candidate in the Southern District of Illinois because she has been assigned 8 Xarelto® cases, 6 of which were filed by the same lawyers. However, after the Plaintiffs filed their Motion to Transfer, Judge Yandle's cases were transferred to Judge Herndon. In their moving papers, Plaintiffs do not mention the significant caseload in the Southern District of Illinois or that Judge Yandle's courtroom is not located in a major metropolitan area, but is located in Benton, Illinois, which is two hours from the nearest airport that could accommodate counsel and would be highly inconvenient. Plaintiffs' argument for Illinois pales in comparison to the case for the District of New Jersey as set forth in more detail below.

### 2. The District of New Jersey Is Uniquely Situated to Serve as the MDL Court

The District of New Jersey is better suited to meet the goals of any MDL proceeding than the venue recommended by Plaintiffs. There are several judges in that district who are qualified to serve as an MDL judge, including The Honorable Stanley Chesler, Robert Kugler, William Martini, Jerome Simandle or Freda Wolfson.

This Panel has previously held that the District of New Jersey is a convenient location that has sufficient resources to handle an MDL proceeding. *See, e.g., In re: Nickelodian Consumer Privacy Litig.*, 949 F. Supp. 2d 1377 (J.P.M.L. 2013) (finding that the District of New Jersey is "a convenient and accessible forum, relatively close to potential witnesses and evidence located in New Jersey and New York City.").

---

(pending in the Northern District of Texas); I*n re Biomet Ma@ Magnum Hip Implant Product Liability* (MDL 2391) (pending in the N.D. Indiana); *In re: Stryker Rejuvenate and ABG II Hip Implant Product Liability Litigation* (MDL 2441) (pending in the District of Minnesota); Zimmer Durom Hip Cup Product Liability Litigation (MDL 2158) (pending in the District of New Jersey); *In re: Nuva Ring Products Liability Litigation*, 572 F. Supp. 2d 1382 (J.P.M.L. 2008) (MDL assigned to Eastern District of Missouri); *In re: Ortho Evra Products Liability Litigation* (MDL 1742) (pending in Northern District of Ohio).

The District of New Jersey also has been considered a strong candidate for transfer when many witnesses and documents relevant to the case are located there. *Id.*; *see also In re: Merck & Co., Inc., Securities, Derivative & ERISA Litig.*, 360 F. Supp. 2d 1375, 1377 (J.P.M.L. 2013) (documents and witnesses likely located at Merck's New Jersey headquarters); *In re: Lifelock, Inc. Marketing and Sales Practices Litigation*, 582 F. Supp. 2d 1376, 1377 (J.P.M.L. 2008) (transferring cases to the District of Arizona in part because relevant evidence would likely be found there); *In re: Avandia Marketing, Sales Practices and Products Liability Litigation*, 528 F. Supp. 2d 1339 (J.P.M.L. 2007) (transferring cases to the Eastern District of Pennsylvania because defendants' principal place of business). Because Plaintiffs who have filed Xarelto® cases are geographically diverse, there is no single district that is convenient for plaintiffs. *See, e.g., In re: Darvocet, Darvon and Propoxyphene Prods. Liab. Litig.*, 780 F. Supp. 2d 1379, 1381 (J.P.M.L. 2011). Many of the Janssen Defendants and also Defendant Bayer Healthcare Pharmaceuticals Inc. however have their principal places of business in the District of New Jersey that offers distinct advantages of proximity to witnesses and documents. The District of New Jersey also is located in a major metropolitan area that can accommodate counsel and courthouses are well equipped to handle an MDL proceeding. *See, e.g., In re Educational Testing Service PLT 7-12 Test Scoring Litigation*, 350 F. Supp. 2d 1363, 1365 (J.P.M.L. 2004); *In re Inter-Op Hip Prosthesis Products Liability Litigation*, 149 F. Supp. 2d 931, 933 (J.P.M.L. 2001). The District of New Jersey also has the resources available and the relative congestion of their dockets that weigh in their favor. *See*, *e.g*., *In re GMAC Insurance Management Corp. Overtime Pay Litigation*, 342 F. Supp. 2d 1357 (J.P.M.L. 2004) (the Middle District of Florida had "the resources available to manage this litigation"); *In re Baycol Products Liability*

Case MDL No. 2592 Document 45-1 Filed 11/02/14 Page 19 of 20
Case MDL No. 3089 Document 264-2 Filed 11/02/23 Page 19 of 20

*Litigation*, 2001 WL 34134820 at *2 (J.P.M.L. 2001) (Minnesota courts are "not currently overtaxed …").

The District of New Jersey has a caseload per judgeship less than the national average at 545 pending actions per judge.[12] The district has several MDL dockets with less than 1,000 pending actions combined, and is therefore not overburdened with pending MDL litigation.[13] The Honorable Jerome Simandle, Chief Judge of the District of New Jersey, has stated that the District of New Jersey enjoys handling MDLs and "hope[s] to maintain [its] excellence in complex litigation, including patents, class actions, and multi-district litigation generally." N.J. State Bar Assoc., Federal Practice and Procedure Newsletter, Vol. 7, No. 1, at 8 (June 2013) (available at http://www.archerlaw.com/files/NJSBA_Newsletter_Coghlan_2.pdf (last visited Oct. 30, 2014).

Several judges in the District of New Jersey are well suited and equipped to handle an MDL docket. Judge Martini is currently presiding over 3 MDL proceedings with a combined caseload of 28. *See* Ex. H. Judge Kugler is not presiding over an MDL proceeding. Judge Chesler is currently presiding over 2 MDL proceedings with a total of 8 pending actions. *Id.* Judge Woflson is currently presiding over the *In re Plavix Prods. Liab. and Mktg. Litig*. (MDL 2418), which currently has only 74 cases. *Id.* Judge Simandle is not currently presiding over an MDL proceeding but has handled coordinated proceedings in the past. Each of these judges has considered important *Daubert* and dispositive motions and has managed complex litigation. Most of these judges also have presided over an MDL proceeding.

---

[12] Ex. I, United States District Court, Judicial Caseload Profile (District of New Jersey) (http://www.uscourts.gov/viewer.aspx?doc=/uscourts/Statistics/FederalCourtManagementStatistics/2014/district-fcms-profiles-june-2014.pdf&page=15).

[13] Ex. H, MDL Statistics Report – Distribution of Pending MDL Dockets by District (Oct. 15, 2014) (http://www.jpml.uscourts.gov/sites/jpml/files/Pending_MDL_Dockets_By_District-October-15-2014.pdf ).

The experience of these judges, the caseload in the district, the location of documents and witnesses, the convenience to major airports and abundance of hotels weighs decidedly in favor of the District of New Jersey. Although there is not currently any action pending in New Jersey, considerations of all of these factors weighs decidedly in favor of New Jersey. *See, e.g., In re: Southwestern Life Ins. Co. Sales Practices Litig.*, 268 F. Supp. 2d 1377, 1378 (J.P.M.L. 2003) (finding that although no action was currently pending in the district, it was appropriate to transfer actions there because "relevant documents are likely located there"). Accordingly, any MDL proceeding for Xarelto® should be assigned to Judges Chesler, Kugler, Martini, Simandle or Wolfson.

## IV.

## CONCLUSION

For the foregoing reasons, Plaintiffs' Motion should be denied, or in the alternative an MDL should be assigned to the District of New Jersey.

Dated: October 31, 2014

DRINKER BIDDLE & REATH LLP

By: /s/ Susan M. Sharko
Susan M. Sharko
DRINKER BIDDLE & REATH LLP
600 Campus Drive
Florham Park, NJ 07932-1047
Telephone: (973) 549-7000
Facsimile: (973) 360-9831
susan.sharko@dbr.com

Attorneys for Defendants
JANSSEN PHARMACEUTICALS, INC.,
JANSSEN RESEARCH & DEVELOPMENT,
LLC, JANSSEN ORTHO LLC and JOHNSON
& JOHNSON